**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| ILIFE TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 3:13-cv-04987 |
| v. | § | |
| | § | **Jury Trial Demanded** |
| NINTENDO OF AMERICA INC., | § | |
| | § | |
| Defendant. | § | |

## NINTENDO OF AMERICA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................... 1

II. DISPUTED CONSTRUCTIONS ............................................................................ 2

    A.  "Within Environmental Tolerance"/"Within an Environmental Tolerance"/"Within Said Environmental Tolerance" ........................................... 2

        1.  "Within Environmental Tolerance" Requires a Determination of Whether Potentially Harmful or Intolerable Movement Has Occurred ............................................................................................................ 2

        2.  Nintendo's Construction Does Not Read Out Disclosed Embodiments ........................................................................................... 5

    B.  "Dynamic and Static Accelerative Phenomena of the Body"; "Dynamic Acceleration"; "Static Acceleration" ...................................... 9

        1.  "Static Acceleration" ............................................................................ 9

        2.  Dynamic Acceleration ......................................................................... 10

    C.  "Substantially Continuously Measuring" ........................................................ 12

    D.  "Acceleration Measuring Device" .................................................................... 12

    E.  "Subtracting a Value of Gravitational Acceleration" ........................................ 15

    F.  "Evaluate [or Evaluates or Evaluating] Movement of a Body Relative [to] an Environment"/"Evaluate [or Evaluates] Body Activity Relative to an Environment" ................................................................................................. 17

    G.  "Communication[s] Device"/"System Within a Communication Device" ......... 18

    H.  "An Unsuccessful Attempt to Change Position"; "A Motion of a Body Moving With a Gait Associated With a Disability"; "A Swaying Motion"; "A Near Fall" ................................................................................................. 20

III. CONCLUSION ..................................................................................................... 21

i

# TABLE OF AUTHORITIES

## Cases

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) ............................................................................... 12

*Diamondback Firearms, LLC v. Saeilo, Inc.*,
  No. 10-cv-1664-Orl-28DAB, 2012 WL 4513067 (M.D. Fla. Sept. 30, 2012) ........................ 16

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009). ............................................................................... 11

*Innova/Pure Water Inc. v. Safari Water Filtration Sys. Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ............................................................................... 7

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) ............................................................. 12, 20, 21

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ........................................................................................... 12

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ............................................................................... 17

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................................... 19

*Smartphone Techs. LLC v. Research in Motion Corp.*,
  No. 6:10-CV-74-LED-JDL, 2012 WL 489112 (E.D. Tex. Feb 13, 2012) ............................. 16

*SourceProse Corp. v. AT&T Mobility, LLC*,
  No. 11-cv-117, 2014 WL 28979694 (W.D. Tex. June 24, 2014) ........................................... 16

## I.    INTRODUCTION

The Asserted Patents[1] describe and claim systems for evaluating movement of a body to detect potentially harmful or intolerable movements (*See, e.g.,*'481 Patent, D.I. 1-1 at 1:59-63; Appeal Br. at App. 3.)  In an attempt to capture Nintendo's video game systems, iLife argues for broad constructions that would read out the patents' core concept of detecting potentially harmful or intolerable movements.  In fact, iLife's constructions would render the claims broad enough to cover almost any system that compares acceleration data against a generic predetermined threshold or range, including prior art that the patentee explicitly identified and distinguished in the specifications of the Asserted Patents.

For example, iLife argues that movements of a body are "within environmental tolerance" if they are "acceptable," which in iLife's view "is ultimately a "binary (yes or no) determination of the normality or acceptability of the body movement or activity."  (Nintendo Opening Claim Construction Br., D.I. 51 at 12.)  iLife's construction reads on any determination of whether acceleration data meets a "specified value" – that is, simply comparing the data against a preset value without a qualitative determination of whether the data indicates an "intolerable" movement.[2]  This construction reads broadly on generic evaluation of acceleration data, which the patentee admitted were known in the prior art.

iLife's other proposed constructions are similarly broad.  As discussed further below, iLife's constructions disregard the explicit teachings of the intrinsic record.  In some cases, iLife ignores what it concedes to be express definitions in the specification.  (*See, e.g.,* iLife Opening Claim Construction Br., D.I. 51 at 18 ("This definition does not actually *define* the meaning of

---

[1] U.S. Pat. Nos. 6,307,481 (the "'481 Patent"), 6,703,939 (the "'939 Patent"), 6,864,796 (the "'796 Patent"), 7,095,331 (the "'331 Patent"), 7,145,461 (the "'461 Patent"), and 7,479,890 (the "'890 Patent") (collectively, the "Asserted Patents").
[2] For example, tilting an iPad to cause the screen to change orientations could be characterized as "unacceptable" under iLife's proposed construction.

the term"); 22-23 (ignoring '461 Patents' express definition of "g.").)   In others, iLife

intentionally confuses distinct concepts.   (*See* D.I. 51 at 3 (arguing that "within environmental

tolerance" is the same as the separately-defined term "tolerance indicia.").)   Accordingly, the

Court should reject iLife's proposed constructions and adopt Nintendo's, which (as discussed in

Nintendo's opening brief) are rooted in the claims and intrinsic record.

## II.   DISPUTED CONSTRUCTIONS

### A.   "Within Environmental Tolerance"/"Within an Environmental Tolerance"/"Within Said Environmental Tolerance"

| Defendant's Definition | Plaintiff's Definition |
| --- | --- |
| Not so abnormal as to be damaging, destructive, crippling, harmful, injurious or otherwise alarming or, possibly, distressing to the body relative to the physical system in which the body is located | Acceptable based on criteria including a specified value given the environment and application for which body movement is being evaluated |

iLife's broad construction characterizes "within environmental tolerance" as a

comparison to determine whether sensed acceleration data is "acceptable."   But the Asserted

Patents are clear that determining whether a body movement is "within tolerance" is not just a

comparison between acceleration data and a predefined "acceptable" value or threshold.   Instead,

the term requires further analysis to determine whether an unacceptable or abnormal movement

is nevertheless tolerable or is instead potentially harmful or intolerable to the body.   ('481 Patent,

D.I. 1-1 at 1:55-59.)   iLife's construction seeks to read the fundamental concept of tolerance out

of the claim terms and render the associated limitations effectively unlimited in scope.

### 1.   "Within Environmental Tolerance" Requires a Determination of Whether Potentially Harmful or Intolerable Movement Has Occurred

iLife's proposed construction rewrites the claims to cover any system that uses

acceleration data to determine whether a movement is "***acceptable*** based on criteria including a

specified value," *i.e.*, to make "a binary (yes or no) determination of the ***normality or***

*acceptability* of the body movement or activity."  (D.I. 51 at 12.)  iLife's position is contrary to

the claim language and specification.

The patents are clear that determining whether a movement is "normal" or "abnormal" or

"acceptable" or "unacceptable"[3] is not enough to determine whether that movement is "within an

environmental tolerance" as the claims require.  Instead, each patent demonstrates that analysis is

also required to determine whether an unacceptable movement is beyond tolerance of the body.

This analysis is critical to the Asserted Patents, and each makes this distinction no fewer than

four times:

- explaining that prior art methods could not "evaluat[e] body movement to determine whether the same is *normal or abnormal*; and if abnormal, whether such movement is *so abnormal to be beyond tolerance*."  (*E.g.*, '481 Patent, D.I. 1-1 at 1:55-58);

- describing a processor that is "preferably programmed to distinguish between *normal and abnormal* accelerative events, and, when an abnormal event is identified, to indicate *whether the abnormal event is tolerable, or within tolerance*."  (*E.g.*, *id.* at 2:32-38);

- describing processing "to distinguish a variety of accelerative phenomena and, ultimately, to selectively act based on the distinctions, as is described in detail hereafter to determine Whether the evaluated body movement is *normal or abnormal, and, if abnormal, whether the same is within tolerance*."  (*E.g.*, *id.* at 5:45-54);

- Describing processor that "is programmed to distinguish between *normal and abnormal* accelerative events (e.g., walking, sitting, lying down, etc. versus tripping, falling down, etc.), and, when an abnormal event is identified, indicates *whether the abnormal event is tolerable, or within tolerance*."  (*E.g.*, *id.* at 11:23-28.)

Each patent also clearly illustrates what types of movements are "beyond tolerance":  namely,

movements that are "damaging, destructive, crippling, harmful, injurious, or otherwise alarming

or, possibly, distressing to the body."  (D.I. 49 at 12-13.) (citing '481 Patent, D.I. 1-1 at 1:55-59.)

This determination of whether an abnormal movement is *so abnormal* that it is "beyond

tolerance" and potentially harmful or injurious is the alleged point of novelty of the patents, and

is applicable to the fall detection embodiments of iLife's patents as well as the inactivity

---

[3] The intrinsic record further indicates that "acceptable" and "normal" are synonymous.  (*See* '481 Patent, D.I. 1-1 at 1:31-32 ("These methods fail to discern 'normal,' or acceptable, changes in levels of body activity.").)

embodiments.    In both cases, the movement being evaluated becomes intolerable if the movement is so abnormal as to be potentially harmful or injurious to the body, *i.e.*, not merely normal or abnormal, but intolerable to the body.

Despite the clear guidance in the patents, iLife's proposed construction does nothing to capture this critical distinction, or the explicit illustration of the kinds of movements that are beyond tolerance.    Indeed, iLife's construction would water down the claims to a mere determination of whether a movement was "acceptable" or "unacceptable" for any reason, even if the movement had not yet crossed the line into being an intolerable one.[4]

iLife's broad construction of "within environmental tolerance" would also improperly eliminate the distinction between normal or abnormal and tolerable or intolerable that is the point of novelty emphasized in the patents.    Methods of evaluating movement that were unable to distinguish between normal, abnormal, and intolerable movements as required by the iLife patents were well-known in the prior art, including a number of references discussed on the face of the Asserted Patents.    The "Background of the Invention" sections of the specifications cite, for example, U.S. Patent No. 4,110,741, which claims a device "for monitoring the movements of a person," such as with an accelerometer, that includes an "alarm device … to provide an alarm in the absence of said signals due to the monitored person's '***normal***' movements."[5]    (*See*

---

[4] iLife does not dispute that determining whether a movement is abnormal is not enough to determine whether that movement is within or beyond tolerance.  For example, consistent with the distinction discussed above, the iLife patents describe ways to prevent "an out-of-tolerance abnormal movement" from being "determined incorrectly in response to a single sharp impact, such as a collision between mount 17 and a hard surface when sensor 25 is off the body causing a sharp signal spike."  ('481 Patent, D.I. 1-1 at 7:55-59.)  Thus, a single sharp impact, though abnormal, may still be tolerable.  The Asserted Patents further explain that the concept of "tolerance" changes based on the environment in which the body is located, and so "would likely be very different for a monitored body of an elderly person with a heart condition, a box in a freight car, a container of combustible gas, etc."  (*Id.* at 8:64-67.)  While a fall or sudden sharp impact for any of these "bodies" could constitute an abnormal event, it would not necessarily be intolerable to that particular "body."  For example, a toddler's fall might be an abnormal event, but nevertheless tolerable if the toddler can quickly stand back up and continue moving without injury.

[5] The Asserted Patents discuss many additional references that similarly teach monitoring whether a person's movements are "acceptable" or "normal."  *See, e.g.,* U.S. Pat. No. 4,829,285 at Abstract (disclosing an "alarm for

*id.* at 1:21; '741 Patent at Claim 1.)  The prior art contained "many methods [ ] for sensing body movement, or non-movement," including "methodologies [ ] for the detection of falls."  (*See* '481 Patent, D.I. 1-1 at 1:26-27.)  In fact, the patentee admitted that methods "for determining specific movements of a body … are, generally speaking, known."  (*Id.* at 1:11-13.)  The patentee attempted to distinguish its invention over the crowded prior art field by describing a system capable of "evaluat[ing] body movement over time and to determine whether such movement is **tolerable**."  (*Id.* at 1:59-62.)

In its patents, iLife confirmed that its alleged invention goes beyond the concept of whether a movement is "normal" to determine if an abnormal movement is "tolerable."  (*See, e.g., id* at 1:55-57; 5:48-54.)  The Court should therefore reject iLife's attempt to substitute the term "acceptable" for the claimed term "tolerance."

## 2.    Nintendo's Construction Does Not Read Out Disclosed Embodiments

iLife complains that Nintendo's proposed construction is overly-restrictive because it would limit the claims to fall detection and thereby read out disclosed embodiments.  iLife's arguments fail for several independent reasons.

First, the distinction between abnormal and beyond tolerance appears in each of the iLife patents numerous times, as does iLife's explicit illustration of movements that qualify as beyond tolerance.  However, the patent excerpts that iLife points to as showing that not all embodiments involve dangerous or potentially harmful events appear in only two of the six asserted patents – the later-filed '461 and '890 patents.  In any event, the specific excerpts that iLife points to show that Defendants' construction allegedly excludes embodiments actually involve embodiments that also relate to dangerous or potentially harmful activity.  (iLife Br. at 11, citing '461 Patent,

---

sending out distress information when the user is in an abnormal position"); U.S. Pat. No. 5,879,309 at Claim 1 (disclosing a "Personal motion event monitor" claiming a device that "generates an alarm upon detection of a predetermined activity"); U.S. Pat. No. 5,523,742 at 1:15-17 (disclosing a "motion sensor which detects a particular type of motion over a preselected period of time to then trigger an alarm.").

D.I. 1-5 at 3:53-4:31 (describing embodiments that involve signaling when "e.g., a patient *suffered a stroke* in bed, a *prisoner failed to comply with wearing a monitoring system*, etc." or failed to comply with "a prescribed regimen of activity *to rehabilitate an injury* or *to maintain health*.").) These embodiments clearly describe events that relate to harmful or potentially injurious activity. Nintendo's construction embraces these embodiments and does not limit the claims to fall detection as iLife contends.

iLife counters that "there is nothing in the claims to suggest that the invention is limited to detection of damaging events." (D.I. 51 at 10.) But each asserted claim determines whether a body movement is "within … tolerance" rather than whether movement is "acceptable" or "normal." As described above, whether something is "within … tolerance" is explicitly described in the Asserted Patents as an event that is so abnormal as to be harmful or potentially injurious. Moreover, the determination of whether a movement is "normal" or "abnormal" according to iLife's construction is distinct and separately claimed. For example, independent claim 25 of the '481 Patent does not include the concept of "environmental tolerance," but a method that "distinguishes between *normal* accelerative events and *abnormal* accelerative events."[6]

Second, the examples in the Asserted Patents that iLife claims undercut Nintendo's position (describing "'counts' and other suitable statistics") actually relate to "tolerance indicia," not the disputed claim term that requires determining whether movement is "within an environmental tolerance." For example, iLife's block cite from the '461 Patent, a continuation-in-part of the '939 Patent (which is itself a continuation-in-part of the parent '481 Patent), starts with a sentence mentioning "environmental tolerance," and then uses ellipses to skip over 17

---

[6] iLife has not asserted Claim 25 of the '481 Patent against Nintendo.

lines of text and resume the quotation in the middle of a discussion on the "tolerance indicia"

feature. [7]  Specifically, iLife omits the underlined text:

> Regardless, the principles of the advantageous exemplary embodiment discussed heretofore need at least one accelerative event characteristic to be represented to enable the processor to determine whether the evaluated body activity is within environmental tolerance, which is again advantageously based upon both dynamic and static acceleration measurements.
>
> According to a related advantageous embodiment, the system may be associated with other components or sensing systems. For instance, in an assistance monitoring application, the sensor may repeatedly sense dynamic and static acceleration of the body in the plural axes and generate output signals indicative of the measurements. The processor continuously processes the output signals to distinguish between selected accelerative and non-selected accelerative events (described in detail hereafter) based upon both the dynamic and the static acceleration of the body, and generates state indicia, including tolerance indicia, that is communicated to a monitoring controller.
>
> In an advantageous embodiment, the system processes accumulated data for purposes of determining and selectively signaling if a select (e.g., static, dynamic, variable, etc.) amount of activity has not occur over a select (e.g., static, dynamic, variable, etc.) time period ... Regardless of the purpose, tolerance indicia may suitably to communicated to the monitoring controller for record keeping/statistical purposes, as well as to provide "live" monitoring of the individual subscriber.

(D.I. 51 at 11; '461 Patent, D.I. 1-5 at 3:60-4:9.)  When read in totality, the omitted portion

clarifies that this passage is referring to "tolerance indicia" as "accumulated data" which may be

transmitted to a "monitoring controller" to show a select level of activity over a given period of

time, or "counts" of particular activities.  (*See also id.* at 2:59-3:18.) ("The tolerance indicia is

communicated to the monitoring controller for record keeping/statistical purposes, as well as to

provide 'live' monitoring of the individual subscriber.")[8]

---

7The passage iLife cites was first added to the '461 Patent application years after the parent '481 Patent was filed. The new disclosure introduced in the '461 Patent should be interpreted in a manner consistent with the explicit teachings of the parent '481 Patent. See, e.g., *Innova/Pure Water Inc. v. Safari Water Filtration Sys. Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (emphasis added) ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."). iLife's interpretation of the new disclosure in the '461 Patent is inconsistent with the parent '481 Patent, which teaches that tolerable movements are those that are not potentially harmful or injurious to the body. iLife's interpretation should be rejected because it improperly expands the scope of the claims of the '461 Patent well beyond the scope disclosed in the parent '481 Patent.

8 The patents emphasize this concept elsewhere. (*See, e.g.,* '481 Patent, D.I. 1-1 at 2:19-22, 2:61-62 (explaining that "state indicia," which includes "tolerance indicia," "represents the state of the body within the environment ***over***

In other words, the embodiments on which iLife relies do not relate to environmental tolerance. Instead, these embodiments relate to various potential uses of "tolerance indicia" to evaluate certain conditions, such as "trends in activity levels." (*Id.* at 4:24-25.) The parties' agreed construction of "tolerance indicia" – "information indicating whether evaluated body movement is within environmental tolerance" – reinforces that the use of "tolerance indicia" is distinct from the determination of whether a movement is "within environmental tolerance."

The claims of the patents further illustrate this distinction. Independent claim 1 of each Asserted Patents, for example, requires that the claimed system "determine whether said evaluated body movement is ***within environmental tolerance.***" (*See, e.g.,* '481 Patent, D.I. 1-1 at Claim 1; s*ee also* '461 Patent, D.I. 1-5, at Claim 1.) ("determine whether said evaluated body activity is within environmental tolerance.") That is, the claimed system must determine whether a particular movement is tolerable to the body. "Tolerance indicia," on the other hand, is separately recited in the dependent claims, such as claim 4 of the '481 Patent, which requires that the processor "generates tolerance indicia ***in response to said determination.***" (*See, e.g.,* '481 Patent, D.I. 1-1 at Claim 4; *see also* '461 Patent, D.I. 1-5 at Claim 9 ("said processor generates tolerance indicia in response to said determination."); '481 Patent, D.I. 1-1 at 2:59-64 ("According to a related embodiment, the processor is further operable, in response to processing the sensed accelerative phenomena, to generate state indicia, which includes tolerance indicia, generated in response to determining whether the evaluated body movement is within environmental tolerance.").)

Consistent with the language of the claims and agreed construction, "tolerance indicia" is separate and apart from the determination of whether a movement is "within environmental

---

*time*.") (emphasis added)).

tolerance."[9]  Nintendo's proposed construction properly captures the concept of "environmental tolerance" as described by the patentee and so should be adopted by the Court.

### B. "Dynamic and Static Accelerative Phenomena of the Body"; "Dynamic Acceleration"; "Static Acceleration"

| Term | Defendant's Definition | Plaintiff's Definition |
|---|---|---|
| "static acceleration" | Acceleration experienced as a result of gravity | change in velocity (or acceleration) indicating position [of the body] relative to earth |
| "dynamic acceleration" | Acceleration experienced as a result of motion | Change in velocity (or acceleration) indicating vibration or movement |
| "dynamic and static accelerative phenomena of the body" | Accelerative phenomena experienced as a result of motion and gravity "body" retains its agreed construction | Occurrences of change in velocity (or acceleration) indicating vibration or movement of the body and position of the body relative to earth using gravity as a gauge of position |

The parties dispute with respect to these terms is the appropriate constructions for "static acceleration" and "dynamic acceleration."[10]

### 1. "Static Acceleration"

iLife downplays the portions of the intrinsic record that are inconsistent with its proposed construction of "static acceleration."  For example, the patents state that "static acceleration, *or gravity … is [ ] a gauge of position.*"  (*See, e.g.,* '481 Patent, D.I. 1-1 at 1:44-47.)[11]  A plain

---

[9] iLife also advances several arguments with respect to the remaining portion of iLife's proposed construction, "based on criteria including a specified value given the environment and application for which body movement is being evaluated."  Nintendo does not disagree that the determination of whether a body movement is "within environmental tolerance" may be based on a mathematical value, but iLife is not correct to suggest that this determination require only the use of a single "specified value."  The embodiments iLife cites do not require the use of a single "specified value" (with some examples relying on a plurality of different values) and in any case, these embodiments relate to "tolerance indicia," not "environmental tolerance."  (D.I. 51 at 12-13.)

[10] As discussed in Nintendo's opening brief, "accelerative phenomena" has an agreed construction.  iLife's proposed construction for "dynamic and static accelerative phenomena of the body" simply reads the agreed construction of "accelerative phenomena" in along with iLife's constructions for "dynamic acceleration" and "static acceleration."  There does not appear to be a substantive dispute in the proposed constructions of "dynamic and static accelerative phenomena of the body" other than the appropriate constructions for "dynamic acceleration" and "static acceleration."

[11] *See, also id.* at 5:40-41 ("i.e., static acceleration component related to gravity.")

reading of this phrase indicates that (1) static acceleration *is* acceleration experienced due to gravity and (2) static acceleration can be used as a gauge of position.[12]  Functionally construing "static acceleration" as "indicating position [of the body] relative to earth," as iLife proposes, is not appropriate because static acceleration does not itself "indicate" position.[13]  Rather, static acceleration information is used as a gauge, in combination with other information, to determine position.  To determine position, one needs to know not only static acceleration, but also a frame of reference for the body.  (*See id.* at 5:34-41.) ("sensor 25 generates analog output voltage signals corresponding to measurements in the x and y axes, which include … a dc voltage component proportional to an angle relative to earth (i.e., static acceleration component related to gravity.").  iLife does not dispute this principle.  (*See* D.I. 51 at 16.) ("For example, a change in position of at least 45 degrees may be used in determining whether a particular movement constituted a fall.").

Because static acceleration does not itself "indicat[e] position [of the body] relative to earth," iLife's construction is not accurate.  Nintendo's construction, "acceleration experienced as a result of gravity," is accurate, concise and more helpful to the jury.  Therefore, the Court should adopt Nintendo's construction.

### 2.    Dynamic Acceleration

iLife's proposed construction for "dynamic acceleration" is "change in velocity (or acceleration) indicating vibration or movement."  iLife argues its construction is correct because, according to iLife, the patents define "dynamic acceleration" as, "i.e., vibration, body movement, and the like).  ('481 Patent, D.I. 1-1 at 1:45-46.)  iLife criticizes Nintendo's construction of "dynamic acceleration" as contrary to the inventor's alleged "express definition."  (*Id.* at 15-16.)

---

[12] iLife's own brief discusses that "static acceleration is ***used to*** gauge position."  (D.I. 51 at 16.)
[13] As discussed in Nintendo's opening brief, "orientation" would be a more accurate term than "position."  (D.I. 49 at 20-21.)

However, iLife's construction is no more consistent with the alleged "definitional" statement than Nintendo's. iLife takes the "vibration" and "movement" terms, removes the "and the like" portion of the phrase, and adds the term "indicating."

Nintendo does not disagree that the use of "i.e." can shed light on the meaning of a term. *See, e.g., Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009). However, iLife's addition of the term "indicating" to the "i.e." phrase found in the specification is problematic because dynamic acceleration does not necessarily "indicat[e] vibration or movement." As detailed in Nintendo's opening brief, dynamic acceleration occurs continually even when movement ceases. (*See* '481 Patent, D.I. 1-1 at 1:16-19.) ("many methods are known for sensing body movement, or non-movement (i.e., sensed dynamic accelerations, including cessation of movement.)").

iLife's construction of "dynamic acceleration" is also erroneous because it would include changes in acceleration that do not result from movement, and so therefore fall into the category of what the patent identifies as "static acceleration." For example, the force of gravity (which the Asserted Patents refer to as "static acceleration" (*see, e.g.*, *id. at* 1:44-45)) may appear to indicate movement as a result of changes in the orientation of a body when in fact, no movement has occurred. Adopting iLife's construction of "dynamic acceleration" would therefore cause this term to overlap with the distinct concept of "static acceleration."

Nintendo's construction of "dynamic acceleration" as "acceleration experienced ***as a result*** of motion" does not overlap with "static acceleration" and preserves the separation of these two concepts as taught in the Asserted Patents. Accordingly, the Court should adopt Nintendo's proposed construction of "dynamic acceleration."

## C. "Substantially Continuously Measuring"

| Defendant's Definition | Plaintiff's Definition |
|---|---|
| Indefinite | Plain and ordinary meaning |

iLife's brief does not and cannot explain the difference between "substantially continuous" and "continuous" because the specifications provide no guidance to one of ordinary skill in the art.  For example, iLife states that one of ordinary skill would understand that "for power consumption purposes, it may be preferable to sample the sensor periodically rather than continuously."  (D.I. 51 at 17.)  However, even a "continuous" sampling rate is periodical.  That is, a "continuous" sample is taken at a regular specified time period (e.g., every second, every tenth of a second, etc.), and so is "periodical" because it is repeated at a constant rate.  Accordingly, this statement does not distinguish "substantially continuous" from "continuous."

The Asserted Patents provide no objective guidance as to what sampling rate would be "substantially continuous."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014) ("It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims"); s*ee also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014) ("As we have explained, a term of degree fails to provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'") (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)).  Thus, the meaning of "substantially continuously measuring" is not reasonably certain and the Court should find the term indefinite.

## D. "Acceleration Measuring Device"

| Defendant's Definition | Plaintiff's Definition |
|---|---|
| A plural axis accelerometer mounted on a single monolithic integrated circuit or chip | Plain and ordinary meaning<br>If construed:  A device capable of measuring acceleration. |

iLife argues Nintendo's construction is unduly limiting because it refers to a "plural axis" accelerometer.   But iLife fails to support its position with intrinsic evidence.   All of the embodiments iLife cites refer to or expressly show the use of plural-axis accelerometers.   For example, iLife admits that Figure 11 of the '461 Patent discloses "two plural-axis accelerometers."  (D.I. 51 at 19.)  iLife also characterizes Figure 9 of the '461 Patent as showing "embodiments with three single-axis accelerometers" but this is incorrect.   The description of Figure 9 indicates that "acceleration measuring devices 910, 920 and 930 *may each comprises [sic] a plural axis measuring device of the type previously described*."[14]  ('461 Patent, D.I. 1-5 at 14:32-34.)

In fact, the written description consistently describes the "sens[ing] of dynamic and static acceleration of the body *in plural axes*."  (*E.g.*, '481 Patent, D.I. 1-1 at 2:27-32, 3:6-9.)  And the "acceleration measuring device" term is described only as "a plural-axis (dual shown) acceleration measuring device suitably mounted on a single monolithic integrated circuit (one conventional sensor is an accelerometer available from ANALOG DEVICES, INC., [ ] namely, Model No. ADXL202)."  (*Id.* at 4:66-5:5.)  Indeed, even the prior art described in the patent taught use of "two-axis accelerometers" to detect motion.  (*Id.* at 1:40-41.)  It would be illogical and contrary to the patentee's disclosures to revert to a rudimentary, one-axis accelerometer to carry out the claimed invention.

iLife argues that requiring "each 'acceleration measuring device' to be multi-axis … renders dependent claims reciting multi-axis accelerometers meaningless, which is improper and violates the doctrine of claim differentiation."  (D.I. 51 at 20.)  But the dependent claims iLife

---

[14] iLife characterizes this discussion as referring to Figure 11 (D.I. 51 at 20), but the specification and Figure 9 are clear that acceleration measuring devices 910, 920 and 930 are each part of the embodiment disclosed in Figure 9.

cites to do not support its claim differentiation argument. For example, claim 4 of the '939

Patent states as follows:

> 4. The system set forth in claim 1 wherein said plurality of acceleration measuring devices comprises two plural axis accelerometers in which a first plural axis accelerometer is aligned within a first plane of a three dimensional coordinate system and in which a second plural axis accelerometer is aligned within a second plane of said three dimensional coordinate system.

Claim 4 specifies that the "plurality of acceleration measuring devices" identified in claim 1

comprises two acceleration measuring devices (rather than three or more). Claim 4 further

identifies the particular orientation of the plural axis accelerometers. None of this is disclosed in

independent Claim 1 of the '939 Patent. Far from being superfluous, claim 4 adds claim

elements not required by independent claim 1.

Finally, iLife argues that the acceleration measuring device need not be mounted on a

single monolithic integrated circuit or chip, as is required by Nintendo's construction. (D.I. 51 at

21.) iLife claims Nintendo is relying on an embodiment that is "for the purposes of illustration"

and that "'any sensor that is capable of sensing accelerative phenomena relative to a body may

be used…'" (*Id.* at 21.) (quoting '481 Patent, D.I. 1-1 at 55-59.) iLife's characterization is again

incorrect. The portions of the specification iLife is citing here describe the "sensor," not the

"acceleration measuring device." ('481 Patent, D.I. 1-1 at 4:66-5:2 ("***Sensor 25 is illustratively***

***shown*** as a plural-axis (dual shown) acceleration measuring device suitably mounted on a single

monolithic integrated circuit."); *Id. at* 5:55-59 ("***any sensor*** that is capable of sensing

accelerative phenomena relative to a body may be used ….").) The terms "sensor" and

"acceleration measuring device" are not synonymous; rather, a sensor may comprise multiple

acceleration measuring devices. (*See, e.g.*, '890 Patent, D.I. 1-6 at Claim 1 ("said sensor

comprising a plurality of acceleration measuring devices.").) Thus, iLife fails to rebut

Nintendo's construction.

iLife has not provided a meaningful construction for the term "acceleration measuring device."   Nintendo's proposed construction, on the other hand, is fully consistent with the specifications of the Asserted Patents.  Accordingly, the Court should adopt Nintendo's proposed construction.

### E.   "Subtracting a Value of Gravitational Acceleration"

| Defendant's Definition | Plaintiff's Definition |
|---|---|
| Subtracting a value of one "g" | Plain and ordinary meaning<br>If construed:  subtracting a value for gravity |

Nintendo's proposed construction of "subtracting a value of one 'g'" is correct.   As discussed in Nintendo's Opening Brief, the intrinsic record confirms Nintendo's construction and, in fact, only Nintendo's construction makes sense in the context of the claims.  iLife even agrees that "Defendant's proposed construction is consistent with [the specification's] explanation."  (D.I. 51 at 23.)

Nevertheless, iLife argues that Nintendo's proposed construction "does not clarify the meaning of the claim language and adds potential ambiguity."  (*Id.* at 23.)  Nintendo's proposed construction of "one 'g'" provides an exact value—the very antithesis of "ambiguity."  One 'g' is a widely understood mathematical constant and ***is expressly defined in the specification:***  "The value 'g' is the acceleration of gravity at the surface of the earth (32 feet/sec$^2$ or 9.8 m/sec$^2$)."[15] ('461 Patent, D.I. 1-5 at 7:13-15.)   One "g" is a far more precise definition than iLife's intentionally vague constructions of "plain and ordinary meaning" or "subtracting a value for gravity."

---

[15] Again, iLife attempts to selectively choose when it will be bound by the lexicographic definitions present in its own patents.

iLife's brief ignores the intrinsic record in favor of extrinsic evidence with dubious relevance. For example, iLife cites to Wikipedia[16] to argue that the defined value of one "g" can vary by several hundredths of a meter per second squared depending on where one stands on the Earth's surface. (D.I. 51 at 23.) According to iLife, this slight variance renders Nintendo's construction ambiguous. (*Id.*)

iLife's argument is incorrect. iLife confuses "acceleration of gravity", with one "g." These are different concepts. One "g" is the international unit for standard acceleration due to gravity and is defined as 9.80665 meters per second squared. (*See* App. at 26.) ("The value adopted in the International Service of Weights and Measures for the standard acceleration due to gravity is 980.665 cm/s2, value already stated in the laws of some countries."); (*see also* '461 Patent, D.I. 1-5 at 7:13-15.) "Acceleration of gravity" changes very slightly at different locations around the globe, but the defined value of one "g" does not. As discussed in both iLife and Nintendo's opening brief, the patents teach "subtract[ing] the value of one 'g' from the total acceleration" not the "acceleration of gravity." (*Id.* at 17:1-2.)

Tellingly, iLife cites no intrinsic support for its own proposed constructions. iLife's assertion that its construction is "essentially the same" as Nintendo's (D.I. 51 at 23) is not true. iLife's proposed constructions of "plain and ordinary meaning" or "subtracting a value for gravity" are non-constructions that would allow iLife to argue that ***any*** value for gravity can be

---

[16] Courts have often declined to rely on Wikipedia, finding it unreliable and inaccurate. *See, e.g., Smartphone Techs. LLC v. Research in Motion Corp.,* No. 6:10-CV-74-LED-JDL, 2012 WL 489112, at *5, n.3 (E.D. Tex. Feb 13, 2012) (characterizing information from Wikipedia entries as potentially "unreliable," changing "on a day-to-day basis," and suffering from "other more fundamental problems"); *SourceProse Corp. v. AT&T Mobility, LLC,* No. 11-cv-117, 2014 WL 28979694, *14 n.5 (W.D. Tex. June 24, 2014) ("in proffering the Wikipedia definition, SourceProse does not assert that a person skilled in the relevant art would have 'commonly understood' the Wikipedia definition at the time of the invention or that the Wikipedia definition is related to a technical or scientific dictionary definition that would have been 'commonly understood' at that time. Given the susceptibility of Wikipedia entries to inaccurate, untimely, or incomplete information, this court and many other courts - caution against using Wikipedia citations as primary support for legal arguments."); *Diamondback Firearms, LLC v. Saeilo, Inc.,* No. 10-cv-1664-Orl-28DAB, 2012 WL 4513067, *9, n.8 (M.D. Fla. Sept. 30, 2012) ("the Court declines to rely on Wikipedia in addressing claim construction.").

subtracted. But, as explained above, in Nintendo's opening brief (D.I. 49 at 23-25), and in iLife's opening brief (D.I. 51 at 22-23), the Asserted Patents explicitly require subtracting a value of one "g" to determine whether a body has experienced dynamic acceleration.

F.  **"Evaluate [or Evaluates or Evaluating] Movement of a Body Relative [to] an Environment"/"Evaluate [or Evaluates] Body Activity Relative to an Environment"**

| (a) Defendant's Definition | (b) Plaintiff's Definition |
|---|---|
| Evaluate [or evaluates or evaluating] movement of a body relative to the conditions and the influences of the physical system in which the body is located / Evaluate [or evaluates] body activity relative to the conditions and the influences of the physical system in which the body is located | Plain and ordinary meaning<br>See the agreed term "environment" |

iLife offers two arguments against Nintendo's proposed construction. First, iLife raises issue with Nintendo proposing the same construction for both "evaluate *movement of a body* relative to an environment" and "evaluate *body activity* relative to an environment." The Asserted Patents indicate little substantive difference between these two phrases. "Body activity" was added to the '461 Patent, primarily to expand the scope of the claims to include inactive states. (*See, e.g.,* '461 Patent, D.I. 1-5 at Claim 3.) Nevertheless, to address iLife's concern, Nintendo agrees to construe the term "evaluate body activity relative to an environment" as "evaluate *body activity* relative to the conditions and the influences of the physical system in which the body is located."

iLife also argues that "Defendant's proposed construction incorporates the meaning of the term 'environment,' which is unnecessary because the term is independently defined." The fact that a term being construed contains other terms with agreed definitions does not mean that the term does not need construed. *See O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper

scope of these claims, the court, not the jury, must resolve that dispute."). Here, adding the agreed definition of "environment" to this term will assist the trier of fact because it clarifies that the movement of the body is being evaluated against the environment the body is located in. (D.I. 49 at 11.) Without construction, the "an environment" limitation could improperly be read as *any* environment.

iLife's argument is further belied by the fact that iLife's proposed construction for "dynamic and static accelerative phenomena of the body" incorporates the agreed construction of "accelerative phenomena" as well as iLife's proposed constructions for "dynamic acceleration" and "static acceleration." (D.I. 51 at 13-14.) iLife cannot complain that explicitly incorporating agreed definitions into constructions is "unnecessary" when it engages in the same practice.

### G.    "Communication[s] Device"/"System Within a Communication Device"

| Defendant's Definition | Plaintiff's Definition |
|---|---|
| Device comprising cellular telephones, personal digital assistants, hand held computers, laptops, computers, wireless Internet access devices, and other similar types of communications equipment | Plain and ordinary meaning<br><br>If construed:<br>    A device capable of communication, which may include, without limitation, cellular telephones, personal digital assistants, hand held computers, laptops, computers, wireless Internet access devices, and other similar types of communications equipment. |

As discussed in Nintendo's opening brief, only the '796 Patent claims use the term "communication[s] device." The '796 specification lexicographically defines "communication device" as follows:

> The term "communication device" *is defined broadly to include*, without limitation, cellular telephones, personal digital assistants, hand held computers, laptops, computers, wireless Internet access devices, and other similar types of communications equipment.

('796 Patent, D.I. 1-3 at 2:46-50.) Nintendo proposes this lexicographic definition in its construction.

Notwithstanding this broad lexicographic definition, iLife insists that "the term 'communication device' does not require construction." (D.I. 51 at 17.) This is incorrect. As iLife argues elsewhere, "Courts are bound by an inventor's express definition of a term." (*Id.* at 15.) *See also Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) ("the inventor's lexicography governs").

While admitting this phrase *is* a "definition," iLife nevertheless insists that "this definition does not actually define the meaning of the term but offers only a non-limiting list of examples, which includes the open-ended catchall 'other similar types of communications equipment.'" (D.I. 51 at 18.) The definition *explicitly defines* the term "communication device." And Nintendo's construction captures the "catchall" phrase of "other similar types of communications equipment" that iLife references.

iLife's construction improperly broadens the term "communication device" beyond the definition the patentee provided by inserting the word "may," so that the term would mean, "a device capable of communication, which *may* include, without limitation, cellular telephones, personal digital assistants, hand held computers, laptops, computers, wireless Internet access devices, and other similar types of communications equipment." (*Id.*) The insertion of "may" effectively renders the construction identical to iLife's original construction of "a device capable of communication" because it allows "communication device" to read on any device, rather than devices similar to cellular phones and the other exemplary types of communication devices that the patentee identified. This is inconsistent with the patentee's definition.

iLife cannot pick and chose among the patentee's definitions only when it deems them advantageous. Construing "communication device" as iLife suggests would not only be contrary to the patentee's definition, it would broaden this already-broad term to the point of being meaningless. Accordingly, the Court should adopt Nintendo's proposed construction.

19

H.   **"An Unsuccessful Attempt to Change Position"; "A Motion of a Body Moving With a Gait Associated With a Disability"; "A Swaying Motion"; "A Near Fall"**

| Term | Defendant's Definition | Plaintiff's Definition |
| --- | --- | --- |
| "an unsuccessful attempt to change position" | Indefinite | Plain and ordinary meaning |
| "a motion of a body moving with a gait associated with a disability" | Indefinite | Plain and ordinary meaning |
| "a swaying motion" | Indefinite | Plain and ordinary meaning |
| "a near fall" | Indefinite | Plain and ordinary meaning |

iLife's opening brief does not explain how one of ordinary skill would understand the scope of these terms with reasonable certainty. Instead, iLife parrots back the portions of the specification that mention these terms and states "one of ordinary skill in the art, reading the claims in light of the specification, would understand the scope of the claims with reasonable certainty." But iLife does not provide proposed constructions or provide any extrinsic evidence as to what these terms would mean to one of ordinary skill in the art. (*Id.* at 25.)

The Asserted Patents do not explain what "an unsuccessful attempt to change position" means. This phrase was first introduced in the specification of the '939 Patent and is only mentioned once in passing. ('939 Patent, D.I. 1-2 at 16:54-56.) iLife does not attempt to ascribe any meaning to the term. Without some description in the specification, this subjective term should be held indefinite. *Interval Licensing,* 766 F.3d at 1371 (holding the "highly subjective" term "unobtrusive manner" indefinite where the term "on its face, provides little guidance to one skilled in the art.")

The Asserted Patents similarly fail to describe the other terms in this grouping. iLife argues that "a swaying motion" is "the motion of a person who is unsteady and swaying back and forth." (D.I. 51 at 25.) But defining this term by restating it—*i.e.*, that a "person" with a "swaying motion" "sway[s] back and forth"—is not helpful. iLife takes this same flawed

approach with other terms such as "near fall." (*Id.*) ("'a near fall' occurs when 'a person loses his or her balance but recovers in time to keep from actually falling.'"). These terms lack the reasonable certainness with which the specification describes other claim terms, such as "fall." Depending on the subjective interpretation of the reader, many different motions could be interpreted as a "swaying motion" or a "near fall." *Interval Licensing,* 766 F.3d at 1371.

iLife does identify that "a motion of a body moving with a disability" could include "e.g., limping." (D.I. 51 at 25.) But this single vague example is not enough to render the term definite. Many different gaits could subjectively be interpreted as "moving with a disability." *See, e.g., Interval Licensing,* 766 F.3d at 1373 ("we decline to cull out a single 'e.g.' phrase from a lengthy written description to serve as the exclusive definition of a facially subjective claim term.") Because one of ordinary skill in the art could not determine the scope of these claims with reasonable certainty, the Court should hold that the claims including these terms are indefinite.

## III.   CONCLUSION

For the reasons above, Nintendo respectfully asks the Court to adopt its proposed constructions, which are fully supported by the intrinsic record. The Asserted Patents describe and claim systems and methods for identifying abnormal and potentially intolerable events such as falls. iLife's constructions go well past the intrinsic record and attempt to reclaim scope that was already in the prior art of record. Accordingly, iLife's constructions should be rejected in favor of Nintendo's.

Dated:  December 15, 2014                    Respectfully submitted,


                                            */s/   Thomas C. Wright*
                                            Thomas C. Wright
                                            Texas State Bar No. 24028146
                                            Alex J. Whitman
                                            Texas State Bar No. 24081210
                                            3500 Maple Avenue, Suite 900
                                            Dallas, TX 75219
                                            Telephone: (214) 752-8600
                                            Fax: (214) 752-8600
                                            twright@rosewalker.com
                                            awhitman@rosewalker.com


                                            Of Counsel:

                                            Stephen R. Smith (*Pro Hac Vice*)
                                            Stephen P. McBride (*Pro Hac Vice*)
                                            Laura J. Cunningham (*Pro Hac Vice*)
                                            Cooley LLP
                                            11951 Freedom Drive
                                            Suite 1600
                                            Reston, VA 20190-5656
                                            (703) 456-8000
                                            stephen.smith@cooley.com
                                            smcbride@cooley.com
                                            lcunningham@cooley.com


                                            *Attorneys for Defendant*
                                            *Nintendo of America, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing **NINTENDO OF AMERICA, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** was served via CM/ECF upon all counsel of record on December 15, 2014.

*/s/ Thomas C. Wright*