**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| ILIFE TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:13-cv-04987-M |
| | § | |
| NINTENDO OF AMERICA, INC., | § | |
| | § | |
| Defendant. | § | |

---

## MEMORANDUM OPINION AND ORDER

On September 20, 2016, the Court held a claim construction hearing to determine the proper construction of the disputed claim terms in United States Patent No. 6,864,796 ("the '796 patent"). Having reviewed the claims, specification, prosecution history, and having considered the parties' arguments and the applicable law, the Court issues this Claim Construction Order.

## I.   BACKGROUND

### a.   PROCEDURAL HISTORY

On January 27, 2015, the Court held a claim construction hearing to construe various terms disputed by the parties. Before an order issued, Nintendo moved to stay the case on the institution of *inter partes* review ("IPR") of the six Asserted Patents. The case was stayed on May 18, 2015 [ECF No. 91].

On April 28, 2016, the PTAB issued its Final Written Decisions in the IPRs, invalidating the asserted claims of five of iLife's patents. The '796 patent was upheld by the PTAB as valid. *Nintendo of America, Inc. v. iLife Technologies, Inc.*, IPR2015-00109, Paper 40 (PTAB Apr. 28, 2016). iLife has not appealed the decisions invalidating other asserted claims and seeks to proceed on the '796 patent, the only remaining live patent. On June 29, 2016, Nintendo appealed

1

the PTAB's decision to uphold the '796 patent to the Federal Circuit, but no decision has yet issued.

This Court lifted the stay on July 11, 2016.  During the course of the stay and the IPR proceedings, the parties presented new arguments that could impact the construction of disputed terms that had previously been considered by the Court in the January 27, 2015, Claim Construction Hearing.  The parties also asserted that new information arising from the IPRs required the construction of two additional terms as to which no constructions had been urged at the January 2015 hearing.  On August 11, 2016, the Court ordered a second *Markman* hearing and directed the parties to provide supplemental briefing on the additional terms.

### b.  BACKGROUND OF THE '796 PATENT

The '796 patent generally discloses systems and methods for evaluating movement or activity of a body relative to an environment.  The system is capable of analyzing both body movement and position over time, to determine if the movement of the body is "acceptable or unacceptable," which the patent describes as being within or beyond "tolerance."  The initial commercial product was a fall detection device intended for use by elderly patients.

The '796 patent states that prior art methods fail to discern normal, acceptable, or unacceptable changes in levels of body activity.  '796 Patent at 1:53–58.  The '796 specification acknowledges that "accelerometers that measure both static and dynamic acceleration are known," but states that "their primary use has heretofore been substantially confined to applications directed to measuring one or the other, but not both."  *Id*. at 2:1–4.  The specification distinguishes between "static acceleration, or gravity," which is "a gauge of position," versus "dynamic acceleration (i.e., vibration, body movement, and the like)."  *Id*. at 1:65–2:1.  The system described in the '796 patent includes a sensor associated with the body

that operates to repeatedly sense dynamic and static accelerative phenomena of the body.  *Id*. at 2:53–55.  The sensor "senses one or more absolute values, changes in value, or some combination of the same" and may be "a plural-axis sensor" that "generates an output signal to the processor indicative of measurements of both dynamic and static acceleration of the body in plural axes."  *Id*. at 2:64–3:5, 5:46–52.  The processor "generates state indicia relative the environment of interest, and determines whether the evaluated body movement is within tolerance in the context of that environment."  *Id*. at 9:48–51.  The specification of the '796 patent states that "'tolerance' would . . . be very different for a monitored body of an elderly person . . . , a toddler, a box in a freight car, a container of combustible gas, etc."  *Id*. at 9:51–54.

The relevant, disputed claims are provided below:

Claim 1)

A system within a communications device capable of evaluating movement of a body relative to an environment, said system comprising:

a sensor, associable with said body, that senses dynamic and static accelerative phenomena of said body, and

a processor, associated with said sensor, that processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance

wherein said processor generates tolerance indicia in response to said determination; and

wherein said communication device transmits said tolerance indicia.

Claim 2)

The system as claimed in claim 1 wherein said communications device comprises one of: a cordless telephone, a cellular telephone and a personal digital assistant.

Claim 3)

The system as claimed in claim 1 wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device.

Claim 4)

The system claimed in claim 1 wherein said communications device transmits an alarm signal when said processor determines that an evaluated body movement signifies an occurrence of a potentially dangerous event.

Claim 7)

The system as claimed in claim 4 wherein said communications device transmits said alarm signal through one of: a wired network and a wireless network.

Claim 8)

The method as claimed in claim 4 wherein said communications device transmits said alarm signal through a portion of the Internet.

Claim 9)

The system as claimed in claim 1 wherein said communications device transmits said tolerance indicia to a monitoring controller.

Claim 10)

A method for operating a system within a communications device, wherein said system is capable of evaluating movement of a body relative to an environment, wherein said system comprises a sensor, associable with said body, that senses dynamic and static accelerative phenomena of said body, and

a processor, associated with said sensor, that processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance, wherein said method comprises the steps of:

generating tolerance indicia in said processor in response to said determination of whether said evaluated body movement is within said environmental tolerance; and

transmitting said tolerance indicia through said communications device.

Claim 11)

The method as claimed in claim 10 wherein said communications device comprises one of: a cordless telephone, a cellular telephone and a personal digital assistant.

Claim 12)

The method as claimed in claim 10 wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device.

4

Claim 13)

The method as claimed in claim 10 wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device.

> Claim 16)
>
> The method as claimed in claim 13 further comprising the step of: transmitting said alarm signal from said communications device through one of: a wired network and a wireless network.
>
> Claim 17)
>
> The method as claimed in claim 13 further comprising the step of: transmitting said alarm signal from said communications device through a portion of the Internet.

Claim 18)

The method as claimed in claim 10 wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device.

Claim 19)

The method as claimed in claim 10 wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device.

Claim 20)

The method as claimed in claim 10 wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device.

## II.   APPLICABLE LAW

The construction of disputed claims is a question of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 971–72 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citations omitted). Accordingly, a proper construction "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Id.* (citations omitted).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1303 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Courts first "look to the words of the claims themselves . . . to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted). The claim terms are "generally given their ordinary and customary meaning;" however, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Id.* (citation omitted).  The "ordinary and customary meaning" of the terms in a claim is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13.

When the meaning of a term to a person of ordinary skill in the art is not apparent, a court is required to consult other sources, including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (citations omitted).  A court must consider the context in which the term is used in an asserted claim or related claims in the patent, being mindful that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.  The specification is "always highly relevant to the claim construction analysis" and is "the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  For example, should the specification reveal that a claim term has been given a special definition by the patentee that is different from the ordinary meaning of the term, the inventor's lexicography

is controlling. *Id.* at 1316 (citation omitted). Furthermore, if the specification reveals an intentional disclaimer or disavowal of claim scope by the patentee, the claim scope dictated by the specification is controlling. *Id.* (citation omitted).

If in evidence, a court should also consider the prosecution history, including prior art and the record of proceedings before the Patent and Trademark Office (PTO). *Id.* at 1317 (citing *Markman*, 52 F.3d at 980). For claim construction purposes, the prosecution history is considered to be less reliable than the specification, if only because the prosecution history merely illustrates an ongoing negotiation between the patentee and the PTO, and not necessarily the final product of that negotiation. *Id.*

Finally, in construing claims, a court may consult extrinsic evidence, including "expert and inventor testimony, dictionaries, and learned treatises." *Id.* (citing *Markman*, 52 F.3d at 980). Technical dictionaries may assist a court in "'better understand[ing] the underlying technology' and the way in which one of skill in the art might use the claim terms." *Id.* (quoting *Vitronics*, 90 F.3d at 1584 n.6). Expert testimony may also be helpful to "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* (citations omitted).

Although extrinsic evidence may "shed useful light on the relevant art," it is considered "less significant than the intrinsic record." *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). More simply, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319. Accordingly, "a court should

discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'"   *Id.* at 1318 (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

Patent claims can be construed by the PTAB during *inter partes* review.  District courts have differed in how they approach these PTAB construction decisions.  The PTAB's claim construction rules differ slightly from those applied in district court; during an IPR, the claim terms in an unexpired patent are interpreted according to their broadest reasonable construction, in light of the specification of the patent in which they appear.  37 C.F.R. § 42(b) (2015); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275–79 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016).

Some courts consider PTAB decisions similarly to how they evaluate claim construction decisions from other districts or judges, and give "reasoned deference" to PTAB's constructions.  *E.g.*, *Contentguard Holdings, Inc. v. Amazon.com, Inc.*, No. 2:13-cv-1112, 2015 WL 8073722, at *11 (E.D. Tex. Dec. 4, 2015) ("On balance, Plaintiff has failed to justify departing from the PTAB's construction, which is entitled to 'reasoned deference.'"); *see also Maurice Mitchell Innovations, L.P. v. Intel Corp.*, No. 2:04-cv-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (stating a district court's earlier construction of claim limitations is entitled "to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman,* even though *stare decisis* may not be applicable *per se*").

Other courts look to a PTAB decision only for guidance or comfort in reaching claim construction decisions.  *Memory Integrity, LLC v. Intel Corp.*, No. 3:15-cv-00262, 2016 WL

1122718, at *19 n.9 (D. Or. Mar. 2, 2016) ("PTAB decisions may at least provide a district court

with guidance. . . .  This Court uses the PTAB decision on this issue not for guidance, but for

comfort."); *Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, No. C–13–04513, 2014 WL

4802426, at *4 (N.D. Cal. Sept. 26, 2014) ("While the PTAB's constructions will not be binding

on this court, the IPR will inform this court's ultimate reasoning.").  Others have suggested that

the PTAB's claim construction decisions are intrinsic evidence of the claim's meaning as part of

the patent's prosecution history.  *E.g.*, *Anglefix, LLC v. Wright Med. Tech., Inc.*, No. 2:13-cv-

02407, 2015 WL 9581865, at *7 (W.D. Tenn. Dec. 30, 2015) (noting that "[a] patentee's

statements during reexamination can be considered during claim construction" and that "IPR and

post-grant review have effectively replaced inter partes reexamination procedures"); *Fairfield*

*Indus., Inv. V. Wireless Seismic, Inc.*, No. 4:14–CV–2972, 2015 WL 1034275, at *5 (S.D. Tex.

Mar. 10, 2015) ("The prosecution history of the patents-in-suit also bolsters Fairfield's

construction. . . .  Although [the] PTAB applies a different construction standard than the district

courts do, its [IPR] claim construction analysis serves as further intrinsic evidence that Fairfield's

proposed construction is appropriate.").  However, some courts have treated PTAB claim

construction decisions as extrinsic evidence, to which the district court "owes no deference."

*Depuy Orthopaedics, Inc. v. Orthopaedic Hosp.*, No. 3:12-CV-299, 2016 WL 96164, at *5 (N.D.

Ind. Jan. 8, 2016) ("Extrinsic evidence may include a PTAB decision regarding IPR, but the

court 'owes no deference to the PTAB's claim construction done as part of an inter partes

review.'").

## III.   CONSTRUCTION OF AGREED TERMS

| Claim Term / Phrase | Agreed Construction |
|---|---|
| Body | any organic or inorganic object whose movement or position may suitably be evaluated relative to its environment |
| Environment | the conditions and the influences that determine the behavior of the physical system in which the body is located |
| Accelerative Phenomena / Accelerative Events | occurrences of change in velocity of the body (or acceleration), whether in magnitude, direction or both |
| Associable / associable with / associable with said body / associable with a sensor / associated with said sensor / | to include, be included within, interconnect with, contain, be contained within, connect to or with, couple to or with, be communicable with, cooperate with, interleave, juxtapose, be proximate to, be bound to or with, have, have a property of, or the like |
| Processor / Controller | any device, system or part thereof that controls at least one operation, such a device may be implemented in hardware, firmware or software, or some suitable combination of at least two of the same |
| Sensor | a device that senses one or more absolute values, changes in value, or some combination of the same, of at least the sensed accelerative phenomena |
| Tolerance Indicia | information indicating whether evaluated body movement is within environmental tolerance |
| Accelerative Event Characteristic | Plain and ordinary meaning [subject to express definition of "accelerative event"] |

These agreed terms are taken from the initial briefing filed in preparation for the 2015 *Markman* hearing.  The 2015 briefs also contained additional agreed terms that do not appear in the '796 patent, which is the only remaining patent at issue, and therefore are not included in this table.  In view of the parties' agreement on the proper construction of each of the foregoing terms, the Court hereby **ADOPTS AND APPROVES** the parties' agreed constructions.

## IV.   CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of the terms "communication[s] device," "evaluating movement of a body relative to an environment," "processes said sensed dynamic

and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance," "dynamic and static accelerative phenomena," and "within environmental tolerance."

### a. "Communication[s] device"

| Disputed Term | iLife's Proposed Construction | Nintendo's Proposed Construction | Court's Construction |
|---|---|---|---|
| "Communication[s] device" <br><br> Claims 1–4, 7–13, 16–20 | One or more associated components capable of transmission of information using a wired or wireless network | An existing device that allows for interpersonal communication including at least "cellular telephones, personal digital assistants, hand held computers, laptops, computers, wireless Internet access devices, or other similar types of communications equipment" | One device or one or more associated components acting together capable of transmission of information using a wired or wireless network |

### i. The Parties' Arguments

At the first *Markman* hearing in 2015, this term was not disputed and neither party provided briefing on the proper construction. However, the IPR proceedings raised issues relating to the scope of this term, and the parties requested an opportunity to argue for the correct construction. PTAB ordered additional briefing on the construction of communication device because the parties disputed whether the devices were required to engage in two-way communication. PTAB eventually construed the term to mean that two-way communication was not necessary.

The specification provides a definition of the contested term as follows:

The term "communication device" is defined broadly to include, without limitation,

cellular telephones, personal digital assistants, hand held computers, laptops, computers, wireless Internet access devices, and other similar types of communications equipment.

'796 Patent, 2:46–50.

iLife maintains that "communication device" is a broad term, covering a "multi-component device, including a device in which the sensors and processor are not located within the same housing and are associated wirelessly." ECF No. 113 at 2. iLife relies on the specification's definition in support of its broad definition, in particular the qualification that the term is not limited to the examples provided in the definition. In support of the inclusion of language permitting wireless and wired communication, iLife points to where the patent describes systems in which components are "distributed"—meaning "the processor and sensor are not co-located but rather associated wirelessly," such as claim 3's reference to a "wireless Internet access device." Furthermore, iLife maintains that two-way or interpersonal communication is not required, alleging that the claims only describe devices that transmit information, not receive it. The patent only describes devices that communicate with other devices, and thus, iLife argues, "interpersonal" is an inappropriate adjective to include in the construction. For support, iLife points to the claim construction of "communication device" in the IPR, where the PTAB rejected Nintendo's argument that the term excluded radio frequency transmitters and included only devices with two-way communication. ECF No. 113 at 2–3.

Nintendo's proposed construction incorporates the definition provided in the '796 patent's specification, and requires that a "communications device" include at least the types of consumer electronic devices there described. In support of this construction, Nintendo argues (1) the specification refers to a "communication device" as including the types identified in the proposed construction; (2) all the communication devices identified in the patent are existing devices that allow for interpersonal communication; (3) iLife's proposed construction that

includes mere component parts as opposed to fully functional devices is nonsensical in the context of statements made in the specification, such as "[t]he general use of communication devices has increased greatly over the last few years," '796 Patent at 2:18–19, and "[i]t would be very useful to have a communications device that is capable of evaluating movement of a body," '796 Patent at 2:25–17; and (4) statements made by the inventor of the '796 patent, Edward Massman, show that a communication device is an existing device that allows for interpersonal communication, and not merely a component. Massman submitted a declaration in the IPR proceeding explaining why he was an inventor on the '796 patent, but not the related '481 patent, which does not disclose a communication device. After the '481 patent application was submitted, Massman explains, he and the other inventors conceived of additional applications of the invention, "including incorporating the invention within a cellphone," and that "[l]ater patents describe and claim such embodiments." This declaration, Nintendo maintains, makes clear that the communication device described in the '796 patent is not merely a component, but instead consists of an existing device such as a cell phone. ECF No. 115 at 11–13.

Nintendo further maintains that iLife's construction is flawed because it does not require two-way communication, and virtually any electronic device that could send information over a wire would qualify as a communication device. Instead, Nintendo maintains, the plain and ordinary meaning of "communication device" includes a device capable of both sending and receiving messages. Nintendo points to language of the claims in refuting iLife's proposed construction: the claim language requires that the sensor and processor of the claimed invention be "*within* a communications device," and that if "communications device" includes mere components, as proposed by iLife, the "within" language would be read out. *See, e.g.*, '796 Patent at 2:47–49.

### ii.  Analysis

Nintendo's proposed construction is unpersuasive.  Nintendo's construction originates in the language of the specification, which defines the term.  Generally, "[t]he patent's specification is the 'single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  When an inventor defines a term in the specification, "the inventor's lexicography governs."  *Id.* at 1316; *see also, e.g.*, *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004) ("The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history.").  Although the Court may not "import limitations from the written description into the claims," it is bound to construe the terms as they are defined in the specification.  *Phillips*, 415 F.3d at 1323.

Neither party disputes the definition in the specification.  However, in its proposed construction, Nintendo narrows this definition so as to require that a communication device be "existing" and allow for "interpersonal communication."  Nintendo justifies the inclusion of "interpersonal communication" by arguing that iLife's proposed construction is too broad, in that it would expand "communications device" beyond its plain and ordinary meaning.  The language of the claims, however, does not support the requirement that the invention be capable of both sending and receiving information.  Considering the express language of independent claims 1 and 10, claim 1 recites a "system within a communications device capable of evaluating movement of a body relative to an environment . . . wherein said communication device transmits said tolerance indicia," and claim 10 recites a "method for operating a system within a communications device . . . wherein said method comprises the steps of . . . transmitting said tolerance indicia through said communications device."  '796 Patent at 13:45–61, 14:19–36.  It thus appears that claims 1 and 10 only require that the "communications device" transmit

14

tolerance indicia, and does not require two-way capability.  Nintendo may argue that the devices

identified in the patent appear to be devices that allow for interpersonal communication, but it

would be improper to read an implied limitation from the specification into the claim language.

*SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

Nintendo's argument that "communications devices" comprise only "existing devices"

and cannot consist of component parts is unsupported by the intrinsic evidence.  The qualifiers

"broadly," "without limitation," and "other similar types of communications equipment" in the

specification's definition indicate that the patent was not intended to limit a communication

device to the particular list of examples provided in the definition, or even to "existing" devices.

*See* '796 Patent at 2:45–50.  Nintendo never satisfactorily explains why it chooses to introduce

"existing" into the specification's definition, particularly as the word existing appears nowhere in

the patent and introduces its own ambiguities.  Furthermore, Nintendo's reliance on Massman's

declaration submitted during the IPR proceeding is unconvincing.  Although Massman's

statements during the IPR may be considered for prosecution disclaimer, they do not rise to the

level of "unambiguous disavowals" so as to be binding on the patentee.  *Grober v. Mako Prods.*,

686 F.3d 1335, 1341 (Fed. Cir. 2012).

Although Nintendo's proposed construction is unconvincing, iLife's proposal is not

without faults.  iLife urges the Court to adopt a construction that includes the phrase "one or

more associated components," which perplexingly permits the existence of one associated

component.

With its proposal, iLife seeks a construction broad enough to cover both multi-

component devices and a preferred embodiment in the patent.  The independent claims of the

'796 patent require a communications device to contain a system that comprises a sensor and a

processor:

> A system within a communications device . . . , said system comprising: a
> sensor, . . . and a processor, . . . wherein said processor generates tolerance
> indicia . . . and wherein said communication device transmits said tolerance
> indicia.

'796 Patent at 13:47–50.

The dependent claims in the '796 patent refer to a communication device as being a

cordless telephone, a cellular telephone, a personal digital assistant, a hand held computer, a

laptop computer, or a wireless Internet access device.  However, a preferred embodiment of the

'796 patent describes how the sensor and processor, which are key parts of the invention, are

"not co-located, but rather associated wirelessly." '796 Patent at 7:28–30.  Thus, the construction

of "communication device" must be broad enough to cover this preferred embodiment, hence

iLife's urging for a construction that permits for a communication device to be one component

(as in the cellular telephones, handheld computers, etc.), but also an embodiment where the

sensor and processor components are merely "associated."

The Court agrees with iLife that the construction of "communications device" must be

broad enough to cover this preferred embodiment.  However, it declines to adopt a

grammatically incorrect phrase that likely introduces error or confusion.  Accordingly, the Court

defines "communication device" to mean "one device or one or more associated components

acting together capable of transmission of information using a wired or wireless network."

**b. "Evaluating movement of a body relative to an environment"**

| Disputed Term | iLife's Proposed Construction | Nintendo's Proposed Construction | Court's Construction |
|---|---|---|---|
| "Evaluating movement of a body relative to an environment"<br><br>Claims 1 and 10 | plain and ordinary meaning<br><br>see the agreed term "environment" | Evaluating movement of a body relative to the conditions and the influences of the physical system in which the body is located | plain and ordinary meaning<br><br>see the agreed term "environment" |

"Environment" is expressly defined in the specification to mean "the conditions and the influences that determine the behavior of the physical system in which the body is located." '796 Patent at 2:43–45. Nintendo's proposed construction merely incorporates the definition of "environment" into the claim term, while removing the words "that determine the behavior."

The Court declines to construe this term. Here, the patentee has acted as the lexicographer by defining "environment" in the specification, and accordingly, this lexicography is controlling. *Phillips*, 415 F.3d at 1316.

**c. "Processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance"**

| Disputed Term | iLife's Proposed Construction | Nintendo's Proposed Construction | Court's Construction |
|---|---|---|---|
| "Processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance"<br><br>Claims 1 and 10 | Plain and ordinary meaning<br><br>(subject to the separately construed terms "dynamic and static accelerative phenomena" and "within environmental tolerance") | Using both static acceleration and dynamic acceleration separately as a function of at least one accelerative event characteristic to determine whether said evaluated body movement is within environmental tolerance | Plain and ordinary meaning<br><br>(subject to the separately construed terms "dynamic and static accelerative phenomena" and "within environmental tolerance") |

### i. The Parties' Arguments

iLife argues that, once "within environmental tolerance" and "dynamic and static accelerative phenomena" are construed, the "processing" element of this claim requires no additional construction, and plain meaning should apply. In iLife's words, the claim language "does not contain words requiring any special type of processing" and accordingly the plain and ordinary meaning of "process" is sufficient to understand the claim. ECF No. 113 at 5. iLife points to the specification for support, in which a preferred embodiment is described using the same form as iLife's proposed construction: an accelerative phenomena can be determined by processing dynamic and static acceleration and using specific values for each acceleration so as to determine whether it is within tolerance. *E.g.*, '796 Patent at 7:62–67, 8:1–67, 9:1–36. iLife also points to the results of the IPR proceeding for support, in that iLife successfully argued the same position urged here, that no construction is necessary.

During the supplementary claim construction hearing before the Court, Nintendo admitted that, for the most part, it does not dispute iLife's proposed construction, and agrees that "both" and "using" can be omitted from the final construction. Instead, Nintendo seeks only to emphasize that the "processing" element in this claim must depend on both dynamic acceleration and static acceleration separately, and in this vein, proposes to add the word "separately" to the construction, to demonstrate this requirement. Nintendo argues that iLife's statements during the '796 IPR proceeding rose to a disclaimer, and narrowed the scope of the claim to require processing of dynamic acceleration separately from static acceleration. The alleged disclaimer occurred in the IPR when iLife was distinguishing the iLife patents from a prior art reference, *Unuma*. Nintendo points to numerous statements by iLife's during the IPR that, it argues, emphasize a requirement that dynamic acceleration is processed separately from static acceleration.

18

iLife maintains that its statements during the IPR were merely to distinguish *Unuma* from the '796 patent, and do not constitute a disclaimer of patent scope. Specifically, iLife claims that, during the IPR, it argued that *Unuma* processes acceleration with a frequency matching technique that excludes static acceleration, and thus *Unuma* differs from the '796 patent because it processed only dynamic acceleration and not both static and dynamic acceleration. Accordingly, iLife contends, its statements during the IPR did not constitute disclaimer—or, at the very least, are ambiguous as to whether disclaimer occurred—and therefore neither limit nor impose additional requirements on the "processing" term.

### ii.  Analysis

The Court concludes that iLife has the better argument. The "process . . ." term at issue contains two phrases that are being separately construed in this Order, as well two agreed terms, "accelerative event characteristic" and "body." iLife's argument is, more or less, that once you factor in the other disputed terms and the agreed term, the only word left in this term that could be construed is "processes," which should be given its plain and ordinary meaning. In other words, the disputed term describes an invention that "processes *A* as a function of *B* to determine whether the evaluated movement is *C*," where *A*, *B*, and *C* are all defined separately. In this context, the Court agrees with iLife that "processes" does not appear to require additional explanation or description, or deviation from its typical, ordinary meaning. Courts first "look to the words of the claims themselves . . . to define the scope of the patented invention." *Vitronics Corp.*, 90 F.3d at 1582. "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Here, the specification does not define "processes" nor give any indication that any particular type of processing, beyond the ordinary meaning of the term, is

required.

During the supplemental claim construction hearing, Nintendo conceded that the plain and ordinary meaning of the disputed term is likely sufficient.  Nintendo maintains, however, that iLife committed prosecution disclaimer during the *inter partes* examination, and that the insertion of the word "separately" into the construction is required to reflect the disclaimer. Statements made during a post-grant reexamination proceeding can be considered later by district courts, and a claim's scope may be narrowed under the doctrine of prosecution disclaimer.  *Grober*, 686 F.3d at 1341.  "Statements made during reexamination can also be considered in accordance with this doctrine."  *Id.*; *Pragmatus AV, LLC v. Yahoo! Inc.*, No. C–13–1176, 2014 WL 1922081, at *4 (N.D. Cal. May 13, 2014) ("Ultimately, what is important here is not what the PTAB said about the claim term 'addressing information' but rather *what [patent owner] said* about the term in the proceedings before the PTAB and whether any disavowal or estoppel argument may be asserted based thereon.").  Disclaimer can arise when the patentee "clearly characteriz[es] the invention in a way to try to overcome rejections based on prior art."  *Comp. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008).

However, the doctrine of prosecution disclaimer only applies to unambiguous disavowals.  *Grober*, 686 F.3d at 1341; *N. Telecom Ltd. v. Samsung Elec. Co.,* 215 F.3d 1281, 1293–95 (Fed. Cir. 2000).  Where the alleged disavowal is ambiguous or amenable to multiple reasonable interpretations, there is no prosecution disclaimer.  *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016).  Prosecution disclaimer does not apply, for example, if the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features.  *See Eolas Techs., Inc. v. Microsoft Corp.,* 399 F.3d 1325, 1337 (Fed. Cir. 2005).  "As applied to a disclaimer analysis, 'the prosecution history can often inform the

meaning of the claim language by demonstrating how the inventor understood the invention.'" *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1063 (Fed. Cir. 2016) (quoting *Phillips*, 415 F.3d at 1317). "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015)

In making its argument for iLife's alleged prosecution disclaimer, Nintendo relies on statements made by iLife's counsel Michael Wilson during a hearing before a panel of three administrative patent judges for combined IPR proceedings on the six Asserted Patents ("IPR hearing"). *See Nintendo of America, Inc. v. iLife Techs.*, IPR 2015-00109, Paper 39 (PTAB Jan. 27, 2016). The IPR hearing addressed whether two prior art references—*Yashushi* and *Unuma*—rendered the claims in the six Asserted Patents obvious. Nintendo contends that during the IPR hearing, while distinguishing the Asserted Patents from *Unuma*, iLife made the disclaimer that the claims of the Asserted Patents require evaluation of static acceleration and dynamic acceleration separately. Specifically, Nintendo maintains that iLife clearly argued "the claims require splitting the two components of the acceleration into DC and AC, looking for a magnitude on the dynamic component and looking for a position change on the static component," as shown in a demonstrative exhibit provided by iLife at the IPR hearing. ECF No. 118 at 4. For support, Nintendo references various portions of the oral hearing where, it contends, iLife distinguished its patents by emphasizing that the Asserted Patents require dynamic and static acceleration to be processed separately—i.e., to require demodulation, splitting, or filtering of the acceleration signal into dynamic and static components—rather than merely requiring that both types of acceleration be processed.

The Court is unpersuaded by Nintendo's argument for disclaimer.  In context, iLife's statements support the distinction that iLife maintains it made to the PTAB: that *Unuma* processes *only* dynamic acceleration and the Asserted Patents—including the '796 patent—process *both* dynamic and static acceleration.  Although the statements Nintendo refers to, standing alone, could feasibly suggest that iLife relied on separation of the acceleration signal into dynamic and static components to distinguish its patents from *Unuma*, in context iLife's statements are far from the unambiguous disavowal of patent scope required to commit prosecution disclaimer.  As will be discussed in greater detail below, because there is more than one reasonable interpretation of iLife's statements, the Court declines to find prosecution disclaimer.  *See Avid. Techs.*, 812 F.3d at 1045.

Much of the testimony given during the IPR hearing concerned whether *Unuma* taught sensing and processing of both dynamic and static acceleration to determine movement and orientation, or just dynamic acceleration.  Generally, an accelerometer produces a raw waveform, which changes shape in amplitude and frequency depending on the movement of the accelerometer.  In *Unuma*, the raw waveform is processed using a Fourier transformation from the time domain to the frequency domain, which creates acceleration patterns that are normalized and compared to known patterns to determine what movement has occurred.  *Unuma* states, among other things, that "the gradient of a human body, that is, the state of the upright/leaning posture of the human body, can be recognized from an average value of variations in acceleration observed by an acceleration sensor."  E.P. App. No. 0,816,986, at 25 (Filed Feb. 2, 1997) ("*Unuma*").  Nintendo's position before the PTAB was that the "leaning posture," or body orientation, referred to in *Unuma* is another way of describing static acceleration, and therefore taking "the average value of variations of the acceleration" impliedly processes static

acceleration.  IPR 2015-00109, Paper 39, at 26:8–27:13.  iLife, by contrast, argued that when the transformed waveform is normalized for comparison purposes in *Unuma*, data relating to static acceleration is eliminated, and therefore there processing of static acceleration is not taught by *Unuma*.  *Id.* at 51:1–18.  Furthermore, iLife argued that processing of total average acceleration does not mean processing static acceleration.  *Id.* at 52:15–22.

This background information regarding the IPR hearing provides necessary context for determining whether iLife disavowed the '796 patent's claim scope.  In the following exchange, for instance, Mr. Wilson, iLife's attorney, distinguishes the Asserted Patents from *Unuma* on the grounds that iLife believes total average acceleration does not include static acceleration, and accordingly, *Unuma* does not process static acceleration *at all*, not that *Unuma* does not process static acceleration *separately*:

> MR. WILSON: As I understand the question, you are asking whether I agree that the individual elements are actually disclosed at different places in Unuma?
>
> JUDGE JUNG: Yes.
>
> MR. WILSON: I do not agree with that. Unuma does not teach separating out and processing static acceleration. What it teaches is you can use total average acceleration in certain limited circumstances to judge body position. That's not static acceleration as required by the patents.

*Id.* at 48:14–24.

Mr. Wilson made a similar point at other times during the IPR hearing.  In the following excerpt, Mr. Wilson discusses *Unuma*'s use of total average acceleration as a means of determining body posture or orientation.  As discussed, iLife's position before the PTAB was that *Unuma*'s method of processing accelerometer waveform data removed static acceleration.  Mr. Wilson urged that the iLife patents do not use averaging to determine body position, but rather consider both dynamic and static acceleration (referred to as AC and DC components, respectively):

MR. WILSON: So Unuma is telling us total average will give you some good information if you are resting and total average might give you information if you assume that there is no other movement going on.

Well, that's not very useful when you are back looking at page 16 on putting together a series of different motions, many of which involve dynamic acceleration; falling, hitting an object, walking, and then lying on the ground.

So, yes, it mentions using total average acceleration. It clearly says that it is limited. And I think this distinguishes it from iLife where we're going to separately filter out, as opposed to averaging, we're going to filter out the AC components and look at what is the current direct component, what is the current static acceleration, so we know what the body's position is at a particular given time.

*Id.* at 71:1–16.

Mr. Wilson's quoted statements go to the same contention he made throughout the IPR hearing: that the Asserted Patents differ from *Unuma*'s use of average acceleration because they consider *both* dynamic and static acceleration, rather than just a total average acceleration:

MR WILSON: In conclusion, we believe that the evidence of record demonstrates that Mr. Lehrman and his co-inventors were, in fact, the first people to invent a method and system and device that processed both static and dynamic, separately processed static and dynamic as a function of magnitude and orientation to make acceptability determinations in that combination of elements, both with respect to Unuma and with respect to Yasushi.

*Id.* at 172:6–22.

MR WILSON: So there are two glaring gaps in the Petitioner's case with respect to Unuma. First, Unuma never discusses separate processing of static. It only discusses using total average acceleration in a very limited context and says it is not useful for complex types of motions where there is non-cyclic activities. It is basically useful if somebody is at rest or you make an assumption of no other types of motion.

So static, actual static is missing. And then, second, even if the Board concludes that the reference to total average acceleration is static acceleration, the record, the evidentiary record is completely devoid of any evidence explaining why a person skilled in the art would combine these different elements that exist in different embodiments, different applications, different limitations, why would they combine those together to now, since both static and dynamic, process both static and dynamic as a function of magnitude and orientation, and to use both of those to then make an acceptability determination.

*Id.* at 85:4–21.

The Court determines Mr. Wilson's references in the preceding excerpts to processing static acceleration separately was an attempt to articulate that the Asserted Patents do not teach consideration of static acceleration as being wrapped up and part of total average acceleration, but instead as its own, individual piece of data to be processed in conjunction with dynamic acceleration. Under this reading of Mr. Wilson's statements, which this Court finds to be reasonable, there is no disclaimer of scope as argued by Nintendo.

Nintendo maintains that iLife made additional statements disclaiming scope during the IPR hearing. In the following exchange, Mr. Wilson initially appears to describe the Asserted Patents as requiring that the dynamic and static components of acceleration be split or separated somehow, to process the signal magnitude and position; however, on a question from Judge Jung, Mr. Wilson clarified that no specific type of processing or separating was required, and that the only thing required by the Asserted Patents was that both dynamic and static acceleration be considered for determining magnitude and position:

> MR. WILSON: Slide 87 contains kind of a pictorial diagram showing what we believe the patent discloses in the specification and also what the claims require. There is a sensing of the waveform, as Your Honor pointed out. That waveform is just showing the sensing, it is not showing processing.
>
> Then we split the two components of the acceleration into DC and AC. We're going to look for a magnitude on the alternating current or the dynamic. We're going to look for a position change on the separated DC. And we're going to use both of those in the acceptability determination.
>
> So let's talk about Unuma. Here is a summary . . . of the pattern matching in Unuma. One thing is the main embodiment . . . discusses identifying particular motions by frequency analysis. Static acceleration has no frequency. It doesn't change.
>
> And so as we will see as we go through the Unuma disclosures, when you do a frequency analysis by necessity, you are not evaluating static acceleration.
>
> The second thing we will talk about in Unuma is the fact that it is normalized, which strips out magnitude or direction. And then I am going to talk about a specific embodiment discussed in Unuma whereby it uses a series of individually-identified motions to make a decision on a collapsed state. And I am going to again show how that is based purely on dynamic motions, not static.

JUDGE JUNG: Mr. Wilson, before you go on with Unuma, back to the challenged patents, it seems like you are trying to read into the word "process" in the claim limitations that the processing requires a demodulation, a filtering, a separating out of AC and DC signals, and then figuring out the magnitude and the direction. What is the reason to read in all those features into the word "process"?

MR. WILSON: I don't think that I am just reading all those features into the word "process." What I believe, based on the Board's interpretation of accelerative event characteristic, the Board has decided that an accelerative event characteristic relates to magnitude and direction.

So I am using the Board's adopted definition of accelerative event characteristic to address the part about magnitude and/or direction, that the processing requires looking at those issues.

So it is not so much the processing. I don't think that I'm using a narrow construction of the word "processing." What is important is that we have processing that looks at magnitude and directional thresholds, and that that processing using those thresholds is what makes the acceptability determination.

JUDGE JUNG: So we can apply the plain and ordinary definition of "processing"?

MR. WILSON: Yes, I believe so. So long as the processing uses those features of acceleration and it is that processing using those acceleration features that is used to make the determination on acceptability. Then I believe that satisfies the claim.

*Id.* at 54:4–56:11

Here, despite iLife's clarification, Nintendo argues that iLife's statement "[s]o long as the processing uses those features of acceleration" refers "back to the statements iLife made just moments earlier about the need for processing 'the separate components of acceleration, AC and DC.'"  ECF No. 118 at 4.  The Court is unconvinced that the transcript must be read this way; it's likely that by "those features of acceleration," iLife was referring to dynamic and static components generally, and not dynamic and static acceleration separately or demodulated.  As there is more than one reasonable reading of this statement, the Court will not find disclaimer. *See Avid. Techs.*, 812 F.3d at 1045.

Nintendo also points to the following exchange as proof of disclaimer, where iLife argued that a preferred embodiment described in *Unuma* relied entirely on dynamic

acceleration—specifically, frequency analysis that iLife argued does not include static

acceleration—to identify when someone wearing the invention collapses:

> MR. WILSON: The first embodiment [in Unuma] was we're going to identify individual motions through frequency analysis. Then . . . it tells us one of the things we couldn't do using the method before is identify a more complicated activity, such as collapsing on the ground. . . . However, it makes clear it is using the same method, which . . . is based entirely on frequency analysis.
>     . . .
> When you are falling, you are seeing acceleration due to dynamic acceleration. When you hit an obstacle, the acceleration sensed is from a dynamic -- it is from motion or vibration.
> So there is nothing there indicating that they are using static. They do mention lying still, but, again, . . . what they have told us is we're going to identify lying on the ground based on the frequency components and the frequency components necessarily are based on dynamic acceleration.
>     . . .
>
> JUDGE BONILLA: I'm sorry, can you explain how it would know a distinction between standing still and lying still on the ground? I mean, it talks about that as two distinct things that it recognizes. How would it do that?
>
> MR. WILSON: It doesn't explain. It does not explain. And, as a matter of fact, I believe that the [sic] Unuma acknowledges that they may be difficult to distinguish between. That's why it talks about adding location. That's why it talks about having animation and other features.
> But there is no discussion in Unuma that says we are going to separately process static acceleration in these embodiments, . . . no teaching that says, by the way, we're going to distinguish standing still and lying down by looking at total average acceleration or processing static acceleration. It just doesn't exist.
>     . . . [O]ne thing you learn from Unuma is that Unuma loved frequency analysis. He believed all motions could be identified by breaking down frequency and looking at frequency components.
>     . . . [T]hat is his invention. Frequency necessarily is dynamic acceleration. And he believed that you could do that, you could tell, look at lying still, standing erect, looking only at frequency, looking only at dynamic. I don't think he is correct. I think that iLife is an improvement that says no, we're also going to process static together with that to make decisions. And Unuma doesn't teach that.
>
> JUDGE BONILLA: So let me ask you, this part on page 16 talks about looking at motion patterns. By doing that, they are figuring out that somebody is walking or standing still and maybe they fall and then they lie still on the ground.
> And your position is at that point they are always just measuring frequency, they are always only measuring dynamic, but by looking at that stuff when they are looking at a pattern, are they also discerning what would be the static also and then

processing that to make a determination about whether there is a collapse, for example? Is that one way to look at it?

MR. WILSON: Well, I think using hindsight, we could now, based on the teachings in iLife, realize that you could add to what is discussed on 6 and 16, you could add a separate processing of the separate static component to aid in that decision-making but that's not what Unuma teaches.

IPR 2015-00109, Paper 39, at 63:15–67:18.

Here, Mr. Wilson distinguished the Asserted Patents by emphasizing that, in its analysis of what happens when someone collapses on the ground, *Unuma* lacks consideration of static acceleration. In the context of the whole exchange, his statements go to the fact that iLife believes *Unuma* does not consider static acceleration *at all* when it processes total average acceleration and performs its frequency analysis, and not Nintendo's contention that the Asserted Patents require consideration of static acceleration separately.

In conclusion, the Court declines to find disclaimer on the basis of iLife's statements before the PTAB. Mr. Wilson's statements do not rise to the level of unambiguous disavowal required for disclaimer of patent scope. *See Grober*, 686 F.3d at 1341. Furthermore, the Court notes that there are multiple times in the record of the oral hearing where iLife distinguishes the Asserted Patents from *Unuma* without suggesting that dynamic and static acceleration must be processed separately. *See, e.g.*, IPR 2015-00109, Paper 39, at 49:14–18; 50:7–10; 50:18–22; 52:10–22; 54:21–55:6. The Court finds that it is reasonable to interpret the alleged disavowals quoted previously as being consistent with Mr. Wilson's other statements during the oral hearing, and accordingly there is not prosecution disclaimer. *Avid Tech.*, 812 F.3d at 1045. Finally, other references Nintendo cites to in the prosecution history and the IPR proceeding do not explain why "separately" is required. The references all appear to quote iLife in acknowledging the use of *both* static and dynamic acceleration in determining acceptability, but

do not seem to indicate that the inventors limited themselves to the two types separately.[1]

For the foregoing reasons, therefore, the Court construes "processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance" to have its plain and ordinary meaning, subject to the separately construed terms "dynamic and static accelerative phenomena" and "within environmental tolerance."

### d. "Dynamic and static accelerative phenomena"

| Disputed Term | iLife's Proposed Construction | Nintendo's Proposed Construction | Court's Construction |
|---|---|---|---|
| "Dynamic and static accelerative phenomena"<br><br>Claims 1 and 10 | occurrences of change in velocity (or acceleration) indicating vibration or movement of the body and position of the body relative to earth using gravity as a gauge of position | Accelerative phenomena experienced as a result of motion and of gravity<br><br>"body" retains its agreed construction | occurrences of change in velocity (or acceleration) indicating vibration or movement of the body and position of the body relative to earth using gravity as a gauge of position |

iLife argues that its proposed construction for "dynamic and static accelerative phenomena" is correct because it incorporates express definitions from the specification. ECF No. 51 at 17. Nintendo argues that the definitions of "static acceleration" and "dynamic acceleration" provided in the specification are inaccurate with regard to how the terms are actually used in the specification. Nintendo wishes to simplify the definitions to emphasize that static acceleration is acceleration due to gravity, and that dynamic acceleration is acceleration

---

[1] *E.g.* IPR2015-00109, Paper 39, at 54:4–15 ("[W]e're going to use both [static and dynamic acceleration] in the acceptability determination."); IPR2015-00109, Patent Owner Response, Paper 14, at 37 ("Although [prior art reference] recognizes the difference between static and dynamic acceleration, its simplified approach fails to teach or suggest that both static and dynamic acceleration needs to be processed . . . ."); *id.* at 20 ("The inventors saw the need . . . for systems that processed and analyzed both dynamic and static acceleration.").

due to movement.

The Court finds that the specification expressly defines the terms at issue in this claim, and accordingly that definition controls.  The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  *Phillips*, 415 F.3d at 1317.  However, absent lexicography or disavowal, the Court does not depart from the plain meaning of the claims.  *Thorner*, 669 F.3d at 1365.  To act as a lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to redefine the term."  *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (citing *Thorner*, 669 F.3d at 1365).  The standards for finding lexicography are "exacting."  *Id.* (citing *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

The specification language of the '796 patent provides several definitions that apply to this claim term.  For instance, "the phrases 'accelerative events' or 'accelerative phenomena' are defined as occurrences of change in velocity of the body (or acceleration), whether in magnitude, direction or both."  '796 Patent at 5:20–24.  Dynamic acceleration is described in the following way: "dynamic acceleration (i.e., vibration, body movement, and the like)."  *Id.* at 1:66–67.  "[S]tatic acceleration, or gravity, is not the same as a lack of dynamic acceleration . . . , but is instead a gauge of position."  *Id.* at 1:65–2:1.  Additionally, the specification distinguishes "static acceleration" from "static acceleration of the body": "static acceleration of the body (i.e., the position of a body relative to earth within broad limits)."  *Id.* at 1:63–65.

The specification language indicates that the patentee is defining the terms as they will be used in the patent.  This conclusion is supported by the distinction between "static acceleration" and "static acceleration of the body," which shows that the terms are being used in a particular

and meaningful way.  Based on the foregoing evidence, the Court construes "dynamic and static accelerative phenomena" to mean "occurrences of change in velocity (or acceleration) indicating vibration or movement of the body and position of the body relative to earth using gravity as a gauge of position."

### e.   "Within environmental tolerance"

| Disputed Term | iLife's Proposed Construction | Nintendo's Proposed Construction | Court's Construction |
|---|---|---|---|
| "Within environmental tolerance" / "within said environmental tolerance"<br><br>Claims 1 and 10 | Acceptable based on criteria including a specified value given the environment and application for which body movement is being evaluated | Not so abnormal as to be damaging, destructive, crippling, harmful, injurious or otherwise alarming or, possibly, distressing to the body relative to the physical system in which the body is located<br><br>In the alternative, if iLife's proposed construction is adopted, it should be modified to read:<br><br>Acceptable based upon criteria *to determine whether such movements are abnormal,* including a specified value given the environment ~~and application~~ for which body movement is being evaluated | Acceptable based on criteria including a specified value given the environment for which body movement is being evaluated |

### i.   The Parties' Arguments

iLife maintains that "environmental tolerance" is not limited to sensing and identifying only harmful or abnormal events.  iLife argues that the claims were drafted to cover "movement

or activity of a body" broadly, and that the phrase "within environmental tolerance" was intentionally used to avoid limiting the claims to detection of damaging or destructive events such as falls. They assert there is nothing in the claims to suggest that the invention is limited to the detection of damaging events; although some of the dependent claims discuss transmission of an "alarm signal" or a "potentially dangerous event," the independent and other asserted claims do not. '796 Patent, claims. 4–6, 8, 13–17. Furthermore, iLife argues that the specification indicates that the disclosed fall detection system is merely an example of one embodiment of the invention:

> For example, when a communications device detects a body movement that signifies the occurrence of a potentially dangerous event (e.g., a fall), the communication device can immediately send an alarm to call for assistance.

'796 Patent at 2:27–32.

Instead of indicating an abnormal or dangerous event, iLife argues, "within environmental tolerance" indicates a binary determination of whether a measurement is acceptable or unacceptable, or inside or outside of a normal range. In support, iLife points to the specification, which discloses that conventional body monitoring devices were unable to "discern 'normal,' or acceptable, changes in levels of body activity." '796 Patent at 1:53–54. Thus, iLife asserts, the invention disclosed in the '796 patent is able to discern between acceptable or unacceptable changes in levels of body activity—i.e., those within environmental tolerance, but not necessarily harmful or dangerous. In other words, iLife is arguing that events within environmental tolerance are simply those that fall inside a range of acceptability based on a particular environmental context.

Furthermore, iLife argues that the patent explains that the determination of environmental tolerance must be based on criteria that include a specified value. In support, iLife points to different embodiments of the invention in which the criteria indicates numerical values, such as

32

embodiments that may include values for thresholds, values for change in body position, and

values for time. *E.g.* '796 Patent at 3:38, 9:18–9, 12:11. Furthermore, "tolerance," iLife asserts,

is used according to its plain and ordinary meaning of utilizing a specific value; for support, iLife

cites to various dictionaries.[2]

In support of its proposed construction, iLife points to its consistency in arguing for the

same construction of "within environmental tolerance" in each proceeding involving its related

iLife patents. In contrast, iLife argues, Nintendo has taken "drastically inconsistent positions

depending on their desired objective in that particular forum."[3] iLife asks that the Court give

"reasoned deference" to Judge Conti's construction in *iLife Techs. Inc. v. Body Media, Inc.*, 90 F.

Supp. 3d 415 (W.D. Pa. 2015), in which Judge Conti adopted iLife's proposed construction for

"within environmental tolerance" in related patents,[4] and to the three-judge PTAB panel's partial

adoption of iLife's proposed construction in the '796 patent IPR proceeding. *Nintendo of*

*America, Inc. v. iLife Techs., Inc.*, IPR2015-00109, Paper 26, at 9–13 (PTAB Apr. 28, 2016).

In the initial round of claim construction briefing, Nintendo urged "within environmental

tolerance" to be construed as "not so abnormal as to be damaging, destructive, crippling,

harmful, injurious or otherwise alarming or, possibly, distressing to the body relative to the

---

[2] iLife cites definitions from the *McGraw-Hill Dictionary of Scientific and Technical Terms*, at 2159 ("A permissible deviation from a specified value"); *Modern Dictionary of Electronics*, at 787 ("A permissible deviation from a specified value"; "[a] specified allowance for error from a desired or measured quantity."); and *Webster's New Universal Unabridged Dictionary*, at 1992 ("[T]he permissible range of variation in a dimension of an object."). ECF No. 51 at 17.

[3] iLife asserts that Nintendo has asserted four different constructions of the same claim: one in the proceeding in front of Judge Conti (which is also the construction proposed originally at the 2015 hearing), one in front of PTAB, the proposed alternative construction offered in the supplemental briefing, and apparently a fourth exchanged between the parties that concerned "alarm criteria." ECF No. 119 at 3.

[4] *Body Media*, 90 F. Supp. 3d at 429 ("Body Media asserts that all intolerable movements or events must cause harm, damage, or alarm to the body. iLife contends that intolerable events are simply those that fall outside a range of acceptability, based upon the context of a particular environment. The record does not support the narrow construction that Body Media proposes, and does support iLife's proposed construction." (citations omitted)).

physical system in which the body is located."  In support, Nintendo points to the specification of

the '796 patent, which describes movement that is "so abnormal to be beyond tolerance, for

instance, to be damaging, destructive, crippling, harmful, injurious, or otherwise alarming or,

possibly, distressing to the body."  '796 Patent at 2:11–13.  It follows, Nintendo asserts, that

behavior within tolerance is behavior that is *not* "damaging, destructive, crippling, harmful,

injurious, or otherwise alarming or, possibly, distressing to the body."  The specification defines

"environment" to mean "the conditions and influences that determine the behavior of the

physical system in which the body is located." *Id.* at 2:43–45.  Nintendo combines these two

phrases to get to its proposed construction of "within environmental tolerance."  In support,

Nintendo points to other references in the patent where movements are evaluated for tolerance

after it is determined that they are abnormal; specifically, Nintendo quotes the Summary of the

Invention and several portions of the Description of the Invention.[5]  Nintendo also points to

several dictionaries that support the conclusion that tolerance is related to capacity to withstand

destruction or harm.[6]

 Although Nintendo still contends that its originally proposed construction is correct, in its

most recent supplemental claim construction briefing Nintendo also argues for a slight

---

[5] For support, Nintendo references the Summary of the Invention and other ideal embodiments of other related patents. '796 Patent at 3:7–11 ("The processor is preferably programmed to distinguish between normal and abnormal accelerative events, and, when an abnormal event is identified, to indicate whether the abnormal event is tolerable, or within tolerance."); *id.* 6:33–40 ("[T]he sensed accelerative phenomena of the body may subsequently be processed to distinguish a variety of accelerative phenomena and, ultimately, to selectively act based on the distinctions, as is described in detail hereafter to determine whether the evaluated body movement is normal or abnormal, and, if abnormal, whether the same is within tolerance."); *id.* 12:13–20 ("Exemplary processor 47 is programmed to distinguish between normal and abnormal accelerative events (e.g., walking, sitting, lying down, etc. versus tripping, falling down, etc.), and, when an abnormal event is identified, indicates whether the abnormal event is tolerable, or within tolerance. Processor 47 may also suitably be programmed to distinguish other physical characteristics, including temperature, pressure, force, sound, light, relative position (including lying down), and the like.").

[6] "The capacity to endure hardship or pain."  *See, e.g.*, American Heritage College Dictionary, Third Edition (1997) at 1423; Webster's II New College Dictionary (1999) at 1159.

modification of iLife's proposed construction if it is adopted.  ECF No. 115 at 9.  Nintendo

contends that "application" is an undefined and superfluous addition to the claim language

"body" and "environment," which have agreed constructions, and should be excised.  Nintendo

further asks that if iLife's proposed construction is adopted, it be modified to clarify that

"acceptable based on criteria" requires "criteria to determine whether such movements are

abnormal."  It argues that "environmental tolerance" denotes more than just any arbitrary

threshold, because the specification indicates that the "invention is not simply directed to

measuring whether acceleration in a particular axis passed a certain threshold (which the prior art

already did), but instead seeks to detect movements that are out of 'tolerance' or in some way

'abnormal.'"  *Id.* at 11.  Nintendo urges that this distinction should be captured in the

construction of the term, despite also arguing that "[Nintendo] believes that Judge Conti's

construction already captures the concept that 'acceptable' must distinguish between normal and

abnormal movements."  *Id.* at 10.

### ii.  Analysis

The Court begins its analysis of "within environmental tolerance" with its belief that

Judge Conti's previous construction of this disputed term is entitled to reasoned deference.  Prior

to being invalidated during *inter partes* review, the '481 patent was a patent-in-suit in this case.

The '796 patent was a continuation in part of the '481 patent and contains similar language and

claims.[7]  As a general rule, claim language used in one patent of a family is presumed to have the

same meaning when used in another patent of the same family, absent clear evidence to the

contrary.  *NTP, Inc. v. Research in Motion, Ltd*., 418 F.3d 1282, 1293 (Fed. Cir. 2005).  A prior

---

[7] *See* '796 Patent at 1:6–10 ("This application is a continuation of prior U.S. Application Ser. No.
09/727,974 filed on Nov. 30, 2000, now issued as U.S. Pat. No. 6,501,386 on Dec. 31, 2002, which is a
continuation-in-part of U.S. Application Ser. No. 09/396,991 filed Sep. 15, 1999, now U.S. Pat. No.
6,307,481.").

construction involving the same patents-in-suit is entitled to "reasoned deference under the broad

principles of stare decisis and the goals articulated in Markman." *Blue Calypso, Inc. v. Groupon,*

*Inc.*, 93 F. Supp. 3d 575, 583 (E.D. Tex. 2015).  Prior constructions are entitled to "substantial

weight" and should not be departed from "absent a strong reason for doing so." *TQP*

*Development, LLC v. Intuit Inc.*, 2:12-cv-180, 2014 WL 2810016, at *6 (E.D. Tex. June 20,

2014); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839–40 (2015)

("[A]ttorneys will no doubt bring cases construing the same claim to the attention of the trial

judge; those prior cases will sometimes be binding because of issue preclusion, and sometimes

will serve as persuasive authority." (citation omitted)).  Additionally, there are significant

similarities between the two cases that justify reasoned deference to Judge Conti's construction.

The Body Media defendants in the earlier case proposed a practically identical construction for

"within environmental tolerance" as Nintendo does in the case currently before the Court.[8]  Like

Nintendo, Body Media cited various parts of the patent that indicated associated abnormality or

dangerousness with the concept of tolerance, but like the '796 patent at issue in this case, all of

the references relied on were in the specification, not the claims.  *Body Media*, 90 F. Supp. 3d at

428.  Body Media similarly relied on a single passage in the specification of the '481 patent

(which also appears in the '796 patent) that provides the basis for the "damaging, destructive,

crippling . . ." language in Nintendo's proposed construction.

    With regard to its first proposed construction, Nintendo has not provided a strong reason

for departing from Judge Conti's construction.  The Court is generally bound to construe the

---

[8] *Compare Body Media*, 90 F. Supp. 3d at 425 ("[N]ot so abnormal so as to be damaging, crippling, harmful, injurious or otherwise alarming or, possibly, distressing to the body."), *with* ECF No. 115 at 9 ("Not so abnormal as to be damaging, destructive, crippling, harmful, injurious or otherwise alarming or, possibly, distressing to the body relative to the physical system in which the body is located.").  Note that the court in *Body Media* did not consider Nintendo's alternative construction proposed in its supplemental briefing.

terms as they are defined in the specification, but the Court may not "import limitations from the written description into the claims." *Phillips*, 415 F.3d at 1323. A particular written embodiment appearing in the specification or written description "may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp.*, 358 F.3d at 875. In this case, there is no dispute that the specification of the '796 patent includes the "damaging, destructive, crippling, harmful, injurious, or otherwise alarming or, possibly, distressing to the body" language proposed by Nintendo, but this language is not present in the claims themselves. Additionally, the language surrounding descriptions of movements being evaluated for tolerance after it is determined that they are abnormal indicate that they are examples; the specification states that "[f]or example . . . a communications device detects a body movement that signifies the occurrence of a potentially dangerous event (e.g., a fall)." '796 Patent at 2:27–30. Nintendo cites to various embodiments of the invention in support of its proposed language. However, the claim language is broader than that urged by Nintendo; the claims reference a "potentially dangerous event" in only two dependent claims, and the independent claims—the only claims that contain the contested phrase "within environmental tolerance"—contain no such limitation. *See id.* claims 6, 13. Accordingly, the limitations of the particular written embodiments pointed to by Nintendo cannot by read into the claim, because the claim language is broader than the embodiment. Furthermore, under the doctrine of claim differentiation there is a presumption that "an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006). Claim differentiation thus supports concluding that the "potentially dangerous event" required by dependent claims 6 and 13 are not required by the independent claims 1 and 10 where "within environmental tolerance" appears.

With regards to its alternative proposed construction, Nintendo requests that iLife's proposed construction be altered, first to modify "acceptable based on criteria" by adding "to determine whether such movements are abnormal", and second, to remove the phrase "and application."  These proposed changes will each be addressed in turn.

1.  *"Acceptable Based on Criteria To Determine Whether Such Movements Are Abnormal"*

Nintendo argues that the invention detects movements that are out of "tolerance" or are in some way "abnormal," and does not merely detect when a movement passes a certain threshold; accordingly, it wants to add language to clarify that "acceptable" distinguishes between normal and abnormal events.  Nintendo points to various parts of the specification for support, which reference embodiments of the invention that evaluate body movement as being normal or abnormal.  *E.g.* '796 Patent at 3:6–11 ("The processor is preferably programmed to distinguish between normal and abnormal accelerative events . . .").  During the claim construction hearing, Nintendo argued that the word "acceptable," standing alone, lacks sufficient mooring to the patent, and thus, relying on the Federal Circuit's decision in *Curtiss-Wright*, the construction requires additional clarification using abnormality language from the specification.

In response, iLife argues that "within environmental tolerance" does not incorporate an abnormality determination, and that to do so would improperly incorporate limitations from the specification into the claim terms.  Specifically, iLife highlights how all references to normality or abnormality in the specification are examples or preferred embodiments.  In this regard, iLife urges the Court to follow Judge Conti's construction, in which iLife argues she considered and rejected the argument for abnormality.

The Court finds iLife's argument to be more persuasive.  iLife's broad characterization of the "within environmental tolerance" as being dependent on criteria specified by the environment

—rather than notions of normal or abnormal movements—is supported by the claim language, which is broad; for example, claims 1 and 10 describes a processor that senses an "accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance," and does not include any limitations on "environmental tolerance" or what sort of criteria is used to evaluate environmental tolerance.  The only instances of a limitation on the type of system being evaluated or the criteria informing the system are in dependent claims 4 and 13, which describe a variation of the patent in which the evaluated body movement signifies a potentially dangerous event.  Therefore, Nintendo's suggested change would create an additional limitation on the independent claims that the criteria for evaluating whether a movement is within environmental tolerance must be based on use of the words "abnormal" and "normal" discussed in the specification, which is improper.

The '796 patent clearly contemplates that tolerance determinations do not always invoke considerations of normality, but rely instead on varying potential criteria that will change given the environment for which the body movement is being evaluated.  "Acceptable," in this regard, could be exchanged for any number of other adjectives signifying that a movement satisfies some criteria in whatever environment it is being evaluated.[9]  Judge Conti made a similar conclusion in her analysis of this term in the '481 patent, in which she noted that "[s]imply put, and from a layman's perspective, tolerable and acceptable are synonyms; as are permissible and allowable."  *Body Media*, 90 F. Supp. 3d at 431.

---

[9] This characterization is supported by the specification, which uses "acceptable" and "normal" as interchangeable synonyms in the context of a fall detection environment:

> These [prior art] methods however fail to discern normal, or acceptable, changes in levels of body activity. Stated another way, the foregoing fall detection methodologies provide no position change analysis and, therefore, cannot determine whether a change in position, once attained, is acceptable or unacceptable.

'796 Patent at 1:53–58.

Thus, while in certain embodiments of the invention, a movement may be evaluated for whether it is normal or abnormal, it is not the case that *every* embodiment will consider whether a movement is normal.  For instance, the specification of the '796 patent describes applications of the invention to cargo monitoring and tactical maneuver monitoring, and discloses that the processor may be programmed to distinguish "other physical characteristics, including temperature, pressure, force, sound, light, relative position, and the like."  '796 Patent at 3:11–25.  Identical language appeared in the '481 patent, leading Judge Conti to note that, in these embodiments:

> [I]ntolerance need not indicate that the "body," i.e., the package or the soldier, has been harmed. A package can tip over, which the shipper may not prefer, allow, accept, or permit, but not be injured or in distress. Likewise, a particular level of sound could be deemed unacceptable, but not harmful, as, for example, in a classroom. The patent's disclosure of these variant applications reflects that intolerable events need not be harmful.

*Body Media*, 90 F. Supp. 3d at 430.

The Court finds that Judge Conti's explanation is equally compelling in the context of making abnormality determinations.  A package can tip over, which the shipper may not prefer, allow, accept, or permit, but not be abnormal in its movement.  A particular level of sound in a classroom may be considered unacceptable for daily lessons, but not necessarily be abnormal.  Accordingly, the Court declines to incorporate a normality determination into consideration of environmental tolerance, and instead follows Judge Conti's decision to use "acceptance" in construing this term.

During the claim construction hearing, Nintendo relied on the Federal Circuit's decision in *Curtiss-Wright* for its argument that "acceptable" must be tethered to the specification by incorporating an abnormality determination.  However, the Court finds that *Curtiss-Wright* can be distinguished from the current case.  In *Curtiss-Wright*, the patent described a system for

removing solid coke from an oil drum, in a process generally known as de-heading.  438 F.3d at

1375.  The patent's specification described deficiencies in the prior art, specifically that the

patent was an improvement over conventional drums because it permitted de-heading to occur

without the removal of the entire drum head unit.  *Id.* at 1378.  The specification "associate[d]

the adjustability of the live loaded seat with that critical aspect of the invention."  *Id.* at 1379.

Specifically, "the patent stresse[d] that adjustment occurs during operation and without removal

of the head unit."  *Id.*

Under an apparent theory of claim differentiation, the district court in *Curtiss-Wright*

construed "adjustable" to mean that the live loaded seat could be changed in a manner "not

limited by any time, place, manner, or means of adjustment."  *Id.* at 1378 (internal quotation

marks removed).  However, the Federal Circuit reversed, holding that the district court had

placed "too much emphasis on the ordinary meaning of 'adjustable' without adequate grounding

of that term within the context of the specification."  *Id.*  The specification "consistently, and

without exception, describe[d] adjustment that occurs during the operation of the de-header

system," and the trial court's decision to construe "adjustable" according to plain and ordinary

meaning, "which includes a structure that requires dismantling of the [drum head] valve to

perform the adjustment, [found] no support in the overall context" of the patent's specification.

*Id.* at 1379.

In the current case, the specification does not "consistently, and without exception"

describe environmental tolerance as depending on a determination of abnormality.  Although

Nintendo is correct that the specification makes frequent reference to abnormal movements as

falling outside of environmental tolerance, it also refers to environmental tolerance indicia not

related to whether a movement is normal or abnormal.  *E.g.*, '796 Patent at 3:32–44; 6:52–59;

9:47–54; 10:2–9.  Accordingly, *Curtiss-Wright* does not control in this case.

2.   *"And Application"*

Removing the phrase "and application" from the proposed construction, Nintendo

contends, prevents the introduction of language that is superfluous to the language of the claims.

iLife responds by arguing that the '796 specification "makes clear that tolerance decisions are

environment and application specific."  ECF No. 119 at 4.  However, during the claim

construction hearing, iLife conceded that inclusion of "and application" was not necessary for

inclusion.

When construing claim terms, the Court first looks to the plain language of the claims.

The word "application" does not appear in the patent's claims.  Instead, the disputed term

"within environmental tolerance" is used only in relation to the environment in which the body

movement is being evaluated—i.e., the "conditions and influences" that determine behavior.

The plain language of the claims does not directly support adding "and application" to the

proposed construction.

The specification does, however, refer to instances where the accelerative event criteria—

i.e., the criteria that is applied in tolerance determinations—is defined by the specific application

of a preferred embodiment, and not just the environment in which the body is located.  *E.g.*, '796

Patent at 3:47–50 ("[I]n an assistance monitoring application, the sensor may repeatedly sense

dynamic and static acceleration of the body in the plural axes and generate output signals

indicative of the measurements."); *id.* at 3:42–47 ("[The] processor is operable to process sensed

accelerative phenomena as a function of at least one accelerative event characteristic, and that

such characteristics will largely be defined by the specific application.").  In other words, some

preferred embodiments described in the specification support inclusion of "and application,"

because the accelerative event characteristics and criteria are defined by the application of the preferred embodiment, and not just the environment.

However, there is also language that indicates that "environment" implies consideration of the application for which the invention is being used, or even that the terms "environment" and "application" are interchangeable. For instance, in an embodiment of the invention used for assistance monitoring, the specification describes the environment as being an "assistance monitoring environment." *Id.* at 3:37–42 ("[T]he present invention broadly introduces systems . . . that evaluate movement of a body relative to an environment, which in the above-given example is an assistance monitoring environment."). Other parts of the specification describe how the invention evaluates body movements relative to different environments, in which the environment is different depending on the application for which it is being used. *Id.* at 3:15–21 ("It should be noted that the relevant environment may be statically or dynamically represented. The sophistication of any such representation may be as complex or as uncomplicated as needed by a given application (e.g., disability, injury, infirmity, relative position, or other organic assistance monitoring; cargo or other transport monitoring; military, paramilitary, or other tactical maneuver monitoring; etc.)"); *id.* at 8:25–30 ("[S]uitable alternate embodiments of system 11 for evaluating movement of a body relative to different environments may likewise be implemented in accordance with the principles hereof, such as for relative position, other assistance monitoring, transparent monitoring, tactical maneuver monitoring etc."). In these examples, the environment appears to change depending on the application the system is being used for, be it assistance monitoring, cargo or other transport monitoring, etc. Thus, there is also support in the specification that the term "environment" with regards to tolerance decisions broadly includes consideration of the application at issue.

43

The specification, therefore, appears to support both inclusion and exclusion of the term "and application."  What is determinative in deciding this claim construction is whether "environment *and application*" imposes an additional limitation such that the specific application *must* be considered in every embodiment of the invention, or whether consideration of the application is allowed but not mandatory.  To impose an additional limitation would be improper, because it would import a limitation from the written description into the claims, which do not reference consideration of the application.  *See Phillips*, 415 F.3d at 1323. However, the patent's specification clearly contemplates that decisions regarding tolerance will depend on both the environment and the application, and "[c]laims must always be read in light of the specification."  *SimpleAir, Inc. v. Sony Ericsson Mobile Comms.*, 820 F.3d 419, 429 (Fed. Cir. 2016) (citing *Phillips*, 415 F.3d at 1315).  In adopting a construction that includes reference to the invention's application, Judge Conti followed this latter approach, explaining that "[t]he '481 Patent explains that 'environmental tolerance' is a function of the application and the environment and 'would likely be very different for a monitored body of an elderly person with a heart condition, a toddler, a box in a freight car, a container of combustible gas, etc.'"  *Body Media*, 90 F. Supp. 3d at 430.

Although Judge Conti's decision is persuasive authority, the Court is not inclined to read what it perceives to be an additional limitation from the specification into the claim terms.  The Court instead concludes that the term "environment" is broad enough to include consideration of the specific application, and therefore adopts Nintendo's suggested modification of iLife's proposed construction not to include "and application."  The patent states that "environment" is "defined broadly as the conditions and the influences that determine the behavior of the physical system in which the body is located."  '796 Patent at 2:43–45.  In the Court's opinion, the

condition and influences of the environment would take into account the application being considered.  And, as discussed, the specification appears to support this conclusion. Additionally, although the Court is not bound to follow or take guidance from the PTAB's decisions, the PTAB in the '796 patent IPR proceeding adopted iLife's proposed construction for "within environmental tolerance," but declined to incorporate "and application" into the final construction.  2015IPR-00109, Paper 12, at 13.

For the foregoing reasons, the Court defines "within environmental tolerance" to mean "acceptable based on criteria including a specified value given the environment for which body movement is being evaluated."

## V.    CONCLUSION

For the foregoing reasons, the Court **ADOPTS** the claim constructions as set forth above. The parties may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning in the presence of the jury any portion of this opinion, other than the actual definitions adopted by the Court.

**SO ORDERED.**

February 9, 2017.

**BARBARA M. G. LYNN**
**CHIEF JUDGE**