**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| ILIFE TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:13-cv-4987-M |
| | § | |
| NINTENDO OF AMERICA, INC., | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court is Plaintiff iLife Technologies, Inc.'s ("iLife") Motion for Partial Summary Judgment on Prior Art Invalidity Defenses and Counterclaims [ECF No. 150]; iLife's Motion to Strike and Exclude Defendant's New and Previously Undisclosed Invalidity Theories [ECF No. 152]; Nintendo of America, Inc.'s ("Nintendo") Cross Motion to Amend Its Invalidity Contentions [ECF No. 171]; Nintendo's Motion to Strike and Exclude Undisclosed Damages Evidence, Theories, and Opinions of Bratic and Davenport [ECF No. 157]; and Nintendo's Motion to Strike and Exclude Plaintiff's New Infringement Technologies [ECF No. 159]. The Court has already notified the parties that iLife's Motion for Partial Summary Judgment is **GRANTED**; iLife's Motion to Strike Nintendo's Invalidity Theories is **GRANTED**; Nintendo's Cross Motion to Amend Its Invalidity Contentions is **DENIED**; Nintendo's Motion to Strike and Exclude the Opinions of Bratic and Davenport is **DENIED**; and Nintendo's Motion to Strike iLife's Infringement Technologies is **DENIED**. The reasons for those rulings are set out herein.

1. **Background**

iLife brought this action against Nintendo, alleging infringement of United States Patent No. 6,864,796 ("the '796 patent") and five other patents. In accordance with the parties' Joint

Status Report concerning scheduling, Nintendo served its invalidity contentions on August 18, 2014, identifying 19 patents, 9 patent applications, 12 publications, and numerous systems and prior art combinations.  Besides the currently pending Cross Motion to Amend Invalidity Contentions, Nintendo did not amend or seek leave to amend its invalidity contentions.

On October 21, 2014, Nintendo petitioned the PTAB for IPR of claims 1–3, 9–12, and 18–20 of the '796 patent, asserting that the claims were obvious in light of a single prior art reference, JP10-295649, *Yasushi*.  *Nintendo of America, Inc. v. iLife Technologies, Inc.*, IPR 2015-00109, Paper 1 (PTAB Oct. 21, 2014).  On April 29, 2015, the PTAB instituted an IPR of the '796 patent and on May 18, 2015, on Nintendo's motion, this Court stayed the case pending the outcome of the IPR of the '796 patent and the five other asserted patents.  IPR 2015-00109, Paper No. 12 (PTAB Apr. 29, 2015); ECF No. 91.  In requesting that the Court stay this case pending the outcome of the IPRs, Nintendo urged that "[i]ssuance of the final decisions will immediately estop [Nintendo] from asserting invalidity based on any ground [Nintendo] 'raised or reasonably could have raised during th[e] inter partes review.'"  ECF No. 86 at 9–10 (quoting 35 U.S.C. § 315(e)).

On April 28, 2016, the PTAB issued its Final Written Decisions in the IPRs, upholding the '796 patent was valid, but invalidating the asserted claims of the other five the patents in suit. IPR 2015-00109, Paper 40 (PTAB Apr. 28, 2016).  iLife did not appeal those decisions and is proceeding only on the '796 patent.  iLife asserts claims 1, 3, 10, and 12 of the '796 patent (the "Asserted Claims").

On March 3, 2017, the parties exchanged expert reports.  Nintendo served the expert report of Robert Dezmelyk, in which he argues that the asserted claims of the '796 patent are

invalid.  iLife served the report of Dr. Isaac Davenport, which provides an analysis of iLife's infringement claims, and the report of Walter Bratic, which analyzes damages.

## 2.  iLife's Motion for Partial Summary Judgment

iLife moves for partial summary judgment on the grounds that, under 35 U.S.C. § 315(e), Nintendo is estopped from asserting invalidity based on patents and printed publications that Nintendo reasonably could have raised during the IPR.

iLife argues that certain patents and printed publications relied on by Dezmelyk in his report—those described in Charts 4 through 8[1] of his report—were disclosed by Nintendo in its invalidity contentions, served on August 18, 2014, before the IPR.[2]  Specifically, iLife points to five patents that it alleges Nintendo is estopped from asserting for invalidity purposes: EP 0816986 (*Unuma*); US Patent No. 4,110,741 (*Hubert*), alone or in combination with *Unuma*; U.S. Patent No. 4,699,379 (*Chateau*), alone or in combination with *Unuma*; U.S. Patent No. 5,593,431 (*Sheldon*), alone or in combination with *Unuma*; and U.S. Patent No. 5,724,265 (*Hutchings*), alone or in combination with *Unuma*.  iLife maintains that Nintendo reasonably could have raised these patents during the IPR of the '796 patent and, therefore, is estopped under 35 U.S.C. § 315(e) from raising them now.  Nintendo responds that it is estopped only from litigating the precise issue decided by the PTAB Board on the merits: whether the '796 patent is obvious in light of the single prior art reference, *Yasushi*, asserted by Nintendo in the IPR of the '796 patent.

Section 315(e)(2) provides that an IPR petitioner who receives a final written decision "may not assert . . . in a civil action arising in whole or in part under section 1338 of title 28 . . . that the claim is invalid on any ground that the petitioner raised or reasonably could have raised

---

[1] Pl. Mot. Summ. J. App. [ECF No. 151] at 353–468.
[2] Pl. Mot. Summ. J. [ECF No. 150] at 6.

during that inter partes review."  35 U.S.C. § 315(e)(2).  It is clear that estoppel applies to the

grounds—in this case, *Yasushi*—upon which the Board instituted review in the '796 patent IPR

(i.e., the "instituted grounds").  *See Intellectual Ventures I LLC v. Toshiba Corp.*, No. 13-453-

SLR, 2017 WL 107980, at *1 (D. Del. Jan. 11, 2017) ("[E]veryone agrees that estoppel applies

to grounds for invalidity upon which the Board instituted review in the IPR proceeding, whether

or not the Board addresses those grounds in its final decision . . . .").  And although not relevant

to this case, as the Board did not reject any of Nintendo's petitioned grounds in the '796 patent

IPR, the Federal Circuit has made clear that estoppel does not apply to invalidity grounds that

were raised by a petitioner in an IPR, but rejected by the Board as instituted grounds (i.e.,

"non-instituted grounds").  *Shaw Indus. Grp., Inc. v. Automated Creel Sys, Inc.*, 817 F.3d 1293,

1300 (Fed. Cir. 2016).

      In this case, the issue is not whether estoppel under § 315(e)(2) applies to instituted or

non-instituted grounds—both of which consist of patents and printed publications that were

actually put before the PTAB Board in the IPR petition for review—but whether estoppel also

applies to grounds on which the IPR petitioner reasonably *could have* petitioned the PTAB to

consider, but did not ("unpetitioned grounds").  If § 315(e)(2) estoppel applies to grounds that

Nintendo reasonably could have included in its petition to institute the IPR of the '796 patent,

Nintendo is estopped from relying on any patents or printed publications included in its

invalidity contentions served in August of 2014, including five patents on which Dezmelyk relies

on in his report.

      The Federal Circuit has not yet addressed whether estoppel applies to non-petitioned

grounds which reasonably could have been raised in the IPR, although several courts and PTAB

panels have considered the question with varying outcomes.  *Compare Douglas Dynamics, LLC*

*v. Meyer Prods. LLC*, 14-cv-886, 2017 WL 1382556 (W.D. Wisc. Apr. 18, 2017) (construing the phrase in § 315(e)(2), "any ground that the petitioner . . . reasonably could have raised during . . . inter partes review" to include "non-petitioned grounds that the defendant chose not to present in its petition to PTAB"), *and Clearlamp, LLC v. LKQ Corp.*, No. 12-c-2533, 2016 WL 4734389, at *9 (N.D. Ill. Mar. 18, 2016) (under the standard of § 315(e)(2), "the datasheet can be used in civil litigation only if it could not have been found by a skilled searcher performing a diligent search"), *with Intellectual Ventures I LLC v. Toshiba Corp.*, No. 13-453, 2016 WL 7341713, at *13 (D. Del. Dec. 19, 2016) (affirming the court's earlier decision not to apply estoppel, while acknowledging the "absence of specific authority" concerning the estoppel effect of § 315(e)(2) to available grounds that were never raised in the IPR).

In the absence of binding precedent, the Court interprets § 315(e)(2) to determine the scope of its IPR estoppel. The Court begins with the text of the statute. *In re Swanson*, 540 F.3d 1368, 1376 (Fed. Cir. 2008) (citing *Duncan v. Walker*, 533 U.S. 167, 172 (2001)). The Court then turns "to the legislative history to further elucidate Congress' intent." *Id.*

iLife argues that the plain language of § 315(e)(2) supports its position that estoppel prevents Nintendo from asserting invalidity grounds that it reasonably could have included in its IPR petition. The Court agrees. Section 315(e)(2) provides that a final written decision estops the petitioner from asserting invalidity "on any ground that the petitioner raised or reasonably could have raised during that inter partes review." IPR procedure is governed by 35 U.S.C. §§ 311–19; these statutory provisions consistently use the words "ground" or "grounds" when referring to arguments contained in the petition—i.e., raised prior to institution.[3] For instance,

---

[3] 35 U.S.C. § 311(b) ("A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a *ground* that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." (emphasis added)); § 312(a)(3) ("A petition filed . . . may be considered only if . . . the petition identifies . . . the *grounds* on which the challenge to each claim is based, and the

§ 312 provides that a petition is only considered if it identifies "the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." § 312(a)(3). Elsewhere, the USPTO Director is charged with "setting forth the standards for the showing of sufficient grounds to institute a review under section 314(a)." § 316(a)(2).

"[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1296 (Fed. Cir. 2015) (quoting *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015)) (internal quotation marks omitted). "[T]heir ultimate meaning should remain consistent with the remainder of the statute . . . ." *Id.* Accordingly, the Court interprets the word "ground" to mean the same thing in § 315(e)(2) as it does elsewhere in the statute, namely the basis or bases on which a petitioner challenges a claim when seeking to institute an IPR. Under this reading, "on any ground that the petitioner raised or reasonably could have raised during that inter partes review" includes grounds that reasonably could have been included in a petition to institute Board review of the patent.

Nintendo maintains that the plain language of § 315(e)(2), coupled with the Federal Circuit's decision in *Shaw*, limits estoppel only to "arguments raised or that reasonably could

---

evidence that supports the grounds for the challenge to each claim . . . ." (emphasis added)); § 316(a)(2) ("The Director shall prescribe regulations . . . setting forth the standards for the showing of sufficient *grounds* to institute a review under section 314(a)." (emphasis added)). Other portions of the America Invents Act, such as those describing post-grant review, use "ground" and "grounds" similarly. *E.g.*, § 321(b) ("A petitioner in a post-grant review may request to cancel as unpatentable 1 or more claims of a patent on any ground that could be raised under paragraph (2) or (3) of section 282(b) . . . ."); § 322(a)(3) ("A petition filed under section 321 may be considered only if . . . the petition identifies . . .the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim . . . ."); § 324(b) ("Additional Grounds [for institution of post-grand review]:—the determination required under subsection (a) may also be satisfied by a showing that the petition raises a novel or unsettled legal question that is important to other patents or patent applications."); § 325(e) (providing estoppel provisions for post-grant reviews analogous to § 315); § 326(a)(2) ("The Director shall prescribe regulations . . . setting forth the standards for the showing of sufficient grounds to institute a review under subsections (a) and (b) of section 324.").

6

have been raised between institution and a final written decision, not arguments that could have

been raised in a petition prior to institution."[4]  *Shaw* considered whether the Federal Circuit has

jurisdiction to review the Board's decision to institute an IPR on only some but not all asserted

claims and proposed grounds.  *Shaw*, 817 F.3d at 1297–98.  Shaw had petitioned the PTAB to

institute an IPR on three grounds; the PTAB instituted review on two of the petitioned grounds,

but rejected the third ground, *Payne*, as redundant.  *Id.*  In *Shaw*, the Federal Circuit noted that

"[b]oth parts of § 315(e) create estoppel for arguments 'on any ground that the petitioner raised

or reasonably could have raised *during* that inter partes review,'" and that "[t]he IPR does not

begin until it is instituted."  *Id.* at 1300.  The petitioner, therefore "did not raise—nor could it

have reasonably raised—the Payne-based ground *during* the IPR," and therefore "[t]he plain

language of the statute prohibits the application of estoppel under these circumstances."  *Id.*

The Court declines to follow *Shaw* for several reasons.  *Shaw* is distinguishable, in that

*Shaw* discusses the estoppel effects of non-instituted grounds, whereas this case concerns the

estoppel effect of unpetitioned grounds—grounds which reasonably could have been included in

the petition but were not.  The Federal Circuit limited the scope of its discussion *Shaw* by

emphasizing that estoppel did not apply "under *these circumstances*"—i.e., when petitioned

grounds are rejected by the Board and not instituted.  *See id.*  The Federal Circuit's use of

language limiting the estoppel effects of § 315(e) to the circumstances in *Shaw* appears to create

an exception for non-instituted grounds to an otherwise broad estoppel provision, and not, as

Nintendo urges, narrowing estoppel under § 315(e) to apply only to grounds asserted post-

institution.

---

[4] Def. Resp. [ECF No. 167] at 14.

Nintendo's urged construction of § 315(e) would render the statutory language "reasonably could have raised" superfluous. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan*, 533 U.S. at 174)). Under Nintendo's reading of the statute, the only patents and printed publications entitled to estoppel effect are those that are raised or reasonably could have been raised after the Board institutes review. However, institution of an IPR *limits* invalidity review to those grounds specifically instituted upon. *See Nintendo of America, Inc. v. iLife Technologies, Inc.*, IPR 2015-00109, Paper 12, at 23 (PTAB Apr. 29, 2015) ("[I]nter partes review is instituted as to claims 1–3, 9–12, and 18–20 of the '796 patent on the ground that these claims, under 35 U.S.C. § 103(a), are obvious over Yasushi; . . . trial is *limited* to the grounds of unpatentability listed above, and no other grounds of unpatentability are authorized for inter partes review." (emphasis added)); *see also* 37 C.F.R. § 42.108 ("When instituting inter partes review, the Board may authorize the review to proceed on all or some of the challenged claims and on all or some of the grounds of unpatentability asserted for each claim. . . . Denial of a ground is a Board decision not to institute inter partes review on that ground.").

Nintendo argues that § 315(e) "would not estop a petitioner from litigating invalidity grounds that . . . reasonably could have been raised 'during' an already instituted [IPR] proceeding,"[5] while simultaneously contending that Nintendo itself was prevented "from raising additional prior art patent grounds 'during' the [IPR]"[6] because the Board ordered that "no other grounds of unpatentability are authorized for inter partes review." IPR 2015-00109, Paper 12, at

---

[5] Def. Resp. [ECF No. 167] at 10.
[6] *Id.* at 13.

8

23.  In what circumstances, therefore, under the approach Nintendo argues, would it be deemed that a petitioner "reasonably could have a raised" an invalidity ground to trigger estoppel under § 315(e)?  Upon institution, the Board limits IPR review to certain grounds and prevents other grounds of unpatentability from being asserted, and therefore if estoppel under § 315(e) applies only to grounds raised *after* institution, the Court finds no way to interpret § 315(e) estoppel so as to apply to grounds other than those expressly instituted upon, which renders the phrase "reasonably could have raised" superfluous.  Nintendo does not provide an explanation of how an IPR petitioner "reasonably could have raised" another ground after institution, nor does it argue how its proposed reading of § 315(e) avoids this superfluousness issue.

Even assuming that estoppel is limited to grounds raised during the IPR *and* that a petitioner could raise a ground for § 315(e) purposes without the Board actually instituting on that ground, Nintendo does not explain how it is not now estopped from asserting invalidity on the basis of *Unuma*, one of the references on which iLife seeks estoppel.  The PTAB instituted IPR of the five other asserted patents in this case on the basis of *Unuma*, and the reference was discussed at length during the consolidated hearing for the '796 patent and the five other asserted patents.  IPR 2015-00109, Paper 39, at 1–88 (PTAB Jan. 27, 2016).  In both the claim construction briefing and *Markman* hearing for the '796 patent, Nintendo argued that iLife disclaimed the scope of the '796 patent during the IPR based on statements made when iLife distinguished *Unuma* from the asserted patents.  *See iLife Techs., Inc. v. Nintendo of Am., Inc.*, 3:13-cv-4987, 2017 WL 525708, at *9–16 (N.D. Tex. Feb. 9, 2017) (discussing Nintendo's disclaimer argument).  Even if Nintendo were correct and estoppel only applies to invalidity grounds raised after institution, Nintendo arguably raised *Unuma* in the IPR as an invalidity

ground in connection with the '796 patent and would therefore be estopped from reasserting it now.

The Court concludes that the plain meaning of § 315(e) is that an IPR petitioner is estopped from reasserting invalidity on any ground that the petitioner raised or reasonably could have raised in a petition to institute Board review of the patent.  The Court believes that the legislative history of § 315(e) supports this reading, and strongly suggests that Congress intended IPR estoppel to apply not only to grounds actually raised, but also to grounds that could have been raised but, for whatever reason, were not.  *See SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1354 (Fed. Cir. 2016) (Newman, J.) (concurring in part, dissenting in part); *Douglas Dynamics, LLC v. Meyer Prods LLC*, 3:14-cv-00886, 2017 WL 1382556, at *9 (W.D. Wisc. Apr. 18, 2017) ("[T]he legislative history . . . clearly suggests that Congress intended IPR to serve as a complete substitute for litigating validity in the district court.").

The procedural framework for IPRs was implemented as part of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011) (effective September 16, 2012).  "The America Invents Act was designed—after a decade of hearings and revisions—to reduce the cost of patent litigation, to resolve major validity issues in an expert tribunal, and to put an end to repetitive challenges." *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1357 (Fed. Cir. 2016) (Newman, J.) (concurring in part, dissenting in part).  Section 311 describes the scope of inter partes review, and limits such review to challenges that "could be raised under section 102 and 103 and only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b).  Senator Kyl described the detailed filing requirements for IPR petitions, set forth in § 312, as "forc[ing] a petitioner to present all of his best evidence against a patent up front. His petition itself must present a full affirmative case. It

thus reinforces the front loaded nature of an oppositional system, which is critical to the efficient resolution of proceedings by the PTO."[7]

During debate, the requirements of § 312 were described as providing "a higher threshold for initiating a proceeding and procedural safeguards to prevent a challenger from using the process to harass patent owners"; in conjunction with the "strengthened estoppel standard," that higher threshold would prevent petitioners from raising "the same patent issues that were raised or reasonably could have been raised in a prior challenge."[8]  "The estoppel provision [of § 315(e)] was a controversial aspect of the enactment," in particular the "could have raised" estoppel provision.  *SAS Inst., Inc.*, 825 F.3d at 1357.  Upon enactment of the AIA, Senator Grassley summarized that "could-have-raised estoppel . . .will help ensure that if an inter partes review is instituted while litigation is pending, that review will completely substitute for at least the patents-and-printed-publications portion of the civil litigation."[9]  Similarly, the Director of the USPTO testified that the estoppel provisions of § 315(e) "mean that your patent is largely unchallengeable by the same party."[10]

The legislative history, therefore, supports the Court's construction of "any ground that the petitioner . . . reasonably could have raised during that inter partes review" as including non-petitioned grounds that the defendant chose not to present in the IPR petition.  Without this broad, "strengthened estoppel standard," "IPR is not an alternative to litigating validity in the district court, it is an additional step in the process."  *Douglas Dynamics*, 2017 WL 1382556, at *5.  Under Nintendo's reading of § 315(e), petitioners could abstain from asserting known

---

[7] 154 Cong. Rec. S9982-93 (daily ed. Sept. 25, 2008) (statement of Senator Kyl on S. 3600).
[8] *See* 157 Cong. Rec. S952 (Feb. 28, 2011) (statement of Sen. Grassley on final consideration of S. 23)
[9] 157 Cong. Rec. S1360-94 (daily ed. March 8, 2011) (statement of Sen. Grassley).
[10] *America Invents Act: Hearing on H.R. 1249 Before the House Comm. on the Judiciary*, 112th Cong. 12 (2011) (statement of David Kappos, Director, USPTO).

11

references in the IPR and reserve them to relitigate validity in the district court, which is counter to the AIA's purpose of achieving "expeditious and economical final resolution" by "substituting an agency tribunal for district court proceedings on aspects of patent validity." *SAS Inst., Inc.*, 825 F.3d at 1353–54.

Nintendo urges the Court to follow the District Court's decision in *Intellectual Ventures I LLC v. Toshiba Corporation*, ___ F. Supp. 3d ___, 2016 WL 7341713, at *12–13 (D. Del. Dec. 9, 2016) (Robinson, J.), in which the court extended the logic of *Shaw* to "prior art references that were never presented to the PTAB at all (despite their public nature)," despite the court recognizing that this "confounds the very purpose of this parallel administrative proceeding." On reconsideration, the court further recognized that following *Shaw* "leads to the conclusion that a company can play games between the PTAB (IPR) and the courts (litigation), asserting some references in connection with the IPR but reserving some for litigation," but declined to upset the court's earlier decision, "with hopes that an appeal may clarify the issue for future judges in future cases." *Intellectual Ventures I LLC v. Toshiba Corp.*, No. 13-453, 2017 WL 107980, at *1–2 (D. Del. Jan. 11, 2017).

The Court declines to follow *Intellectual Ventures*, which technically supports Nintendo's argument but does nothing to assuage the concerns this Court has in adopting a reading of § 315(e)(2) that runs counter to the statute's plain language and the legislative intent for the nature of IPRs. Other courts to have considered this issue have agreed with the Court's reading of § 315(e). *See, e.g.*, *Douglas Dynamics*, 2017 WL 1382556, at *5; *Parallel Networks Licensing, LLC v. Int'l Bus. Machines Corp.*, No. 13-2072, 2017 WL 1045912, at *11–12 (D. Del. Feb. 22, 2017) (Jordan, J.) ("Allowing IBM to raise arguments here that it elected not to

raise during the IPR would give it a second bite at the apple and allow it to reap the benefits of the IPR without the downside of meaningful estoppel."); *Clearlamp*, 2016 WL 4734389, at *9.

     Nintendo also asserts that the consequence of this Court applying § 315(e) estoppel to grounds that reasonably could have been raised in the petition would supersede its "right to have its invalidity arguments properly considered on the merits."[11]  However, Nintendo made a choice to pursue IPR review of the '796 patent; its petition for review should have presented "all of [its] best evidence" and "a full affirmative case" against the '796 patent.[12]  "[I]n exchange for the expedited adjudication of its best case," Nintendo surrendered "the right to judicial review of its secondary grounds for invalidity."  *Douglas Dynamics*, 2017 WL 1382556, at *5.  After reaping the benefits of the IPR as to the five other asserted patents, it cannot now expect "a second bite at the apple" in relitigating the validity of the '796 patent in the district court.  *See Parallel Networks*, 2017 WL 1045912, at *12.

     Accordingly, the Court concludes that in § 315(e), the statutory language "any ground that the petitioner . . . reasonably could have raised during that inter partes review" includes grounds that the defendant reasonably could have raised in its petition to PTAB.  Thus, Nintendo is estopped from asserting any patents or printed publications that it reasonably could have included in its petition to institute review of the '796 patent.  This includes patents and printed publications disclosed by Nintendo in its invalidity contentions, as well as any reference that could have been found by a skilled searcher performing a diligent search.  *See Clearlamp*, 2016 WL 4734389, at *8 ("[A]n *inter partes* review petitioner is estopped from relying on any ground that could have been raised based on prior art that could have been found by a skilled searcher's diligent search." (quoting 157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl)

---

[11] Def. Mot. Resp. [ECF No. 167] at 13.
[12] 154 Cong. Rec. S9982-93 (daily ed. Sept. 25, 2008) (statement of Senator Kyl on S. 3600).

("Adding the modifier "reasonably" ensures that could-have-raised estoppel extends only to that prior art which a skilled searcher conducting a diligent search reasonably could have been expected to discover.")).

The Court notes, however, that a petitioner could not have reasonably raised a combination of a prior art *product* with a patent or printed publication as a ground for invalidity before the PTAB, as a petition to institute an IPR may be brought "only on the basis of prior art consisting of patents or printed publications." § 311(b).  Accordingly, the Court finds that estoppel applies to all patents and printed publications that reasonably could have been raised in an IPR petition to the Board, but not to patents or printed publications that combined with prior art products would be ineligible for inter partes review under § 311(b).

For the foregoing reasons, therefore, iLife's Motion for Partial Summary Judgment is **GRANTED**.  Nintendo is estopped from asserting any patents or printed publications that it reasonably could have raised in the '796 patent IPR, including any patents or printed publications included in its invalidity contentions originally served in this case, as well as any other patents or printed publications which a skilled searcher conducting a diligent search reasonably could have been expected to discover.

### 3.  iLife's Motion to Strike Nintendo's Invalidity Theories, and Nintendo's Cross Motion to Amend Its Invalidity Contentions

iLife moves to strike certain invalidity theories asserted by Dezmelyk, Nintendo's expert, in his report, on the grounds that Nintendo did not disclose them in its 2014 invalidity contentions.  iLife argues that it has relied on Nintendo's invalidity contentions in developing its case strategy, and that permitting Nintendo to assert new invalidity theories, including system art combinations, would materially impact their preparation to proceed with the litigation.  Allowing

such an amendment, iLife maintains, would undermine the purpose of having invalidity contentions, which are intended to simplify and streamline issues in the case.

Nintendo counters that there is no basis for preventing Nintendo from relying on any of the prior art products that iLife contests, and that iLife was put on notice of its theories as they developed. Nintendo further argues that, concerning the ADXL202 reference, it is permitted to supplement its invalidity contentions under Local Patent Rule 3-6, and for the other contested invalidity theories, it has established good cause to amend its preliminary invalidity contentions. For the reasons provided below, iLife's Motion to Strike is **GRANTED**, and Nintendo's Cross Motion to Amend Invalidity Contentions is **DENIED**.

### a. Legal Background

This Court follows the Northern District of Texas's Local Patent Rules, adopted in Amended Miscellaneous Order No. 62 ("Local Patent Rules"). Local patent rules aid in efficiently managing the various stages of patent litigation. *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006); *Summit 6 LLC v. HTC Corp.*, Nos. 7:14-cv-00014, 7:14-cv-00106, 2015 WL 11117869, at *1 (N.D. Tex. Jan. 8, 2015). Local Patent Rule 3-1 "requires a party claiming patent infringement to disclose its asserted claims and preliminary infringement contentions early in the litigation so that 'the case takes a clear path, focusing discovery on building precise final infringement or invalidity contentions and narrowing issues for *Markman*, summary judgment, trial, and beyond.'" *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, 3:10-cv-276, 2012 WL 9148157, at *2 (N.D. Tex. Feb. 10, 2012). Shortly after service of infringement contentions, defendants serve preliminary invalidity contentions, identifying "each item of prior art that allegedly anticipates each asserted claim or renders it obvious," including combinations of prior art. Local Patent Rule 3-3. "The purpose of

this structure is to streamline the discovery process by narrowing the issues for claim construction and trial." *Summit 6 LLC*, 2015 WL 11117869, at *1.

Under the Local Patent Rules, failure to comply with the requirements for preliminary infringement and invalidity contentions, including requirements of specificity and detail, may result in appropriate sanctions. Local Patent Rules 3-1(b), 3-3(b). The rules do not specify the actions the Court may or must take if there is non-compliance with the requirements for disclosure of contentions. However, the Federal Circuit has held that because local patent rules are "essentially a series of case management orders," the Court may impose "any 'just' sanction for the failure to obey a scheduling order, including 'refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence.'" *O2 Micro Int'l*, 467 F.3d at 1363.

Local Patent Rule 3-3 provides that preliminary invalidity contentions must be served within 45 days from the date infringement contentions are served. "Each party's preliminary infringement contentions and preliminary invalidity contentions will be deemed to be that party's final contentions." Local Patent Rule 3-6. However, within 50 days from the date the claim construction order is filed, final invalidity contentions may be served without leave of court if (1) "a party claiming patent infringement has served its final infringement contentions," or (2) "the party opposing a claim of patent infringement believes in good faith that the presiding judge's claim construction ruling so requires." *Id.*

Apart from these two exceptions, the Local Patent Rules provide that "[a]mendment of preliminary or final infringement contentions or . . . invalidity contentions . . . may be made only by order of the presiding judge upon a showing of good cause." Local Patent Rule 3-7. "Good cause . . . may include newly discovered instrumentalities, newly discovered bases for claiming

16

infringement, or newly discovered prior art references." *Id.* A party seeking amendment of its preliminary invalidity contentions must state "that the newly discovered instrumentalities, newly discovered bases for claiming infringement, or newly discovered prior art references were not known to that party prior to the motion despite diligence in seeking out the same." *Id.*

"[U]nlike the liberal policy for amending pleadings, the philosophy behind amending claim charts . . . is decidedly conservative." *Genetech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 774 (Fed. Cir. 2002). "Good cause," according to the Federal Circuit, "requires a showing of diligence." *O2 Micro Int'l*, 467 F.3d at 1366. "The burden is on the movant to establish diligence rather than on the opposing party to establish a lack of diligence." *Id.* Courts generally have broad discretion to grant untimely motions to supplement invalidity or infringement contentions, but in exercising that discretion, four factors are typically considered: "(1) the explanation for the failure to meet the deadline; (2) the importance of the thing that would be excluded; (3) potential prejudice in allowing the thing that would be excluded; and (4) the availability of a continuance to cure such prejudice." *Mobile Telecomms., Techs., LLC v. Blackberry Corp.*, 3:12-CV-1652-M, 2015 WL 12698061, at *1 (N.D. Tex. May 19, 2015) (Lynn, J.).

### b.  Contested Invalidity Theories

iLife contests several invalidity theories asserted by Nintendo's expert, Dezmelyk, in his expert report, because they were not included in Nintendo's preliminary invalidity contentions. Specifically, iLife objects to invalidity defenses based on certain prior art products: the Microsoft SideWinder Freestyle Pro, ADXL202, Crossbow products, including CXTILT, and various combinations of these prior art products with other prior art.

17

### i. Microsoft SideWinder Freestyle Pro

iLife seeks to strike all defenses based on the Microsoft SideWinder Freestyle Pro (the "Freestyle Pro"), described in Exhibit C-1 of Dezmelyk's report as a "video game controller" that "contains an accelerometer that can be used to determine when the controller is moved."[13] As a preliminary matter, the Freestyle Pro qualifies as a prior art product, and therefore is not subject to the IPR's estoppel effects under § 315(e)(2), as invalidity can only be challenged in an IPR on the basis of patents or printed publications.

iLife claims that the Dezmelyk report discloses new invalidity theories against the '796 patent based on the Freestyle Pro: anticipation, single-reference obviousness, and obviousness in combination with *Unuma*.[14]  iLife maintains that Nintendo knew about the Freestyle Pro since at least 2006, because the USPTO issued a patent to Nintendo Co. Ltd., a Nintendo entity that is not part of this litigation, on August 22, 2006, that lists the Freestyle Pro as a prior art reference.[15] Nintendo appears to admit that the Freestyle Pro was not included in its preliminary invalidity contentions, maintaining instead that Nintendo first discovered the Freestyle Pro "at the same time this case was being stayed pending resolution of [Nintendo's] IPRs."[16]  Nintendo also argues that information regarding the Freestyle Pro was disclosed to iLife during fact discovery and thus that iLife was on notice of its invalidity theory relating to the Freestyle Pro.

### ii. ADXL202

iLife seeks to strike all defenses based on the ADXL202 accelerometer and the combination of *Hubert* in view of the ADXL202.  iLife claims that the Dezmelyk report discloses new obviousness combination invalidity theories against the '796 patent on the basis of

---

[13] Pl. App [ECF No. 153] at 217–18.
[14] Pl. Mot. [ECF No. 152] at 7.
[15] U.S. Patent No. 7,094,147 (filed Aug. 21, 2002); Pl. App. [ECF No. 153] at 3–4.
[16] Def. Resp. [ECF No. 169] at 6.

the ADXL202: the ADXL202 Accelerometer in view of the ADXL202 Data Sheet and/or the
ADXL202 Technical Note, and *Hubert*, U.S. Patent No. 4,110,741, in view of the ADXL202.[17]
The '796 patent references the ADXL202 by name, describing it as "an accelerometer available
from ANALOG DEVICES, INC., located at One Technology Way, Norwood, Mass., United
States of America, namely, Model No. ADXL202."[18]

iLife maintains that Nintendo did not disclose or chart the ADXL202 product against the
'796 patent in its invalidity contentions, nor did Nintendo disclose any invalidity theories based
on the combination of the ADXL202 product with the ADXL202 data sheet or technical note.
The ADXL202 is not listed as a prior art system in Nintendo's preliminary invalidity
contentions.[19]

Nintendo admits that it did not chart the ADXL202 as a separate reference in its
preliminary invalidity contentions, but states that it did include the ADXL202 data sheet as an
additional item of prior art.[20]  Nintendo claims that after the deposition, taken in December of
2016, of Michael D. Halleck, an inventor of the '796 patent, it "realized that the ADXL202
rendered the Asserted Claims obvious."[21]

---

[17] Pl. Mot. [ECF No. 152] at 8.
[18] '796 patent, col. 6, ll. 53–55.
[19] Nintendo's preliminary invalidity contentions state that "many of the references identified [in the contentions] disclose systems implementing accelerometer chips that were widely available for purchase in the late 1990s, such as Analog Devices' . . . ADXL202." Pl. App. [ECF No. 153] at 683.  Elsewhere, the ADXL202 is discussed in a printed publication called Expressive Footwear for Computer-Augmented Dance Performance, by J. Paradiso and E. Hu.  E.g., id. at 761  Nintendo's preliminary invalidity contentions also disclose a prior art publication titled "Low Cost ±2g/±10g Dual Axis iMEMS® Acceleromters [sic] with Digital Output ADXL202/ADXL210," published in 1999 by Analog Devices, as well as references to an "ADXL Data Sheet."  Id. at 982; 768.  It is unclear whether these are referring to the same printed publication.  There do not appear to be any references to the ADXL202 product or system as a basis for asserting invalidity, either alone or in combination with any other reference.  *Id.* at 675–79.
[20] Def. Resp. [ECF No. 169] at 10.
[21] *Id.* at 18.

### i. Crossbow CXTILT

iLife seeks to strike all defenses based on the Crossbow CXTILT and the Crossbow CXTILT in view of *Unuma*.  iLife claims that the Dezmelyk report discloses new invalidity theories against the '796 patent based on the Crossbow CXTILT: anticipation, single-reference obviousness, and obviousness in combination with *Unuma*.[22]

Nintendo's invalidity contentions reference the "Crossbow System" as a prior art system, which Nintendo alleges was "known or used by others, publicly used, offered for sale, or sold by . . . Mike Horton and Richard Newton as early as 1997."[23]  Nintendo discloses no additional details regarding the Crossbow system, other than stating that "[o]n information and belief, the Crossbow system is described in" U.S. Patent No. 5,615,132 and U.S. Patent No. 5,819,206. iLife maintains that the contentions do not identify or disclose any use, sale, or functionality of any Crossbow product, as required by the Local Patent Rules, and the chart of the Crossbow System is based on what is disclosed in U.S. Patent No. 5,615,132, and does not disclose any critical elements of the '796 patent.[24]

iLife objects to Dezmelyk's reliance on the Crossbow CXTILT product, on the grounds that the Crossbow CXTILT was not included in the preliminary invalidity contentions and Nintendo had not moved to amend them.  iLife further maintains that Nintendo was not diligent in deposing Michael Horton to obtain more information on the Crossbow products.  Nintendo responds that it diligently worked to uncover information regarding the Crossbow products, and that it can show good cause for permitting amendment of its invalidity contentions to include the CXTILT product.

---

[22] Pl. Mot. [ECF No. 152] at 8.
[23] Pl. App. [ECF No. 153] at 677.
[24] Pl. Mot. [ECF No. 152] at 9.

### c.  Motion to Amend Under Local Patent Rule 3-6

Concerning the ADXL202, Nintendo argues that the Local Patent Rules permit it to file final invalidity contentions without leave of court.  Under Local Patent Rule 3-6, within 50 days from the date the presiding judge's claim construction ruling is filed, a party opposing a claim of patent infringement may serve final invalidity contentions without leave of court that amend its preliminary invalidity contentions if "the party opposing a claim of patent infringement believes in good faith that the presiding judge's claim construction ruling so requires."  Local Patent Rule 3-6(b).  This exception permits a party to respond to an unexpected claim construction by the court, but does not mean that after every claim construction order, new infringement or invalidity contentions may be filed.  *See Cell & Network Selection LLC v. AT&T Inc.*, 6:13-cv-403, 2014 WL 10727108, at *2 (E.D. Tex. Nov. 10, 2014) ("Traditionally, the Court's adoption of another's party construction alone is not sufficient to support a party's good faith belief it was surprised by the Court's ruling." (internal quotation marks omitted)); *Nike, Inc. v. Adidas Am. Inc.*, 479 F. Supp. 2d 664, 667–68 (E.D. Tex. 2007) ("A party cannot argue that because its precise proposal for a construction of a claim term is not adopted by the court, it is surprised and must prepare new infringement contentions.").

On February 9, 2017, the Court entered its claim construction order.  ECF No. 142. Forty-nine days later, on March 30, 2017, Nintendo served on iLife its supplemental invalidity contentions, including amendments to include the ADXL202, concurrently with the filing of its Response to iLife's Motion to Strike and Cross Motion to Amend Invalidity Contentions.[25] Nintendo claims that its amendment concerning the ADXL202 was proper under Local Patent Rule 3-6(b) because "it responds to the Court's claim construction order," particularly with

---

[25] Def. Resp. [ECF No. 169] at 6 n.1.

regard to the Court's construction of "within environmental tolerance" and "communication[s] device."

For "within environmental tolerance," the parties' proposed constructions, and the Court's final construction, are as follows:

a) iLife's Proposed Construction: Acceptable based on criteria including a specified value given the environment and application for which body movement is being evaluated

b) Nintendo's Proposed Constructions: Not so abnormal as to be damaging, destructive, crippling, harmful, injurious or otherwise alarming or, possibly, distressing to the body relative to the physical system in which the body is located

Nintendo's Alternative Proposed Construction: Acceptable based upon criteria to determine whether such movements are abnormal, including a specified value given the environment for which body movement is being evaluated

c) The Court's Construction: Acceptable based on criteria including a specified value given the environment for which body movement is being evaluated[26]

For "communication[s] device," the parties' proposed constructions, and the Court's final construction, are as follows:

a) iLife's Proposed Construction: One or more associated components capable of transmission of information using a wired or wireless network

b) Nintendo's Proposed Construction: An existing device that allows for interpersonal communication including at least "cellular telephones, personal digital assistants, hand held computers, laptops, computers, wireless Internet access devices, or other similar types of communications equipment"

c) The Court's Construction: One device or one or more associated components acting together capable of transmission of information using a wired or wireless network[27]

---

[26] ECF No. 142 at 31.
[27] *Id.* at 11.

In arguing that Local Patent Rule 3-6(b) permits amendment of its preliminary invalidity contentions, Nintendo does not assert that the Court's final constructions were unexpected or surprising.  The Court finds that Nintendo does not adequately explain why the Court's construction of "communication[s] device" or "within environmental tolerance" differed so from the proposed definitions that amendment of its invalidity contentions was necessary.

As to "within environmental tolerance," Nintendo argues that the Court adopted a broader version of iLife's proposed construction, by omitting "and application" from the construction, and "[n]umerous applications of the ADXL202 satisfy this limitation which may not have satisfied the limitation under narrower constructions."[28]  While this may be true, there is no evidence that the Court's adopted construction was unexpected or a surprise to Nintendo, or so different from the proposed definitions that amendment of its invalidity contentions was necessary.  iLife's proposed construction for "within environmental tolerance" was the same it initially briefed in December of 2014, and the same construction that was adopted by Judge Conti in *iLife Techs. Inc. v. Body Media, Inc.*, 90 F. Supp. 3d 415 (W.D. Pa. 2015).  Furthermore, in omitting "and application," the Court incorporated a suggestion from Nintendo's own proposed construction, and in doing so adopted the same claim construction used by the PTAB in the '796 patent IPR proceeding.  2015IPR-00109, Paper 12, at 13 (PTAB Apr. 29, 2015).  Nintendo can hardly claim that the Court's final construction of "within environmental tolerance" was wholly unexpected.

Concerning "communication[s] device," Nintendo argues that "[t]he Court adopted a broader version of iLife's proposed construction," such that it captures applications of the ADXL202 that previously were excluded.  However, the Court's Claim Construction Order

---

[28] Def. Resp. [ECF No. 169] at 20.

indicates that it agreed with the substantive breadth of iLife's proposed construction, and only changed the language to avoid a grammatically incorrect phrase:

> iLife urges the Court to adopt a construction that includes the phrase "one or more associated components," which perplexingly permits the existence of one associated component. . . . [A] preferred embodiment of the '796 patent describes how the sensor and processor, which are key parts of the invention, are "not co-located, but rather associated wirelessly." . . .  The Court agrees with iLife that the construction of "communications device" must be broad enough to cover this preferred embodiment. However, *it declines to adopt a grammatically incorrect phrase that likely introduces error or confusion*. Accordingly, the Court defines "communication device" to mean "one device or one or more associated components acting together capable of transmission of information using a wired or wireless network."[29]

The Court did not significantly expand the scope or breadth of "communication[s] device" from iLife's proposed construction; therefore, the Court's adopted definition was not so different from the proposed constructions as to warrant amended invalidity contentions based on the Court's claim construction being unexpected or surprising.

Nintendo argues that the "totality of [the Court's] claim constructions . . . was not foreseeable to [Nintendo] in advance."  However, Nintendo elsewhere argues that "[b]ased on Mr. Halleck's testimony in conjunction with the claim construction positions *being urged by iLife*, [Nintendo] realized that the ADXL202 rendered the Asserted Claims obvious."[30] Nintendo, therefore, recognized the significance of the ADXL202 as a potential prior art reference before the Court issued its claim construction order.  The Court did not stray far from the parties' proposed constructions; Nintendo cannot now claim surprise at the Court's claim construction as a basis for permitting amendment of its invalidity contentions so as to include the ADXL202.  Accordingly, Nintendo has not shown that it is entitled to amend its invalidity contentions pursuant to Local Patent Rule 3-6.

---

[29] ECF No. 142 at 16.
[30] Def. Resp. [ECF No. 169] at 18 (emphasis added).

### d.  Motion to Amend Under Local Patent Rule 3-7

Under the local rules, a defendant's preliminary invalidity contentions are deemed to be final, unless amendment is permitted "by order of the presiding judge upon a showing of good cause."  Local Patent Rule 3-7.  As Nintendo's preliminary invalidity contentions do not include the Freestyle Pro, the ADXL202 system, or the Crossbow CXTILT or any other Crossbow product, Nintendo must make a showing of good cause for amending its contentions to include them.  In establishing good cause, Nintendo must also make a showing of diligence.  *O2 Micro Int'l*, 467 F.3d at 1366.  The Court proceeds with the four-factor test to determine good cause.  *Blackberry Corp.*, 2015 WL 12698061, at *1.

### i.  Factor 1: Explanation for Delay

For the first factor, Nintendo's explanation for its failure to meet the deadline, the Court considers the explanation given for each contested invalidity theory.

### 1.  Freestyle Pro

Concerning its explanation for the delay in asserting the Freestyle Pro, Nintendo maintains that it only learned about the Freestyle Pro shortly before the Court stayed the case for the IPRs, pointing to a declaration of its counsel, Stephen McBride, who asserts that "[t]he product known as the Microsoft Sidewinder Freestyle Pro was first discovered by [Nintendo] in the middle of May 2015."[31]  Once the stay was lifted, Nintendo maintains that it has been researching the Freestyle Pro diligently; McBride's declaration states that Nintendo "did not begin evaluating the Freestyle Pro until August 201[6]."[32]  Nintendo further claims that it served an invalidity chart concerning the Freestyle Pro to iLife in December of 2016 and made the

---

[31] Def. App. [ECF No. 170] at 0002.
[32] ECF No. 170 at 5.  McBride's declaration states that evaluation did not begin "until August 2017" which the Court assumes is a typographical error.

system available for iLife's inspection.[33]  In an email dated December 8, 2016, Stephen McBride stated that Nintendo "expect[s] to move to amend [Nintendo's] invalidity contentions to include the Freestyle Pro chart once full discovery is complete."[34]

The Court finds this first factor weighs against amendment to include the Freestyle Pro. Nintendo has provided no explanation why the Freestyle Pro reference was not initially included in its preliminary invalidity contentions.  *Cf. Blackberry*, 2015 WL 12698061, at *4 (granting leave to amend invalidity contentions when defendant was not aware that plaintiff would be seeking an earlier priority date, and then took a reasonable amount of time to search for and obtain prior art that antedated plaintiff's new priority date).  Other than identifying the time period when it allegedly learned of the Freestyle Pro, Nintendo provides no explanation for the circumstances surrounding its discovery or its delay in finding it.  There is evidence of lack of diligence by Nintendo in seeking out prior art, in that the Freestyle Pro was cited in an earlier patent assigned to Nintendo Co. Ltd, a Nintendo entity.[35]  It was clearly prior art that "could . . . be found using publicly available information," and was readily ascertainable to Nintendo; there is no suggestion that the Freestyle Pro was an obscure reference or hard to find. *See Summit 6 LLC*, 2015 WL 11117869, at *4.  Nintendo provides no reason for its failure to include the Freestyle Pro in its preliminary invalidity contentions.

Nintendo asserts that it found the Freestyle Pro in May 2015, approximately nine months after the deadline to serve its invalidity contentions.  In early December 2016, Nintendo clearly

---

[33] Def. App. [ECF No. 170] at 0355.
[34] *Id.*
[35] Nintendo argues that "[t]he fact that one of the thousands of patents assigned to a Nintendo entity cites an article referring to the Freestyle Pro is not a reasonable basis for attributing knowledge of the Freestyle Pro to [Nintendo] ten years later in an entirely unrelated litigation."  Def. Resp. [ECF No. 169] at 13 n.7.  However, the Court is not imputing knowledge of the Freestyle Pro to Nintendo on the basis of the earlier patent; instead, inclusion of the Freestyle Pro in the earlier patent is indicative of whether the reference was hard to find or obscure.  The fact that various Nintendo entities have many patents assigned to it does not explain Nintendo's delay in finding the Freestyle Pro in this litigation.

anticipated the need to amend its invalidity contentions to include the Freestyle Pro, yet did not move to do so until prompted by iLife's Motion to Strike some four months later.[36]  "To show good cause to amend invalidity contentions, the moving party must both show that it diligently searched for and analyzed prior art and that it *promptly* disclosed any newly discovered references."  *Summit 6 LLC*, 2015 WL 11117869, at *2 (emphasis added) (quoting *Guardian Techs., LLC v. Radio Shack Corp.*, No. 3:09-CV-00649-B, slip op. at *4 (N.D. Tex. Aug. 8, 2010)).  Nintendo provides no explanation for this additional delay in moving to amend. Nintendo carries the burden of establishing diligence, and with regard to the Freestyle Pro, the Court finds that it has not sufficiently done so.  *See O2 Micro Int'l*, 467 F.3d at 1366.

## 2.  ADXL202

In explaining its delay in seeking leave to amend its preliminary invalidity contentions to include the ADXL202, and associated combinations of the ADXL202 with the ADXL202 data sheet, technical note, or *Hubert*, Nintendo argues that it did not initially consider the ADXL202 accelerometer as a primary prior art reference, and did not chart it "because Nintendo viewed the ADXL202 as an obviousness combination that overlapped with much of the prior art already charted."[37]  When it filed its preliminary contentions, Nintendo maintains that it "had no reason . . . to suspect that iLife was interpreting the claims so broadly that they were rendered invalid" in light of the ADXL202.[38]  Nintendo argues that it was only taking Halleck's deposition in December of 2016, coupled with the broad claim constructions advocated by iLife, that "led [Nintendo] to determine that the ADXL202 should be independently charted."[39]

---

[36] Nintendo filed its Opposition to Plaintiff's Motion to Strike and Cross Motion to Amend Invalidity Contentions on March 30, 2017, and its separate Motion to Amend Invalidity Contentions that same day.  ECF Nos. 169, 171.
[37] ECF No. 189 at 13.
[38] *Id.*
[39] Def. Resp. [ECF No. 169] at 25.

Nintendo maintains that it then "promptly disclosed its intention to chart the ADXL202 to iLife and proceeded to do so in the Dezmelyk [r]eport."[40]

The Court finds that this factor does not weigh in favor of permitting amendment of the ADXL202 accelerator. Local Patent Rule 3-7 states that "good cause" for amendment purposes includes "newly discovered prior art references"; here, the '796 patent itself cites the ADXL202 accelerometer, so it can hardly be considered "newly discovered." Nintendo advocates it should be entitled to amend to include the ADXL202 accelerator because it had some sort of epiphany following Halleck's deposition when he stated that "the ADXL202 datasheet advised engineers to account for both static and dynamic acceleration in designing tilt (orientation) sensors using the ADXL202."[41] However, the Federal Circuit has rejected the notion that good cause for amendment of contentions exists "merely because new evidence was revealed during discovery." *O2 Micro Int'l*, 467 F.3d at 1366. Nintendo does not explain adequately why it did not initially include the ADXL202 in its preliminary contentions; the Court is not convinced by its explanation that the ADXL202 "overlapped with much of the prior art already charted," particularly when avoiding redundancy and repetition in its invalidity contentions does not appear to have been a primary concern.

Furthermore, Nintendo has failed to establish that it acted with diligence in pursuing the ADXL202 as a potential prior art reference; the '796 patent identifies the ADXL202 by name and Nintendo was clearly aware of its potential to be relevant prior art because it included the ADXL202 data sheet in its preliminary contentions, yet Nintendo waited until the last day of fact discovery to depose Halleck about the significance of the ADXL202 in the creation of the technology described in the '796 patent. Nintendo also provides no explanation for the three-

---

[40] *Id.*
[41] Def. Resp. [ECF No. 169] at 18.

month delay between mid-December, when it claims it identified the ADXL202 as prior art, and when it finally moved to amend its invalidity contentions at the end of March. *See O2 Micro Int'l*, 467 F.3d at 1367 (affirming district court's finding of a lack of diligence when movant waited almost three months to serve proposed amended contentions and two more weeks to formally move to amend). Nintendo's explanation that Dezmelyk's report provided notice because it charted the ADXL202 to the '796 patent is likewise insufficient; experts should not be "permitted to opine on obviousness combinations or motivations to combine that were never disclosed for a particular claim in . . . [i]nvalidity [c]ontentions." *Tyco Healthcare Grp. LP v. Applied Med. Res. Corp.*, 9:06-cv-151, 2009 WL 5842062, at *3 (E.D. Tex. Mar. 30, 2009). "This is especially true when the expert's revelation is revealed for the first time in his report, well after the fact discovery period has closed," as is the case here. *Id.*

### 3. Crossbow CXTILT

Concerning the delay in asserting the Crossbow CXTILT, Nintendo maintains that it diligently pursued discovery related to Crossbow products after it served its preliminary invalidity contentions in August 2014, in which Nintendo reserved the right "to rely upon additional evidence concerning . . . other Crossbow Technology's products developed or produced during the course of discovery."[42]  In February of 2015, Nintendo asserts that it reached out to the founder and CEO of Crossbow Technologies, Michael Horton, for information on Crossbow products.[43]  Horton allegedly informed Nintendo that Crossbow had been purchased by a company named Moog and all relevant Crossbow documents were the property of Moog.[44]  Moog requested that Nintendo serve a subpoena to access the documents, which

---

[42] *E.g.*, Pl. App. [ECF No. 153] at 849.
[43] Def. App. [ECF No. 170] at 00131–32.
[44] McBridge Decl. ¶ 3, Def. App. [ECF No. 170] at 0001–02.

Nintendo did in March of 2015.[45]  Moog produced documents responsive to Nintendo's third

party document and deposition subpoenas on April 28 and May 4, 2015; the documents were

provided to iLife on May 5, 2015.[46]  Nintendo was in the process of scheduling a deposition of

Horton, when the Court stayed the case, on May 18, 2015, while IPRs were pending.[47]

The stay was lifted on July 11, 2016.[48]  In August 2016, Nintendo claims that it emailed

Moog's attorney to schedule a deposition of Horton, and was told that Horton was no longer

associated with or represented by Moog.[49]  In early September 2016, Nintendo contacted Horton

directly, and on October 25, 2016, Nintendo retained Horton as a consultant.[50]  On November 14,

2016, Nintendo amended its initial disclosures to disclose Horton as a potential fact witness

regarding his "[k]nowledge of the Crossbow products, including the Crossbow DMU-6 and CX-

Tilt products."[51]  On November 28, 2016, Nintendo noticed Horton's deposition for December 8,

2016.[52]

On December 5, 2016, iLife filed its Motion for Protective Order, seeking to quash the

deposition of Horton.[53]  The next day, the Court stayed Horton's deposition pending resolution

of iLife's motion.[54]  On March 1, 2017, the Court denied iLife's Motion for Protective Order,

and lifted the stay preventing Nintendo from deposing Horton.  ECF No. 147.  On March 3,

2017, Nintendo designated Horton as a technical expert and served a report.[55]  Horton's

---

[45] *Id.*; Def. App. at 134–150.
[46] Def. App. [ECF No. 170] at 134–35, 220–21.
[47] Def. App. [ECF No. 170] at 223–25; ECF No. 91 (Court's Order Granting Nintendo's Motion to Stay Based on Institution of Inter Partes Review).
[48] ECF No. 106 (Court's Order granting Motion to Lift Stay).
[49] Def. App. [ECF No. 170] at 399.
[50] *Id.* at 130, 342.
[51] Def. App. [ECF No. 170] at 265.
[52] Def. App. [ECF No. 170] at 271.
[53] ECF No. 131 at 1.
[54] ECF No. 133 at 1.
[55] Def. App. at 347.

deposition took place on March 29 and 30, 2017.  Nintendo moved to amend its preliminary invalidity contentions on March 30, 2017.

The Court concludes that the first factor weighs against permitting Nintendo to amend its preliminary invalidity contentions to include the CXTILT Crossbow Product.  On one hand, Nintendo has explained some reasonable delay in deposing Horton—namely, Moog's representation of Horton and the need to obtain subpoenas, the intervening stay for IPRs, Horton's subsequent departure from Moog, and the stay of Horton's deposition while the Motion for Protective Order was resolved.  On the other hand, Nintendo delayed seeking out information on the Crossbow Systems for six months between service of its preliminary invalidity contentions in August 2014 and initially contacting Horton in February 2015.  Furthermore, on December 15, 2016, Nintendo served on iLife a claim chart asserting invalidity of the '796 patent on the basis of the Crossbow CXTILT in combination with *Unuma*,[56] indicating that in mid-December, 2016, Nintendo had sufficient knowledge of the CXTILT to amend its invalidity contentions, as least with regard to the CXTILT and *Unuma* combination, yet it did not do so. Similarly, Dezmelyk had sufficient knowledge of the CXTILT and CXTILT in combination with *Unuma* to describe these specific invalidity theories in his report.  Nintendo has provided no reason why it could not amend its invalidity contentions to reflect the same.[57]

Furthermore, Nintendo has not adequately explained why the delay in deposing Horton prevented it from amending its invalidity contentions.  Local Patent Rule 3-3 does not require that invalidity contentions for prior art products be supported by inventor testimony.  In addition, Nintendo's December 15, 2016, claim chart asserting invalidity on the basis of CXTILT and

---

[56] Pl. App. [ECF No. 153] at 532–58.
[57] Nintendo asserts that it had "good cause for supplementing its CXTILT claim chart with its opening expert reports."  ECF No. 189 at 7.  Nintendo seems to equate providing invalidity theories in an expert report with amending its invalidity contentions.

*Unuma* states that Horton will be deposed to provide "additional evidence to corroborate the sales dates of the CXTILT" and "will testify to various applications and modifications of the CXTILT that in fact took place prior to the 102(a) and (b) dates for the [']796 patent and will be relevant to inherency and obviousness arguments."[58]  While this testimony is undoubtedly important to Nintendo's case, the delay in obtaining it does not excuse Nintendo's delay in moving to amend its invalidity contentions.

### ii.  Factor 2: Importance of the Amendments

As to the second factor, importance of the amendments, Nintendo maintains that the contested prior art products "are all likely to dispose of all of the Asserted Claims and are therefore critically important to [Nintendo's] invalidity defense."[59]  Granting iLife's Motion to Strike, Nintendo asserts, "could amount to a disfavored 'death-penalty' sanction."[60]

The Court finds the supposed importance of the amendments Nintendo seeks is undermined by Nintendo's lengthy delay in seeking leave to amend; if these invalidity theories are as important as Nintendo claims, it surely would have sought leave to include them in its invalidity contentions much earlier, and not only in response to iLife's Motion to Strike.  *See Tyco*, 2009 WL 5842062, at *4.  Furthermore, the Federal Circuit has expressly considered whether denying amendment of infringement contentions is too severe a sanction for failure to comply with deadlines required by the local patent rules, and concluded that "exclusion of evidence is often an appropriate sanction for the failure to comply with such deadlines."  *O2 Micro Int'l*, 467 F.3d at 1369.

---

[58] Pl. App. [ECF No. 153] at 532.
[59] Def. Resp. [ECF No. 169] at 25.
[60] *Id.* at 26.

Accordingly, the Court finds this second factor is neutral, neither weighing for nor against amendment.

### iii.   Factor 3: Potential Prejudice to iLife

The Court finds that permitting amendment to include the contested invalidity theories would result in substantial prejudice to iLife.  The purpose of disclosing infringement and invalidity contentions early in the case is to create a "clear path, focusing discovery" and "narrowing issues for *Markman*, summary judgment, [and] trial."  *Gen. Elec. Co.*, 2012 WL9148157, at *2.  Early notice of infringement and invalidity contentions, coupled with "diligence in amending those contentions when new information comes to light in the course of discovery," balances "the right to develop new information in discovery with the need for certainty as to the legal theories."  *O2 Micro Int'l*, 467 F.3d at 1365.  In other words, requiring early infringement and invalidity contentions requires "parties to crystallize their theories of the case early in the litigation."  *Id.* at 1364.

This case has been pending since December 23, 2013.  Nintendo moved to amend its invalidity contentions on March 30, 2017, a mere four months before trial is scheduled in August 2017 and roughly three and a half months after the close of fact discovery.[61]  Rather than narrowing issues for trial, Nintendo's assertion of these additional invalidity theories has created more confusion and delay, interfering with the schedule for serving responsive expert reports, expert discovery, and the filing of dispositive motions.  iLife is currently trapped in the unfortunate position of not knowing which invalidity theories Nintendo will ultimately present at trial, despite the case having been pending for more than three years and the trial date fast

---

[61] By agreement, the end of expert discovery is "three weeks after the responsive expert reports are due."  ECF No. 140 at 1.  Responsive expert reports are due fourteen days after the Court issues this opinion.  Fact discovery was completed on December 15, 2016.  ECF No. 128 at 1.

approaching. "If the parties were not required to amend their contentions promptly after discovering new information, the contentions requirement would be virtually meaningless as a mechanism for shaping the conduct of discovery and trial preparation." *O2 Micro Int'l*, 467 F.3d at 1366.

Concerning the Freestyle Pro, Nintendo argues that there is no prejudice to iLife because the Freestyle Pro was disclosed to iLife during fact discovery and made available for inspection, and because iLife has questioned Horton about the Freestyle Pro and will have the opportunity to depose Dezmelyk about it. The Court disagrees. Without "certainty as to [Nintendo's] legal theories," iLife could only guess whether Nintendo would actually rely on the Freestyle Pro. *See O2 Micro Int'l*, 467 F.3d at 1365. Nintendo informed iLife that it intended to move to amend its contentions to include the Freestyle Pro in December 2016, but it was months after the close of fact discovery, when the Dezmelyk report was served on March 3, 2017, that Nintendo's reliance on the Freestyle Pro became clear. Far from streamlining discovery, Nintendo's late announcement of its intent to rely on the Freestyle Pro has thwarted the discovery process by asserting products after the close of fact discovery.

By arguing that iLife will suffer no prejudice with its amendment, Nintendo suggests that because iLife received notice of the Freestyle Pro in December 2016 and will have an opportunity to depose Dezmelyk prior to trial, it will be in exactly the same position had the Freestyle Pro been included in Nintendo's preliminary invalidity contentions served in August of 2014. The Court disagrees. *See Nike*, 479 F. Supp. 2d at 669 (holding that merely because a party was on notice of a potential theory of infringement does not show that the party would not be unfairly prejudiced by untimely infringement contentions). Under the Local Patent Rules, parties are entitled to each other's theories of infringement and invalidity early in the case so as

34

to focus discovery, plan for claim construction and summary judgment, and refine arguments for trial.  Furthermore, iLife has presumably made strategic decisions based on Nintendo's invalidity contentions, such as decisions to pursue certain discovery, retain certain experts, and adopt certain positions in the IPR and this case.  To permit Nintendo to assert its new invalidity theories now would encourage parties "to adopt a 'rolling' approach to infringement and invalidity contentions in the hope of hiding their true intentions until late in a case."  *Nike*, 479 F. Supp. 2d at 669.  Nintendo's proposed new invalidity theories will undoubtedly require entirely new responses and counterarguments from iLife, and asserting them so late in this litigation is highly prejudicial.

Nintendo makes substantially the same arguments concerning the CXTILT and ADXL202, namely that iLife "has long been aware of precisely what [Nintendo] is arguing with respect to Crossbow," and that "iLife has been aware that the ADXL202 is relevant prior art since before it filed the case."[62]  The Court disagrees; rather than move to amend its invalidity contentions promptly after discovering new information, Nintendo waited to provide these new invalidity theories and combinations for the first time in an expert report.  iLife's ability to formulate responses to the new theories has been severely curtailed; fact discovery has ended, and iLife had only a short time before rebuttal expert reports were due to analyze the new allegations, leading to iLife's Motion to Strike.  *Cf. Tyco*, 2009 WL 5842062, at *3 ("Whether or not Tyco would have to perform in-depth analysis or undertake a great deal of discovery to rebut Applied's assertions is irrelevant; the point is that Applied should have, and did not, disclose the combination in a timely manner.").

---

[62] Def. Resp. [ECF No. 189] at 11, 14.

### iv.  Factor 4: Availability of a Continuance to Cure Prejudice

Nintendo maintains that permitting amendment of its invalidity contentions would not require a continuance, because iLife has already deposed Horton regarding the CXTILT, and will have the opportunity to depose Dezmelyk regarding his report.  iLife responds that a continuance would not cure the prejudice caused by Nintendo's proposed amendments, namely that iLife has made decisions throughout this litigation in reliance on Nintendo's invalidity contentions, which cannot be undone.

The Court finds that this factor weighs against granting leave to amend.  A continuance would not cure the prejudice to iLife were the Court to permit Nintendo to amend its invalidity contentions.  Additional time to respond to Nintendo's new invalidity theories cannot undo the path this litigation has taken and the decisions iLife has made in response to Nintendo's initial invalidity contentions.  Furthermore, the Court is bound by Federal Rule of Civil Procedure 1, which requires the Court "to secure the just, speedy, and inexpensive determination of every action."  This case has already been pending for more than three years, with a lengthy stay for the IPR, two claim construction hearings, and delays of the rebuttal expert report deadline and dispositive motion deadline.  Additional delay, and the associated cost, will only serve to further prejudice to iLife.

### e.  Conclusion

The Court finds that Nintendo has not shown good cause to amend its invalidity contentions pursuant to Local Patent Rule 3-7.  Nintendo has not provided an adequate explanation for its delay in asserting the Freestyle Pro, the ADXL202, or the CXTILT.  While the proposed amendments could be important to Nintendo's invalidity defense, the prejudice to iLife is substantial and would not be sufficiently cured by a continuance.  Additionally, Nintendo

has not shown that it is entitled to amend its invalidity contentions pursuant to Local Patent Rule

3-6.  Accordingly, iLife's Motion to Strike is **GRANTED**, and Nintendo's Cross Motion to

Amend is **DENIED.**

### 4.  Nintendo's Motion to Strike and Exclude Undisclosed Damages Evidence

Nintendo moves to strike portions of Dr. Davenport's report concerning damages, and

portions of the report of Walter Bratic, iLife's damages expert, on the grounds that (1) Bratic and

Dr. Davenport both rely on a jury trial verdict that did not involve these parties or the '796

patent, and summaries of four third-party agreements , and (2) the jury verdict and the four third-

party agreements were not disclosed during fact discovery.  Nintendo maintains that Bratic's

damages opinion is based on undisclosed evidence in violation of Federal Rules of Civil

Procedure 26(a)(1)(A)(iii), 33, 34, and 26(e).  iLife responds that Nintendo's motion should be

denied because it has complied with the Court's scheduling order and the applicable rules of

procedure.

The Court concludes that Nintendo's first argument for excluding portions of the expert

reports of Bratic and Dr. Davenport, namely that they relied on an unrelated jury trial verdict and

third-party agreements, is in fact a challenge to the grounds of their expert opinions, and is better

suited to a *Daubert* motion.  As to Nintendo's second argument, without reaching the question of

whether iLife was untimely in disclosing the materials underlying its experts' opinions to

Nintendo, the Court declines to exclude the challenged portions of Bratic and Dr. Davenport's

expert reports under Rule 37(c)(1).  Rule 37(c) provides: "If a party fails to provide information

or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that

information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless."  In considering whether to exclude expert

testimony under Rule 37(c)(1), the Court considers four factors: (1) the importance of the excluded testimony, (2) the explanation of the party for its failure to comply with the court's order, (3) the potential prejudice that would arise from allowing the testimony, and (4) the availability of a continuance to cure such prejudice.  *Tex. A&M Res. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

Concerning the first factor, importance of the excluded testimony, expert testimony on how to calculate damages is undoubtedly important to iLife seeking relief for patent infringement.  iLife argues that excluding iLife's damages experts would have the effect of ending its case before its experts are deposed.  Nintendo does not dispute the importance of iLife's damages experts.  This first factor weighs against striking Bratic and Dr. Davenport's reports.

Concerning the second factor, iLife maintains that it acted in good faith and complied with the Court's Scheduling Order concerning expert disclosures.  Specifically, iLife maintains that it was relying in good faith on an allegedly common practice in patent cases when a party is relying on a damages expert, which is to defer disclosure of the computation of damages until the time for expert disclosures.[63]  For support, iLife points to a sample discovery form provided by judges in the Eastern District of Texas that incorporates this practice.[64]

---

[63] *E.g.*, *Robert Bosch LLC v. Snap-On, Inc.*, No. 12-11503, 2013 WL 1703328, at *4 (E.D. Mich. Apr. 19, 203).
[64] Sample Discovery Order for Patent Cases Assigned to Judge Rodney Gilstrap and Judge Roy Payne, Eastern District of Texas, ¶ 3(c) ("Without awaiting a discovery request, each party will make the following disclosures to every other party: . . . (c) provide a complete computation of any category of damages claimed by any party to the action, and produce or permit the inspection of documents or other evidentiary material on which such computation is based, including materials bearing on the nature and extent of injuries suffered, *except that the disclosure of the computation of damages may be deferred until the time for Expert Disclosures if a party will rely on a damages expert.*" (emphasis added)).

iLife maintains that it has complied with the Court's Scheduling Order concerning expert disclosures.  iLife contends that in its initial disclosures, served in June of 2014, it stated the following:

> Plaintiff is seeking a reasonable royalty, the calculation of which will be provided as part of Plaintiff's expert disclosures.  Discovery is ongoing and Defendant has not yet produced information needed to calculate a reasonable royalty, including Defendant's financials, sales, and past licenses.[65]

iLife maintains that in July of 2014, when responding to a written request from Nintendo seeking disclosures regarding damages, it stated its objection "that this interrogatory is premature and seeks expert information. Plaintiff will disclose expert opinions on damages in accordance with the Court's Scheduling Order."[66]  iLife states that it consistently responded to Nintendo's requests for damages information by asserting its intent to disclose damages information in accordance with the Court's schedule regarding expert disclosures.  Nintendo never moved to compel iLife to respond to its discovery requests for information on damages.  Other than the grounds for striking the damages expert reports it asserts in this motion, Nintendo does not dispute that iLife has complied with the Court's deadlines regarding expert disclosures.

iLife also argues that it could not have disclosed the jury verdict and third-party agreements that Bratic relies upon in his report during fact discovery because it did not obtain them until after the close of fact discovery.  iLife also asserts that Bratic's and Dr. Davenport's opinions, analysis, and research were exempt from discovery as consulting work product until they issued their expert reports as testifying experts on March 3, 2017, the deadline for opening expert reports.

---

[65] Pl. App. [ECF No. 174] at 407.
[66] *Id.* at 546–47.

The Court finds that this second factor weighs against striking the expert reports.  iLife asserts that it did not disclose damages materials before the expert disclosure deadline in good faith, acting in accordance with a common practice in patent cases that has been expressly endorsed in other district courts.  Furthermore, it made known to Nintendo its intention to defer disclosure of damages materials and its basis for doing so, with no motion from Nintendo to compel it to act differently.  While a motion to compel is not a prerequisite to the Court imposing sanctions for discovery violations, "[t]he imposition of a sanction without a prior warning is to be avoided."  *Julian v. City of Hous.*, No. 4:12-cv-2973, 2014 WL 4471385, (S.D. Tex. Sep. 14, 2010) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).  iLife further asserts that did not receive Wii sales and licensing materials from Nintendo until near the end of fact discovery, and that it did not possess the third-party agreements Bratic relies upon until after the close of fact discovery, and accordingly could not have produced them earlier.  iLife also argues that the third-party licenses at issue are publicly available.

The Court concludes that there is no indication that iLife has acted in bad faith, or withheld documents in its possession.  It has provided an explanation for its deferring disclosure of damages materials that appears reasonable, namely that it relied on precedent and practices common in patent cases.  However, while iLife has provided an explanation for its delay in disclosing the materials relied upon by Bratic and Dr. Davenport, and appears to have acted in good faith, the Court is concerned by iLife's reliance on authorities other than this Court's Local Patent Rules in deferring disclosure of its damages materials.  Local Patent Rule 2-5(a) specifies a list of categories of discovery requests that may be objected to on the ground that they are premature, but it does not include damages materials.  The Court notes, however, that courts generally "have declined to take a rigid approach to the specificity required for initial disclosure

about damages." *Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*, No. 14-cv-02864, 2016 WL 4182402, at *2 (N.D. Cal. Aug. 8, 2016).  There does not appear to be any Northern District of Texas precedent directly discussing this issue, and thus iLife's reliance on precedent from another district—and particularly, the Eastern District of Texas, which has a local rule equivalent to Local Patent Rule 2-5(a) that similarly does not include damages materials— appears to be reasonably justified.  The Court concludes that this second factor weighs against striking the expert reports.

Concerning the third factor, danger of unfair prejudice if the expert testimony is permitted, Nintendo asserts that because fact discovery is now closed, it has been prevented from obtaining third-party discovery into the facts and circumstances surrounding the third-party agreements that Bratic relies upon in his expert report.  This is potentially serious prejudice; Nintendo is entitled to disclosure of the computation of each category of damages, along with documents or other evidentiary materials underlying iLife's theory for damages.  However, any prejudice will be somewhat mitigated by Nintendo's ability to take Bratic's and Dr. Davenport's depositions, as well as the Court's stay of the responsive expert report deadline.  Nintendo has allegedly received all the damages materials, including the third-party agreements, from iLife. The Court concludes the danger of prejudice to Nintendo exists, but is not substantial.  This factor weighs slightly in favor of excluding the evidence.

As to the fourth factor, the availability of a continuance, the Court does not now believe a continuance is necessary to cure the prejudice to Nintendo.  The prejudice Nintendo complains of stems primarily from not having the time and opportunity to conduct discovery on the damages materials that Bratic and Dr. Davenport rely upon.  Nintendo will have that opportunity during expert depositions and the additional time the Court has allowed by staying the responsive

41

expert deadline.  However, if necessary, the Court could reopen fact discovery for a brief time

concerning the licenses at issue, which would likely be extremely limited.  The Court concludes,

therefore, that this factor weighs against exclusion.

Considering all of the factors together, the Court declines to exclude the expert reports of

Bratic and Dr. Davenport.  Nintendo's Motion to Strike is **DENIED.**

### 5.   Nintendo's Motion to Strike and Exclude iLife's New Infringement Theories

Nintendo moves to strike certain infringement theories asserted by Dr. Davenport, iLife's

expert, on the grounds that iLife did not disclose them in its preliminary infringement

contentions or in its responses to Nintendo's interrogatories.  Specifically, Nintendo identifies

the following allegedly new theories of infringement: (1) Wii and Wii U consoles transmit the

tolerance indicia to a display; (2) indirect infringement by Nintendo; and (3) infringement by Wii

and Wii U functionality not identified in iLife's infringement contentions.  iLife responds that

the scope of infringement contentions and expert reports differ, the disclosures made in its

infringement contentions are sufficient, and the Davenport report asserts no new products.  For

the reasons below, Nintendo's Motion to Strike iLife's New Infringement Theories is **DENIED.**

### a.   Legal Standard

The Northern District's Amended Miscellaneous Order No. 62 requires a party claiming

patent infringement to serve on all parties a disclosure of asserted claims and infringement

contentions.  *See* Local Patent Rule 3-1.  As discussed previously, the purpose of this rule is "to

require parties to crystallize their theories of the case early in the litigation so as to prevent the

shifting sands approach to claim construction."  *H-W Tech., L.C. v. Apple, Inc.*, 3:11–CV–651,

2012 WL 3650597, at *2 (N.D. Tex. Aug. 2, 2012) (quoting *O2 Micro Int'l*, 467 F.3d at 1364).

Proper infringement contentions provide notice of the accusing party's theories of infringement.

42

*Fast Memory Erase, LLC v. Spansion, Inc.*, 3-08-CV-0977, 2009 WL 4884091, at *2 (N.D. Tex. Dec. 16, 2009).

Local Patent Rule 3-1 requires that a party claiming patent infringement serve contentions which must contain (1) each claim of each patent in suit that is allegedly infringed; (2) separately for each accused claim, each accused instrumentality; (3) a chart identifying in detail where each element of each asserted claim is found within each accused instrumentality; (4) whether each element of each asserted claim is claimed to be literally present or present under the doctrine of equivalents; (5) the priority date to which each asserted claim allegedly is entitled, for any patent that claims priority to an earlier application; and (6) the party claiming patent infringement's own instrumentalities, should the party wish to preserve its right to rely on that instrumentality.

This Court has recently summarized the difference between infringement contentions and expert reports:

> The scope of infringement contentions and expert reports is not coextensive. *See Fenner Investments, Ltd. v. Hewlett–Packard Co.*, 2010 WL 786606, at *2 (E.D. Tex. Feb. 26, 2010). Infringement contentions need not disclose specific evidence; expert reports, on the other hand, must include a complete statement of the expert's opinions, the basis and reasons for those opinions, and any data or other information considered when forming the opinions. *Id.* However, expert reports may not introduce new theories of infringement not previously set forth in a party's infringement contentions. *Id.* The critical question in deciding whether to strike portions of an expert report on infringement is whether the expert has permissibly specified the application of a disclosed theory or impermissibly substituted a new theory altogether. *See Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, 2014 WL 1653131, at *1 (N.D. Cal. Apr. 24, 2014).

*Mobile Telecomms. Techs., LLC v. Blackberry Corp.*, 3:12-cv-1652-M, 2016 WL 2907735, at *1 (N.D. Tex. May 17, 2016) (Lynn, C.J.).

### b. Discussion

Nintendo argues that the Court should strike several portions of Dr. Davenport's expert

report because he allegedly introduces new theories of infringement. The Court will address

each theory Nintendo seeks to strike.

### i. Wii or Wii U is a "Communication Device" that "Transmits Said Tolerance Indicia" to a Display

Nintendo claims that the Davenport report includes a new infringement theory based on

Element 1.5 of claim 1 of the '796 patent, which states "wherein said communication device

transmits said tolerance indicia." iLife's preliminary infringement contentions on this claim are

as follows:

> Upon information and belief, the Wii systems transmit the generated information
> indicating whether the body is within environmental tolerance. For example, the
> Wii consoles transmit information about actions performed, goals reached, and
> scores attained as a result of evaluated body movements to an external
> device/remote server for online play and leaderboards using, for example, wireless
> (e.g., WiFi IEEE 802.11b/g/n) and/or wired communication devices.[67]

Nintendo maintains that iLife limited its infringement theory to "transmission *to an*

*external device/remote server* for online play and leaderboards," while Dr. Davenport in his

report asserts that element 1.5 is infringed because "[t]he Wii and Wii U consoles transmit the

tolerance indicia discussed in section [1.4] above *to the display*."[68] Nintendo argues that iLife

"now accuses all game play because it is displayed on a television or other display."[69]

The Court finds that in this instance, Dr. Davenport has "permissibly specified the

application of a disclosed theory," rather than substituted a new theory altogether. *See*

*Blackberry*, 2016 WL 2907735, at *1. Element 1.5 in iLife's infringement contentions states that

---

[67] Def. App. [ECF No. 160] at 20.
[68] Def. App. [ECF No. 160] at 167.
[69] Def. Mot. [ECF No. 159] at 7.

the Wii systems transmit information indicating whether the body is within environmental

tolerance.  This element further provides an example of transmitting information to an "external

device/remote server for online play and leaderboards."  The Court finds that in his report, Dr.

Davenport is specifying an "external device" to be a display.  He is not asserting infringement on

the basis of a new product not previously charted by iLife.  *See H-W Tech.*, 2012 WL 3650597,

at *3.  Nor does he fundamentally change elements of the theory of infringement as to this claim.

*See, e.g.*, *O2 Micro Int'l*, 467 F.3d at 1362 (affirming the exclusion of expert evidence, in part

because the theories of infringement were not sufficiently similar to those disclosed earlier; the

district court concluded that "the two theories 'express different ideas' because '[o]ne makes

the . . . comparison in units of current, and the other in units of voltage'").

Furthermore, in context, iLife's infringement contentions clearly contemplate that the

"external device" could be a display or television screen.  Elements 1.3 and 1.4 in iLife's

contentions discuss the claim elements of the '796 patent that sense and process the tolerance

indicia that is subsequently transmitted in Element 1.5.  iLife's associated contentions regarding

how the Accused Products infringe these claims describe generating tolerance indicia, and

provide examples "where data indicative of whether the evaluated body movement is within

environmental tolerance is displayed," with images of television screens and graphics displays

incorporated.

Accordingly, the Court concludes that Dr. Davenport's opinion does not impermissibly

substitute a new theory.  Nintendo's Motion to Strike this portion of Dr. Davenport's expert

report is **DENIED**.

## ii.  Indirect Infringement Theory

In Paragraph 197 of his expert report, Dr. Davenport opines that opines that Nintendo

"indirectly infringes the Asserted Claims of the '796 Patent by inducing and contributing to

infringement by those who sell, offer to sell, and use the Accused Products in the United

States."[70]  According to Dr. Davenport,

> Nintendo actively induces and contributes to the infringement of the Asserted
> Claims by such third parties through at least:
>> Importation of the Accused Products;
>> Sales and offers to sell the Accused Products;
>> Marketing, branding, and advertising for the Accused Products;
>> Instructing users how to use the Accused Products;
>> Distribution of the Accused Products;
>> Demonstrations of the Accused Products;
>> Customer support for the Accused Systems;
>> Presentations and assistance to software developers for the Wii systems;
>> Providing instruction booklets and manuals for the Accused Products.[71]

Nintendo claims that Dr. Davenport's theories about indirect infringement were not

previously disclosed in iLife's infringement contentions or responses to discovery requests.

Nintendo claims that iLife's infringement contentions only assert direct infringement, and

accordingly, Dr. Davenport's theories of indirect infringement should be stricken because they

constitute new infringement theories in violation of Local Patent Rule 3-1.  iLife asserts that it

has provided sufficient notice of its claims of indirect infringement in its Complaint.

Unlike the local patent rules for some other districts, the Local Patent Rules for the

Northern District of Texas do not explicitly require infringement contentions to describe acts of

alleged indirect infringement.  *Compare* Local Patent Rule 3-1, *and* United States District Court

for the Eastern District of Texas, Patent Rule 3-1, *with* United States District Court for the

Northern District of California, Patent Local Rule 3-1(d) ("Infringement Contentions[] shall

---

[70] Def. App. [ECF No. 160] at 160, ¶ 197.
[71] *Id.*

46

contain . . . (d) [f]or each claim which is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement.").  However, it is unsettled whether the lack of an express directive in Local Rule 3-1 excuses iLife from its failure to include *any* discussion of indirect infringement in its contentions.

In *Fenner Investments, Ltd. v. Hewlett-Packard Co.*, No. 6:08–CV–273, 2010 WL 786606, at *3 (E.D. Tex. Feb. 26, 2010), Magistrate Judge Love of the Eastern District of Texas considered whether claims for inducement included in an expert report should be struck because the plaintiff had not explicitly disclosed inducement allegations in its infringement contentions. Like Local Patent Rule 3-1, the patent rules for the Eastern District of Texas do not expressly instruct plaintiffs to disclose allegations of indirect infringement.  The court rejected the defendant's assertion that the local patent rules required explicit disclosure of inducement allegations, asking instead whether the plaintiff provided sufficient notice of its inducement claims.  *Id.* at *2–3; *cf. Fenner Investments, Ltd. v. Juniper Networks Inc.*, 236 F.R.D. 309, (E.D. Tex. 2006) (finding that plaintiff did not provide proper notice for indirect infringement by combination pursuant to § 271(f) because plaintiff's infringement contentions did not adequately give notice of the components defendant allegedly supplied for combination).

"Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement . . . . " *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004).  To assert indirect infringement, "a plaintiff must provide sufficient information to put the alleged inducer on notice as to the underlying direct infringement." *Eon Corp. IP Holdings, LLC v. T-Mobile USA, Inc.*, 6:10-cv-389, 2012 WL 12911056, at *3 (E.D. Tex. Aug. 23, 2012).  Accordingly, in evaluating whether Dr. Davenport's

47

report asserts new indirect infringement theories, the question is whether iLife has provided

notice of its indirect infringement claims—i.e., sufficient information to put Nintendo on notice

as to the underlying direct infringement iLife is alleging.

In count three of its Complaint, iLife brings claims for infringement of the '796 patent,

alleging that Nintendo directly infringes the '796 patent by "making, using, importing, offering

to sell, or selling the Accused Products and Services," and indirectly infringes the '796 patent by

inducement and contribution pursuant to §271(b) and (c), respectively. Comp. [ECF No. 1]

¶¶ 30–31.  iLife alleges that Nintendo induces indirect infringement of the '796 patent "by

controlling and directing, *inter alia*, the actions of users and by advertising and claiming benefits

that require its customers to commit acts of infringement," and contributed to end user

customers' direct infringement "by providing the Accused Products and Services which, as

evidenced by Defendant's advertisements, are specially made for use in a manner infringing the

'796 Patent and have no substantial non-infringing uses." *Id.*  iLife's infringement contentions

state that Nintendo "makes, uses, offers for sale, and/or sells" the Accused Products and

Services.[72]  The remainder of iLife's infringement contentions provide the bases for its claims of

infringement, including a claim chart that details where each element of each asserted claim is

found within the Accused Products, although iLife's infringement contentions do not specifically

reference indirect infringement, whether through inducement or contribution.

Subject to the Court's ruling on Nintendo's other challenges to Davenport's report based

on iLife's preliminary infringement contentions, discussed below, the Court concludes that

iLife's contentions have nevertheless provided an adequate basis for its claims of direct

infringement by the Accused Products.  Furthermore, iLife's allegations of indirect infringement

---

[72] Def. App. [ECF No. 160] at 10.

in the Complaint are sufficiently broad to encompass Dr. Davenport's theories of indirect infringement.[73]  Accordingly, Nintendo's Motion to Strike iLife's theory of indirect infringement is **DENIED**.

### iii.   Allegedly Newly Disclosed Games, Game Play, and Processes

Nintendo argues that Dr. Davenport discloses games, movements during game play, and Wii and Wii U processes that were not disclosed in iLife's infringement contentions.  iLife responds that Dr. Davenport's report merely provides additional evidence supporting the same theories that it disclosed in its preliminary contentions, and does not assert any new theories of infringement.

Nintendo claims that Dr. Davenport discusses two additional games that were not disclosed in iLife's contentions, and that for games which were previously disclosed, Dr. Davenport analyzes movements not previously disclosed.  Specifically, Nintendo objects to Dr. Davenport's references to Wii Sports and Wii Sports Club's games of boxing, and Wii Sports Resort's game of swordplay, on the grounds that iLife's contentions did not reference the boxing or swordplay games.

It appears that Dr. Davenport has provided additional examples of iLife's infringement theory from products identified in the infringement contentions, without altering the infringement theory.  iLife's preliminary contentions disclose its theory that "the Wii Systems process the sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic (e.g., motion patterns, speed . . . swinging a bat, tennis racket, or

---

[73] For instance, Nintendo objects to Dr. Davenport's example that Nintendo indirectly infringed the '796 patent by providing "[c]ustomer support of the Accused Systems" and "[p]resentations and assistance to software developers for the Wii systems."  However, these examples are encompassed by iLife's allegation in the Complaint that Nintendo induced infringement "by controlling and directing . . . the actions of users and by advertising and claiming benefits that require its customers to commit acts of infringement." Compl. ¶ 31.

club; rolling a ball; steering a steering wheel of a car, etc.)"[74]  "Wii [S]ystems" is defined to

include Wii and Wii U video games that incorporate body movement evaluation.  The

contentions further provide, "[i]n non-limiting examples," screenshots of game play, such as

tennis, golf, and baseball, taken from Wii Sports, Wii Sports Resorts, and Wii Sports Club,

which are games identified as being part of the accused Wii Systems.[75]  Dr. Davenport's report

applies the same theory—namely, that Wii Systems, including video games that incorporate

body movement evaluation, process certain accelerative phenomena as a function of at least one

accelerative event—but uses different examples from the games iLife identifies in its

contentions.  In other words, Dr. Davenport has permissibly specified the application of the

disclosed theory to include boxing and swordplay.  *See Blackberry*, 2016 WL 2907735.

Nintendo also complains of movements analyzed by Dr. Davenport that were not

included in iLife's contentions; for example, Dr. Davenport discusses motion data being

evaluated in a tennis game to see if it is "the pre-serve toss, the power serve, and the spin applied

to the ball after a hit," while the contentions only describe examples data being used to determine

if a tennis shot is in or out, the racquet hits or misses the ball, or whether the serve is a power

serve.  The Court concludes that by considering additional gameplay motions as a basis for

infringement, Dr. Davenport has not impermissibly substituted a new theory.  Similarly,

Nintendo claims that Dr. Davenport describes motion with additional specificity than was

disclosed in iLife's contentions; the contentions, Nintendo maintain, "merely accuse 'whether a

ball is bowled within a range of motions so as to meet criteria including direction, orientation,

and/or speed to be a strike, a gutter ball, etc.,' the Davenport Report now identifies examples of

---

[74] Def. App. [ECF No. 160] at 15.
[75] *Id.*  Dr. Davenport describes Wii Sports, Wii Sports Resorts, and Wii Sports Club as each containing sub-games, i.e. bowling, tennis, golf, boxing, and so on.  *Id.* at 127.

processing static and dynamic acceleration phenomena, accelerative event characteristics, and threshold conditions." However, Nintendo fails to point to any instance in which Dr. Davenport advocates a new theory of infringement.

For the foregoing reasons, Nintendo's Motion to Strike and Exclude iLife's New Infringement Theories is **DENIED.**

### 6.  Conclusion

For the foregoing reasons, iLife's Motion for Partial Summary Judgment is **GRANTED**; iLife's Motion to Strike Nintendo's Invalidity Theories is **GRANTED**; Nintendo's Cross Motion to Amend Its Invalidity Contentions is **DENIED**; Nintendo's Motion to Strike and Exclude the Opinions of Bratic and Davenport is **DENIED**; and Nintendo's Motion to Strike iLife's Infringement Technologies is **DENIED**.

**SO ORDERED**.

May 30, 2017.

**BARBARA M. G. LYNN**
**CHIEF JUDGE**

51