**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ILIFE TECHNOLOGIES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Civil Action No. 3:13-cv-04987** |
| | § | |
| **NINTENDO OF AMERICA INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**ILIFE'S RESPONSE ON NINTENDO'S NEW
"TRANSMITS" ARGUMENT**

Plaintiff iLife Technologies, Inc. ("iLife") files this response to Defendant Nintendo of America, Inc.'s ("Nintendo") new "transmits" argument, as follows:

## I.   INTRODUCTION

After 3.5 years of litigation, Nintendo disclosed for the first time—through an expert witness testifying on the stand at trial—new opinions and arguments that (1) the Court's claim construction requires that the communication device transmits tolerance indicia over a wired or wireless network; and (2) the accused systems cannot infringe the "transmits" limitation because they do not include online gameplay functionality. Such new arguments are improper and should not be allowed for at least the following reasons:

- Under the Supreme Court's decision in *Markman*, claim construction is an issue of law to be decided by the Court, not a jury;

- Nintendo never raised its "transmits" argument during claim construction as required by the Court's scheduling order;

- Nintendo never disclosed any expert opinion that the plain and ordinary meaning of the term "transmits" requires transmission over a wired or wireless network;

- Nintendo never disclosed any expert opinion that the accused systems do not infringe claim 1 of the '796 patent because the accused systems do not include online gameplay functionality;

- Nintendo's own internal technical documents and Rule 30(b)(6) testimony clearly stated that the accused systems are capable of online game play; and

- Nintendo never raised its new "transmits" arguments during its summary judgment briefing, in the pre-trial order, in the joint submission on the jury verdict form, or in opening statements.

Nintendo's arguments and tactics are a clear example of trial by ambush. All issues of claim construction were required to be presented in accordance with the local patent rules and the Court's scheduling order to avoid precisely the type of sneak attack Nintendo has tried to pull in this case. Nintendo's failure to timely raise such issues is highly prejudicial and unfair to iLife. Nintendo has not shown—and cannot show—good cause for its failure to timely raise those issues. Accordingly, pursuant to Rule 16(b) and Rule 37, iLife requests that the Court preclude Nintendo from making its new "transmits" arguments to the jury in closing arguments, and that the jury verdict form not include separate infringement questions (or boxes) for each game. iLife further requests that the Court issue an instruction to the jury that the claim element of "transmits said tolerance indicia" does not require transmission over a wired or wireless network.

## II.     BACKGROUND

### A.     Nintendo did not seek a construction of the term "transmits."

On December 23, 2013, iLife filed suit against Nintendo for patent infringement.[1] On September 2, 2014, Nintendo filed its initial notice identifying claim terms for which it sought

---

[1] *See* Pl.'s Original Complaint [Doc. 1].

2

construction.[2] In the notice, Nintendo raised 38 different claims terms, none of which contained the term "transmits."[3]

On September 5, 2014, this Court entered its Order requiring that the parties comply with the Northern District's local patent rules (Miscellaneous Order No. 62), as follows:[4]

| Local Rule | Description | Deadline |
|---|---|---|
| 4-1(a) | Simultaneous exchange of proposed terms and claim elements for construction | September 19, 2014 |
| 4-2 (a) | Deadline for exchange (Exchange of preliminary claim constructions and extrinsic evidence) | October 10, 2014 |
| 4-3 | Joint claim construction prehearing statement | October 17, 2014 |
| 4-4 | Deadline to complete claim construction discovery | November 17, 2014 |
| 4-5(a) | Deadline to serve and file claim construction briefs | December 1, 2014 |

On October 17, 2014, the parties convened and submitted a joint claim construction and prehearing statement.[5] In that statement, the term "transmits" was not among the 9 terms to which the parties reached an agreed upon construction, or among the 22 terms for which the parties disputed construction.[6]

On December 1, 2014, the parties submitted their opening claim construction briefs.[7] Nintendo did not raise any issue with the term "transmits" within its opening claim construction

---

[2] [Doc. 39] at 1.

[3] [Doc. 39] at 3.

[4] *See* Patent Scheduling Order [Doc. 40].

[5] [Doc. 43].

[6] [Doc. 43] Exhibit A and Exhibit B.

[7] [Docs. 49, 51].

brief.[8] Again, in its responsive claim construction brief filed on December 15, 2014, Nintendo did not raise any issue with the term transmits.[9] On January 13, 2015, the Court held a tech tutorial.[10] On January 27, 2015, the Court held a claim construction hearing that lasted for a total of three hours on the briefed terms, which did not include "transmits."[11]

On May 18, 2015, this Court granted a motion for stay pending resolution of the granted IPR petitions.[12] On July 11, 2016, the Court granted iLife's request to lift the stay because the PTAB had issued final decisions on the *inter partes* reviews.[13] After lifting the stay, the parties notified the Court of new issues affecting claim construction and the Court granted the parties' request for leave to file supplemental claim construction briefing.[14] On August 26, 2016, Nintendo filed its supplemental claim construction brief and, on September 2, 2016, Nintendo filed its responsive supplemental brief, neither of which raised any issue with the "transmits" term.[15] On September 2, 2016, Nintendo filed its responsive supplemental brief. On September 20, 2016, the court held a second claim construction hearing that did not discuss any issue with the term "transmits."[16] Then on October 6, 2016, the Court entered a second patent scheduling order.[17] On February 9, 2017, the Court issued its claim construction order.[18]

---

[8] [Doc. 49].

[9] [Doc. 56].

[10] [Doc. 68].

[11] [Doc. 73].

[12] [Doc. 91].

[13] [Doc. 106].

[14] [Doc. 111] at 1.

[15] [Doc. 115, 118].

[16] [Doc. 123].

[17] [Doc. 126].

[18] [Doc. 142].

**B.      The Court did not construe the term "transmits."**

The Court has not previously construed the term "transmits," which appears in the phrase "said communications device transmits said tolerance indicia" as used in claim 1 of the '796 patent. The phrase appears in the last limitation of claim 1 of the '796 patent below:

> 1. A system within a communications device capable of evaluating movement of a body relative to an environment, said system comprising:
>
> a sensor, associable with said body, that senses dynamic and static accelerative phenomena of said body, and
>
> a processor, associated with said sensor, that processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance
>
> wherein said processor generates tolerance indicia in response to said determination; and
>
> wherein said communication device ***transmits*** said tolerance indicia.

In its Markman Order, the court construed thirteen terms; however, no construction was offered that the communication device transmits tolerance indicia.

**C.      Nintendo's internal documents and corporate representative admitted that the accused systems are capable of online game play.**

As part of its production of technical documents in this case, Nintendo produced documents from its software development kits for the accused products, including a "Wii Overview" (PX 25) and a "Wii U Overview" (PX 63), which were preadmitted by stipulation and discussed by iLife's technical expert, Isaac Davenport, at trial. The Wii Overview (PX 25) describes the online gameplay functionality of the accused Wii system:

### 4.1.2   Nintendo Wi-Fi Connection

Nintendo Wi-Fi Connection is a wireless Internet service offered by Nintendo to allow anyone in the world to play games simply and safely using the Internet.

The service allows anyone from anywhere to enjoy games together and for distant players to gather in a single place in a game where they can communicate and play head-to-head games as long as a network environment exists.

The Wii U Overview (PX 63) includes additional details about "Peer-to-Peer" direct communications between two consoles over the internet, rather than through a server:

## 4.1. Peer-to-Peer Internet Communication

Peer-to-peer (P2P) Internet communication refers to direct communication between two Wii U consoles over the Internet, rather than through a server. NEX provides the NetZ library for P2P Internet communication. Matchmaking feature (described in 4.2. Matchmaking) must be used to find peers for P2P Internet communication using NetZ.

NetZ uses only the UDP communication protocol. A NetZ-specific protocol that uses UDP can be used to allow data to be delivered reliably, similar to TCP. NEX P2P Internet communication also supports signed transmissions.

Nintendo's Rule 30(b)(6) witness on technical topics, Steven Rabin, testified at his deposition on December 15, 2016—and by video deposition at trial—that the accused systems are capable of online gameplay:

> **Q.** And that Wi-Fi that's on the Wii and Wii U systems can be used in connection with game play over the Internet; isn't that right?
>
> **A.** Games can communicate over the Internet on the Wii system.
>
> **Q.** And on the Wii U system, as well, right?
>
> **A.** Yes.

iLife's technical expert, Isaac Davenport, testified about the functionality of the accused systems, including online gameplay capabilities, as follows:

> **Q.** Are the Wii and Wii U consoles communications devices?

**A.** Quite clearly. And in looking at this slide, we can see the – the screenshot from the original Wii. And you can access Amazon. You can access YouTube. You know, you can get on the internet. I mean, that's clearly things that communications devices do that can talk over a network.

**Q.** So I want to look at some of the Nintendo documents. The first one is Plaintiff's Exhibit 25. What is Plaintiff's Exhibit 25?

**A.** So this is an internal Nintendo document where they give an overview of the original Wii.

**Q.** So what is the Wii Overview used for?

**A.** So this is to explain to third-party developers, people outside the company, what the platform is all about, you know, what it's made of, what it can do.

**Q.** So is this a document that, for example, a third-party software developer would rely on in trying to program a game?

**A.** Right. Like we talked about before, it would be part of the SDK, part of that bible that describes in good detail, accurately for all of those people outside your company that are going to help you by writing games, what it is that they are working on.

**Q.** Does the Nintendo Wii Overview, Plaintiff's Exhibit 25, prove that the Wii was a communication device?

**A.** Yeah. I mean, I think it's pretty straightforward. They talk about how it's got WiFi and, you know, how it can connect to the net.

**Q.** So I want to talk about the Wii U. This slide references Plaintiff's Exhibit 63. And it's the Wii U Overview. What is Plaintiff's Exhibit 63?

**A.** So this is the same kind of document we talked about before but for the new hardware platform, the Wii U. And it also -- you know, it's got WiFi. You can see on the bottom the WiFi chips that are pointed out there. And that IEEE, I-E-E-E, 802.11 part on the right, that's the WiFi protocol.

**Q.** I've advanced it to another page of the Wii U Overview, Page 103, 4 point -- it's Section 4.1. What does this tell us?

**A.** This talks about another network protocol that the Wii U can use to connect one console directly to another console so they can do really fast peer-to-peer communications. So when you're playing a game, you get, you know, fast interaction between the two consoles over the internet.[19]

Dr. Davenport's testimony at trial was consistent with the opinions he offered in his opening expert report which stated:[20]

| [1.5] wherein said communication device transmits said tolerance indicia. | The Wii and Wii U consoles transmit the tolerance indicia discussed in section [1.4] above to the display (see e.g., paragraphs 113, 114, 127, 131, 135-137, 139, 140, 142, 158). For the Wii Sports Club and Mario Kart 8 games, the Wii U console transmits tolerance indicia over the internet during online play and similar functionality would have been available to Wii console games prior to the cancelation of the WiiConnect24 network. (see e.g., paragraphs 114, 115, 145-148, 194). |
|---|---|

Paragraph 115, referenced above, cites to Nintendo's technical documents discussing the online gaming functionality of the accused systems and to Mr. Rabin's Rule 30(b)(6) testimony concerning online gaming capabilities:

> 115.   The Wii and Wii U also include other "communication features," and "can communicate with an IEEE 802.11b/g standard wireless LAN," or "with a wired LAN using the optional Wii LAN adapter (Ethernet) that connects to the USB connector." Ex. 100 at 25. For example, the "Nintendo Wi-Fi Connection is a wireless Internet service offered by Nintendo to allow anyone in the world to play games simply and safely using the Internet." Ex. 100 at 25. "The service allows anyone from anywhere to enjoy games together and for distant players to gather in a single place in a game where they can communicate and play head-to-head games as long as a network environment exists." Ex. 100 at 25. The Wii and Wii U systems include Wi-Fi, which enables games to "communicate over the Internet," so that "you can play other players over the Internet." Rabin Dep. at 98:15 to 99:13.

---

[19] 08/22/17 Tr. at 42:9-43:20.

[20] [Doc. 282] (Davenport Report at 105).

**D.     Nintendo's expert did not disclose an opinion that the plain and ordinary meaning of the word "transmits" requires transmission over a wired or wireless network.**

Pursuant to the Court's scheduling order, iLife submitted the opening Expert Report of Isaac Davenport on Infringement on March 3, 2017.[21] In response, Nintendo submitted the Rebuttal Expert Report of Robert Dezmelyk on Non-infringement on May 23, 2017.[22]

Nintendo's technical expert, Robert Dezmelyk, did not disclose an opinion on the plain and ordinary meaning of the term "transmits." In his rebuttal report, Mr. Dezmelyk simply alleged that "[t]ransmission to a TV is not transmission using a network [because] network—the TV and console do not form a network."[23] Mr. Dezmelyk also referenced the Court's construction for the term "communication device."[24] However, Mr. Dezmelyk did not disclose any opinion on the plain and ordinary meaning of the term "transmits" or offer any evidence that the plain and ordinary meaning of the word transmits requires transmission over a wired or wireless network.

**E.     Nintendo's expert did not disclose an opinion that the accused systems are incapable of "transmitting" tolerance indicia over a wired or wireless network.**

Mr. Dezmelyk also did not disclose an opinion that the accused products do not infringe because they are incapable of *transmitting* tolerance indicia over a wired or wireless network. In his rebuttal report, Mr. Dezmelyk did offer opinions on whether the tolerance indicia identified by Dr. Davenport met the Court's construction of the term and whether connection to a display was a network.[25] However, at no time prior to trial has Mr. Dezmelyk disclosed an opinion of non-infringement because the accused products are incapable of *transmitting* the tolerance

---

[21] [Doc. 241] Ex. B-1.

[22] [Doc. 241] Ex. 39.

[23] [Doc. 241] (Dezmelyk Rebuttal Report at ¶109).

[24] *Id.*

[25] *Id.*, at ¶¶104, 105, and 109.

indicia over a wired or wireless network. His bald assertion of that opinion at trial was not properly disclosed in his report, and is contradicted by Nintendo's technical documents and the testimony of Nintendo's corporate representative on technical topics.

**F.** **Nintendo did not propose separate findings for each of the accused games in its pretrial verdict form.**

According to the Court's Patent Scheduling Order, the parties were required to submit proposed jury instructions by July 27, 2017.[26] The parties submitted a joint proposed jury instructions and verdict form on July 27.[27] The joint pre-trial verdict form did request separate findings for infringement on a game by game basis.[28]

**G.** **Nintendo's expert did not disclose his new opinion that the term "tolerance indicia" claims antecedence to the term "communications device."**

iLife did not have notice of the non-infringement opinion for the "transmits" element of claim 1 that Mr. Dezmelyk offered to the jury. Mr. Dezmelyk did opine in his expert rebuttal report that "[t]ransmission to a TV is not transmission using a network."[29] But he did not include in his report the non-infringement opinion he testified to the jury.

The term "said tolerance indicia" in the "transmits" element of claim 1 claims antecedence to the term "tolerance indicia" in the previous "generates" claim. However, at trial, Mr. Dezmelyk stated, for the first time, that a reason for non-infringement is because "the transmission of information [in the construction for the term "communication device"] has to be said information; that is . . . the tolerance indicia."[30] In simpler terms, Mr. Dezmelyk deviated from decades of claim construction precedent and told the jury that the term "said tolerance

---

[26] [Doc. 126] at 6.

[27] [Doc. 285] at 93.

[28] [Doc. 285] at 81-83, 85-86.

[29] [Doc. 241] (Dezmelyk Rebuttal Report at ¶ 109.)

[30] 08/28/17 Tr. at 128:18-24.

indicia" claims antecedence to the term "said communication device." His disclosed opinion of transmission to a TV is not using a network was incorrect because the term "transmits" was not construed and does not require a network transmission. He then testified to this antecedent-basis, claim-construction opinion, which was not included in his expert report. iLife had no notice of this opinion and it is highly prejudicial to allow an opposing expert to offer previously undisclosed (and erroneous) expert opinions regarding claim construction while testifying at trial.

**H.     Nintendo did not raise construction of the term "transmits" as an issue of law for the Court to decide in its pretrial order.**

According to the Court's Patent Scheduling Order, the parties were required to submit a joint pre-trial order by July 27, 2017.[31] In accordance with the Patent Scheduling Order, the parties filed a joint pre-trial order on July 27, 2017.[32] Under the list of Nintendo's claims and defenses and contested issues of fact and law, Nintendo did not identify any intent to construe the term "transmits."[33]

**I.     Nintendo did not raise transmission "over a network" in its opening arguments.**

Trial officially began on August 21, 2017. During Nintendo's opening statement, counsel for Nintendo did not utter any of the following terms: transmit, transmits, display, internet, or network.[34]

---

[31] [Doc. 126] at 6.
[32] [Doc. 282].
[33] [Doc. 282] at 2–12.
[34] 08/21/17 Tr. at 71:7–90:10.

**J.      Nintendo's expert argued for the first time on the stand—during the third day of trial—that the Court's claim construction requires transmission of tolerance indicia over a wired or wireless network and that the accused systems are not capable of such functionality.**

On August 28, 2017, Nintendo's technical expert, Robert Dezmelyk, testified—over iLife's objection[35]—that the Court's claim construction requires that the plain and ordinary meaning of the term "transmits" requires that "tolerance indicia . . . is being transmitted using a wired or wireless network":

> **Q.** And so what does this construction tell you in terms of the transmission -- of how the tolerance indicia is to be transmitted according to the claim?
>
> **A.** . . . If we just substitute in the Court's definition for tolerance indicia and communications device, then it's clearer what that final limitation requires. . . . And that shows it's very clear under the construction that the information that's -- the transmission of information has to be said information; that is, the information referred to before, which is the tolerance indicia. It can't be just some information unrelated to the tolerance indicia; it has to be the actual tolerance indicia that is being transmitted using a wired or wireless network.[36]
>
> \* \* \*
>
> **Q.** Why is connection to a television not transmission over a network?
>
> **A.** Well, because the connection to your television is just a wire. In other words, if you have a -- a composite TV or you have an HDMI, you have a cable that goes between your television and the game console. You don't have a network connection like -- you know, like a wired or wireless network like the internet that has addresses and the ability to go to multiple locations and so forth. You simply don't have a network when you plug in your TV into a -- the set-top box or whatever is sending the video signal to it.
>
> MR. MILCH: And let's pull up the '796 patent, which is Plaintiff's Exhibit 1. And if we could get Column 11, Lines 45 through 47.
>
> **Q.** (By Mr. Milch) And what is this description here?
>
> **A.** Well, under Dr. Davenport's theory of infringement where there's tolerance indicia being generated in the first place, the games that can't transmit it over the

---

[35] 08/28/17 Tr. at 119:17-126:20.

[36] 08/28/17 Tr. at 127:22-128:24.

internet cannot possibly infringe because they don't meet the communications limitation to transmit it over a network.

**Q.** Why is connection to a television not transmission over a network?

**A.** Well, because the connection to your television is just a wire. In other words, if you have a -- a composite TV or you have an HDMI, you have a cable that goes between your television and the game console. You don't have a network connection like -- you know, like a wired or wireless network like the internet that has addresses and the ability to go to multiple locations and so forth. You simply don't have a network when you plug in your TV into a -- the set-top box or whatever is sending the video signal to it.

MR. MILCH: And let's pull up the '796 patent, which is Plaintiff's Exhibit 1. And if we could get Column 11, Lines 45 through 47.

**Q.** (By Mr. Milch) And what is this description here?

**A.** This is a section from the patent describing the kind of things that would be a communications device as described by -- by the inventors of the patent.

**Q.** Okay. And is that why you're saying that a connection to a TV wouldn't be a wired or wireless network? Or is this one reason?

**A.** That's one reason. I mean, clearly the -- the inventors were considering, when they used the words, you know, "network," they were thinking about a data communications network like we use for the internet. They were not using that term to try to apply to, you know, a cable that is going to a television set.[37]

## III.   ARGUMENTS AND AUTHORITIES

### A. Nintendo's Rule 30(b)(6) testimony on the issue of online game play is binding on Nintendo as a judicial admission.

The testimony of Nintendo's corporate representative operates as a binding judicial admission regarding the functionality of the accused products, which Nintendo cannot contradict with conclusory, unsupported, and undisclosed expert testimony at trial:

"A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them." *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). Admissions during depositions which are deliberate, clear and unequivocal constitute binding judicial

---

[37] 08/28/17 Tr. at 130:6-131:7.

admissions. A judicial admission "must be deliberate, clear and unambiguous." *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010). "Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention." *Martinez*, 244 F.3d at 476. "The purpose of a judicial admission," in other words, "is that it acts as a substitute for evidence in that it does away with the need for evidence in regard to the subject matter of the judicial admission." *See State Farm Mut. Auto. Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968).

*Blue Spike, LLC v. Audible Magic Corp.*, 6:15-CV-584, 2016 WL 7636118, at *5 (E.D. Tex. June 21, 2016).

### B. Nintendo waived any argument that the term "transmits" requires transmission over a wired or wireless network by failing to raise that issue during claim construction or at any point before the third day of trial.

The local patent rules (1) are designed to force litigants to "'crystallize their theories of the case early in the litigation,'"[38] and (2) "exist to further the goal of full, timely discovery and provide all parties with adequate notice and information with which to litigate their cases, not to create supposed loopholes through which parties may practice litigation by ambush."[39] Nintendo did not seek a construction of "transmits." A party's "eleventh-hour attempt to litigate a newly minted claim construction controversy falls squarely within" the Court's power to exclude.[40]

---

[38] *H-W Tech., L.C. v. Apple, Inc.*, No. 3:11-CV-651-G, 2012 WL 3650597, at *2 (N.D. Tex. Aug. 2, 2012); *Nike, Inc. v. Adidas Am. Inc.*, 479 F. Supp. 2d 664, 667 (E.D. Tex. 2007) (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006)).

[39] *MacroSolve, Inc. v. Antenna Software, Inc.*, No. 6:11-CV-287-MHS-JDL, 2013 WL 3833079, at *1 (E.D. Tex. July 23, 2013) (denying leave to amend invalidity contentions shortly before claim construction briefing because it prejudiced plaintiff and Defendant did not show good cause) (internal quotation marks omitted); *see also Tyco Healthcare Grp.*, 2009 WL 5842062, at *1; *MASS Engineered Design, Inc. v. Ergotron, Inc.*, 250 F.R.D. 284, 287 (E.D. Tex. 2008) (Allowing . . . "untimely invalidity contentions would open the floodgates for other accused infringers to circumvent the Local Patent Rules.").

[40] *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008) ("Qualcomm here has failed to offer its proposed construction of 'networks' at or prior to trial, and we reject such arguments raised for the first time after the jury verdict.").

**C.  Nintendo should not be permitted to argue claim construction issues to the jury.**

A party cannot argue claim constructions to jury, especially when its argument is contrary the court's claim constructions and made before the jury.[41]  In general, arguing claim construction to the jury is improper:

> "[N]o party should be allowed to argue to the jury claim constructions that are contrary to the court's claim constructions or to reassert to the jury constructions that the court has already expressly or implicitly rejected." *Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, No. C 06–110–MWB, 2009 WL 88357 at *9 (N.D.Iowa January 8, 2009) (citing *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed.Cir.2004)). Because this argument is contrary to the claim construction order and was not raised prior to or even following the claim construction hearing it is waived. *See Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1356 (Fed.Cir.2007) (finding waiver of claim construction arguments not raised during the claim construction phase of trial).[42]

Here, Mr. Dezmelyk opined for the first time at trial that the term transmits should be construed contrary to its plain and ordinary meaning. Furthermore, it is highly improper for Mr. Dezmelyk to tell the jury that the Court's claim construction requires transmission over a wired or wireless network because that is not true.

**D.  Nintendo's proposed claim construction for the term "transmits" is contrary to the plain and ordinary meaning of the term and is not supported by the claims or the specification.**

Nintendo's technical expert, Robert Dezmelyk, testified that claim 1 requires tolerance indicia to be transmitted "over a wired or wireless network." In so doing, Mr. Dezmelyk engaged in claim construction and presented claim construction arguments regarding the word "transmits"

---

[41] *Tinnus Enterprises, LLC v. Telebrands Corp.*, No. 6:16-CV-00033-RWS, 2017 WL 3457104, at *3 (E.D. Tex. Aug. 11, 2017) (Striking expert report offering contrary constructions when the "jury will be provided with the Court's claim constructions and will apply those constructions in determining infringement.").

[42] *Fenner Inv., Ltd. v. Microsoft Corp.*, 632 F. Supp. 2d 627, 638 (E.D. Tex. 2009), *aff'd sub nom. Fenner Invs., Ltd. v. Microsoft Corp.*, 369 F. App'x 132 (Fed. Cir. 2010).

to the jury—which is improper because claim construction is an issue of law for the Court to decide—not an issue for the jury to decide.[43]

The parties did not request construction of the term "transmits," and the Court has not separately construed it. Therefore, in the context of claim 1, the word "transmits" is used in accordance with its plain and ordinary meaning. While transmission of tolerance indicia over a wired or wireless network certainly satisfies the claim limitation, specific transmission over a wired or wireless network is not required by the claims, and such an interpretation contradicts other claim language and the patent specification. The claim limitation may be satisfied by *any* transmission of tolerance indicia by the communications device—not just a transmission sent over a wired or wireless network. For example, transmission of tolerance indicia by an audible alarm or to a non-networked device (such as a monitor) also satisfies the transmission requirement.

The claims themselves are instructive on this point. Claims 4 and 7 are dependent claims of claim 1. Claim 4 recites that the communications device in claim 1 "transmits an alarm signal." Claim 7 recites that the communications device in claim 4 "transmits said alarm signal through one of: a wired network and a wireless network."

The only difference between claim 4 and claim 7 is the transmission of "an alarm signal" over a wired or wireless network. And the additional limitation in claim 7 of transmission ***over a wired or wireless network*** would be meaningless and superfluous if claim 4 already required transmission over a wired or wireless network based on Nintendo's interpretation of the word "transmits." Thus, the doctrine of claim differentiation confirms that the communications device need not transmit over a wired or wireless network.

---

[43] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388–89 (1996).

Passages in the specification describe how tolerance indicia is generated and transmitted by "a suitable indicating means":

> According to a related embodiment, the processor is further operable, in response to processing the sensed accelerative phenomena, to generate state indicia, which includes tolerance indicia, generated in response to determining whether the evaluated body movement is within environmental tolerance. Preferably, such tolerance indicia is compared with at least one threshold, likely associated with the accelerative event characteristic. In response to such comparison, *the processor controls a suitable indicating means to initiate an alarm event; to communicate such tolerance indicia to a monitoring controller; to generate statistics; or the like.*[44]

In an exemplary embodiment, indicating means 41 from Figure 2 is "operable to accomplish at least one of the following: initiate an alarm event; communicate such state, or tolerance, indicia to a monitoring controller; generate statistics; etc.":

> Exemplary *indicating means 41*, in response to direction from processor 47, is operable to accomplish at least one of the following: *initiate an alarm event; communicate such state, or tolerance, indicia to a monitoring controller; generate statistics; etc*. Indicating means 41 may take any number of forms, however, for use in system 11 of the present embodiment, stage 41 is an RF transmitter including RF modulator 61 enabled by processor 47. Exemplary data is presented and modulated at modulator 61, amplified at amplifier 63 and transmitted at antenna 65 (to a remote receiver unit as discussed hereinafter).[45]

In such an embodiment, indicating means 41 "may take any number of forms," and need not be just an RF transmitter. For example, in an alternative exemplary embodiment, an "identifiable alarm" is "sent" using indicating means 41 without specifying that the information is sent over a wired or wireless network:

> Exemplary sensor 71 includes a respiration module 73, which includes a body contact breath sensor 75 (for example a volumetric sensor, or a near body breath sensor), low pass filter 77 and amplifier 79 providing output signals indicative of respiration rate and vitality to processor 47. The outputs are processed and, when a dangerous respiratory condition is suggested (generates state indicia relative the environment, and determines whether the evaluated body movement (broadly

---

[44] '796 patent at 3:32-35.

[45] '796 patent at 7:1-11.

defined herein to include organic physiologic phenomena) is within environmental tolerance), *an identifiable (for example, by signal coding) alarm sent indicating means 41.*

Sensor 71 further includes an ECG module 81, which includes input electrodes 83 and 85 providing heart rate signals to filters 87 and 89. The filtered signals are amplified at amplifier 91 and band pass filtered at filter 93. The output is amplified at 95 for input to processor 47 and processed so that dangerous heart rhythms and events can be detected (generates state indicia relative the environment, and determines whether the evaluated body movement is within environmental tolerance) and *an identifiable alarm sent at alert stage 41.*[46]

In a distributed exemplary embodiment, system 11 of Figs. 1 and 2 and remote receiving unit 103 from Figs. 6 and 7 are wirelessly coupled.[47] In this embodiment, sensor 11 transmits acceleration data to the remote receiver unit 103 for processing at processor 117.[48] The '796 patent does not state that transmission of that information must be over a network. An audible alarm 123, LED bank 107, and retransmission unit 125 are connected to receive outputs from the processor 117:

> RF receiver 115 is tuned to receive alarm transmissions from sensor 11/71 and-presents the signal received for *processing at processor 117 for alarm identification and appropriate output.* Processor 117 also receives inputs from keypad 111 and power switch 119. Non-volatile memory 121 is provided for input of identification of the user and/or of the apparatus being monitored. *Audible alarm 123, LED bank 107 and retransmission unit 125* (an autodialer, imbedded digital cellular technology, RF transmitter, an Internet appliance, or the like) are connected to receive outputs from processor 117.

> *When a transmission is received,* or when battery power at the body mounted apparatus is low, *an audible alarm is sounded and the appropriate LED (indicative of the condition causing the alarm, for example a debilitating fall by a user of apparatus 11) is activated.* If not disabled by the user at key pad 111 within a short period, processor 117 activates retransmission unit 125 initiating a call for help or other remote notification.[49]

---

[46] '796 patent at 9:65-10:19.

[47] '796 patent at 7:28-30.

[48] '796 patent at 10:25-39.

[49] '796 patent at 10:40-58.

In that particular embodiment, processor 117 processes sensed acceleration data and outputs an alarm identification to at least one of an audible alarm 123, LED bank 107, and retransmission unit 125. Of those three output options, only one of them—retransmission unit 125—is configured to transmit tolerance indicia over a wired or wireless network. The other two output options are audio and visual outputs, which are activated when a "transmission" is received from processor 117.

Figure 8 then shows an example of transmitting tolerance indicia over an exemplary hybrid wired/wireless network, but such a transmission is not required to "transmit" tolerance indicia, which may be sent by audio or visual means.[50]

Finally, all terms are presumed to be used according to their plain and ordinary meaning. Transmit is a broad term which simply means to "send." Here, the '796 patent does not suggest it is using the word "transmit" differently or more narrowly than generally understood. Accordingly, the "transmit" element should be construed per its plain meaning, and not restricted to network transmission.

## IV.    CONCLUSION

iLife requests that the Court preclude Nintendo from arguing its new claim construction positions to the jury during closing, and that the jury verdict form not include separate infringement questions (or boxes) for each game. iLife further requests that the Court issue an instruction to the jury that the claim element of "transmits said tolerance indicia" does not require transmission over a wired or wireless network.

---

[50] '796 patent at 10:65-11:12.

Dated: August 30, 2017               Respectfully submitted,

*/s/ Michael C. Wilson*
Michael C. Wilson
mwilson@munckwilson.com
Texas Bar No. 21704590
S. Wallace Dunwoody
wdunwoody@munckwilson.com
Texas Bar No. 24040838
Shain Khoshbin
skhoshbin@munckwilson.com
State Bar No. 11375975
Jordan C. Strauss
jstrauss@munckwilson.com
Texas Bar No. 24088480
**MUNCK WILSON MANDALA, LLP**
12770 Coit Road, Suite 600
Dallas, Texas 75251
Telephone: (972) 628-3600
Facsimile: (972) 628-3616

**ATTORNEYS FOR PLAINTIFF
ILIFE TECHNOLOGIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all known counsel of record via CM/ECF, in accordance with the Federal Rules of Civil Procedure on August 30, 2017.

*/s/ Michael C. Wilson*
Michael C. Wilson